## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM,<br><br>     Plaintiff,<br><br>  v.<br><br>ALLIANZ GLOBAL INVESTORS US LLC, ALLIANZ GLOBAL INVESTORS U.S. HOLDINGS LLC, ALLIANZ SE, ALLIANZ ASSET MANAGEMENT GMBH, ALLIANZ OF AMERICA, INC., ALLIANZ ASSET MANAGEMENT OF AMERICA HOLDINGS INC., ALLIANZ ASSET MANAGEMENT OF AMERICA LLC, ALLIANZ ASSET MANAGEMENT OF AMERICA LP, AND PFP HOLDINGS INC.,<br><br>     Defendants. | Case No. 1:20-cv-5615<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL<br><br>**ECF CASE** |

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................. 1

II.  PARTIES ........................................................................................................... 8

    A.  Plaintiff Arkansas Teacher Retirement System ................................... 8

    B.  The Allianz Global Investors Defendants ............................................ 9

III.  JURISDICTION AND VENUE .......................................................................... 14

IV.  FACTUAL ALLEGATIONS .............................................................................. 14

    A.  Background of the Allianz Global Investors Enterprise ...................... 14

    B.  AllianzGI's Duties to ATRS and the Alpha Funds Mandate............... 18

    C.  AllianzGI's Duties to ATRS Included Ensuring That the Alpha
        Funds Were Adequately Hedged to Protect Investors Against
        Downside Risk .................................................................................... 23

    D.  AllianzGI Abandoned Needed Risk Protections Amid Widespread
        Evidence of an Impending Market Downturn ...................................... 27

    E.  AllianzGI's Imprudent Investments and Self-Interested
        Mismanagement in March 2020 Locked in the Alpha Funds'
        Losses................................................................................................. 33

V.  PRAYER FOR RELIEF ..................................................................................... 49

VI.  JURY DEMAND ............................................................................................... 49

Plaintiff, the Arkansas Teacher Retirement System ("ATRS" or the "System"), by and through its undersigned counsel, respectfully submits its Complaint against Defendants Allianz Global Investors US LLC ("AllianzGI"), the Allianz Global Investor defendants (defined fully below), Allianz of America, Inc. ("AAI") and Allianz SE ("AllianzSE") (Defendants AllianzGI, the Allianz Global Investor defendants, AAI and AllianzSE may be referred to collectively as "Defendants" or "Allianz") alleging negligence and breach of contractual and fiduciary duties arising from misconduct and gross mismanagement of three investment funds:  AllianzGI Structured Alpha U.S. Equity 250 LLC ("Alpha 250"), the AllianzGI Structured Alpha Global Equity 350 LLC ("Alpha 350"), and the AllianzGI Structured Alpha Global Equity 500 LLC ("Alpha 500," and together with Alpha 250 and Alpha 350, the "Alpha Funds" or "Funds").

## I.    INTRODUCTION

1.    This case is about a fiduciary that improperly invested client assets, employed a reckless strategy contrary to its obligations to ATRS, and abandoned the risk controls it was required to have in place.  AllianzGI, in violation of its contractual and fiduciary duties, first abandoned the Funds' stated investment mandate, and then "doubled down" on its imprudent strategy after incurring losses, at the very time conservative positions to protect against increasing market volatility were needed most.

2.    Rather than protect against the market downturn that Allianz's own chief economist had been warning about since January 2020, AllianzGI positioned the Funds' portfolios in a manner contrary to the Funds' investment mandate that all but guaranteed substantial losses once that downturn came to pass.  AllianzGI has since admitted that its positioning of the Funds' portfolios in late February and early March 2020 was done to "recoup" the losses the Funds incurred in February.  However, the portfolio's positions left the Funds dangerously exposed to even the slightest increase in market volatility or decline in equity prices—the very conditions that

Allianz economists, and many others, warned were on the immediate horizon.  AllianzGI did not simply make a bad call in the midst of a market disruption: it abandoned the Funds' investment thesis—repeatedly touted by Allianz and memorialized in contracts with ATRS—that the risk management and investment strategies employed by AllianzGI were designed to protect the Alpha Funds' investors against precisely the types of market conditions experienced from February through May of 2020.

3.  AllianzGI's extraordinarily risky and irrational gamble resulted in massive losses for ATRS, wiping out in a matter of weeks hundreds of millions of dollars of school teachers' pension savings that had been accumulated over lifetimes.

4.  The Alpha Funds were a group of investment vehicles marketed by Allianz Global Investors and managed at all times under the full investment authority of AllianzGI.  ATRS was a passive investor in the Alpha Funds, having ceded all discretion to its fiduciary, AllianzGI.  Broadly, the Alpha Funds pursued a "market-neutral" strategy that invested in equity indices to replicate the performance of a given benchmark (the "beta" component), while simultaneously pursuing an actively managed options trading strategy that aimed to capture equity insurance risk premium (the "alpha" component).  The Alpha Funds' purportedly unique "alpha component" provided investors with downside protection and possible upside in both bull and bear equity markets, and in times of both high and low volatility.

5.  Generating returns in times of rising or falling equity markets and both low and high market volatility—*i.e.*, the price movement up and down of an investment or index compared to its average, and which typically increases in times of economic or investor uncertainty—was a key part of the Funds' alpha strategy.  As Allianz Global Investors stated in the Funds' marketing materials, which are incorporated into the agreements between ATRS and AllianzGI that defined

the duties of AllianzGI as investment manager of the Funds, "The Allianz Structured Alpha strategy aims to provide consistent, uncorrelated returns regardless of the direction of equities and volatility. The strategy pursues risk-controlled returns by buying and selling put and call options on US equity and volatility indexes." The "Structured Alpha Strategy" was "to weather different market environments due to the continual optimisation of three types of building blocks" that were the core trading positions employed by the Funds. Through these positions, the Alpha Funds supposedly had an "[a]bility to perform whether equity markets are up or down, smooth or volatile." As materials provided to ATRS explained, the core tenets of the strategy included:

**Allianz (ⅱ)**
Global Investors

**Investment Philosophy**

- Long and short volatility at the same time, at all times
    - Pursue gains, but do not presume that the market will behave normally or that history will repeat itself

- Ability to perform irrespective of the market environment
    - Never make a call on the direction of equities or of volatility

- Three-pronged investment objective:
    - Profit during normal market conditions (up / down / flat)
    - Protect against a market crash
    - Navigate as wide a range of equity-market outcomes as possible

        6.      Critically, the Funds were to be protected "in the event of a market crash," including in the case of "a severe downside market move, such as the Black Monday of 1987." In fact, a "key feature of the strategy's risk management" were downside risk protections that were specifically "designed for tail risk protection, not for outperformance potential." In establishing these positions, the Funds were to buy put options in a greater quantity than sold to "protect the portfolio in the event of a market crash/closure" and which were to be "laddered for various market outcomes to the downside," ensuring protection in a wide range of negative scenarios.

7.      The Alpha Funds' investment mandate required active portfolio management and close monitoring to ensure the portfolio was properly protected against a market crash and positioned to be both short and long volatility as market conditions changed—a portfolio construction that necessarily required stringent risk management policies and protocols to ensure that the strategy worked as required by the contracts and related materials that defined Allianz's duties.  To do so consistent with the Alpha Funds' investment mandate, Allianz purportedly performed "tail-risk protection, risk reduction, and/or volatility smoothing" based on "analysis of historical movements of broad-based US indices, as well as rigorous scenario testing," and was required to stress test the portfolio under the very kinds of market conditions that occurred in February and March 2020.  Indeed, at the end of 2019, Allianz told ATRS that it was "as prepared as ever in the event of a severe market dislocation."  Referring to a "violent correction and volatility surge" that had occurred in February 2018, Allianz said that "Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move." Unfortunately for ATRS, Allianz departed from the Alpha Funds' investment mandate and disregarded the risk management protocols it was required to follow, triggering the massive losses the Funds began to incur in February 2020.

8.      The Funds experienced losses during February 2020, with Alpha 250 down 13%, Alpha 350 down 16%, and Alpha 500 down 20%, with the Funds underperforming their targeted benchmarks by nearly 5%, 7% and over 10%, respectively.  The Funds' underperformance relative to these benchmarks is highly significant because the investment mandate called for AllianzGI to use the "alpha" component of the Funds' portfolios to outperform those benchmarks irrespective of dislocations in the equities markets.  These losses incentivized AllianzGI to further breach its obligations and act in its own interests by directing the Funds into investment allocations that were

contrary to the Funds' mandate and exposed the Funds' investors to extreme risk. Specifically, in February 2020 as investor concerns over the impact of the coronavirus began reverberating through the markets, AllianzGI had positioned the Alpha Funds such that they were indisputably "short" volatility—meaning that the Funds would suffer losses if market volatility increased—and exposed the Funds to catastrophic losses in the event of a market downturn. Many investors, recognizing the risk that current economic and market conditions would cause volatility to increase, sought to *buy* protection against volatility. That demand for volatility protection caused the premiums associated with *selling* volatility protection to increase. The pricing of volatility protection reflected the overall consensus among investors that volatility would increase significantly in the short-term.

9.      The increase in the premiums associated with selling protection against volatility allowed AllianzGI to sell options to other investors at increased premiums, which AllianzGI apparently believed could help "recoup" losses suffered by the Funds in February 2020. This strategy conflicted with the Alpha Funds' stated mandate, and AllianzGI's duty to ATRS, of maintaining market neutrality.

10.     Specifically, with the Chicago Board of Exchange ("CBOE") Volatility Index ("VIX") at record highs, AllianzGI made a risky attempt to profit by selling volatility protection to investors.[1] These positions would generate positive results if volatility decreased. In other words, AllianzGI was effectively selling expensive insurance to other investors seeking to protect themselves from large market swings. This strategy—undertaken with the assets of ATRS in the Alpha Funds—was a gamble that the expected market tsunami would turn out to be a drizzle.

---

[1] The VIX is a measure of expected market volatility derived from the prices of options on the S&P 500 Index. Options and futures are available on the VIX, as well as exchange-traded notes.

Critically, when viewed in terms of AllianzGI's investment mandate to provide downside protection and employ a strategy to outperform benchmarks regardless of the direction of equity prices, AllianzGI's decision to bet against volatility exposed to Alpha Funds to significant losses in the very scenario that the Alpha Funds' should have been protected against.

11.     In March 2020, however, as Allianz economists had predicted, investor uncertainty concerning the economic impact of the coronavirus triggered substantial (but hardly unprecedented) market volatility and prompted sharp declines in equity prices—and the Alpha Funds suffered catastrophic losses resulting from the volatility protection they had sold to other investors.  While AllianzGI was obligated to have positions in place to protect against losses in the event of a market downturn, in reality, the supposed hedges that AllianzGI executed merely locked in the losses, exacerbating a problem that was already spiraling out of control.

12.     Seeing the losses mount in their portfolios' volatility-based positions during March 2020, it also appears that the desperation of AllianzGI may have led it to trade S&P 500 Index options in order to drive down the settlement price of VIX futures on March 18, 2020, in an effort to mitigate the losses the Funds were poised to incur on the settlement price of VIX futures contracts expiring that day.

13.     By the end of March, Alpha 250 was down over 43%, underperforming the S&P by nearly 33%, Alpha 350 was down nearly 56%, underperforming the IMI by 40%, and Alpha 500 was down 75%, underperforming the IMI by nearly 60%.  The losses incurred by the Alpha Funds in this period far exceed the losses incurred by the relevant benchmarks, the equity markets in general, and the performance of funds with comparable investments strategies, demonstrating that these losses were the result of mismanagement by AllianzGI rather than general market conditions.

14.     On March 25, 2020, AllianzGI announced to investors that it was forced to liquidate two other funds in the Alpha portfolio, the Structured Alpha 1000 and Structured Alpha 1000 plus funds, because of insurmountable losses. Analysts and insurers quickly began to downgrade AllianzGI's Alpha Funds as a result of AllianzGI's imprudence and disastrous risk management during the downturn.

15.     The liquidation of these funds, and the losses in the Funds in which ATRS invested, was presaged by the Defendants' decision to undertake an extremely risky strategy to prevent major reputational, income generation and job losses.  Effectively, Allianz knew that once the February 2020 losses had accrued the Alpha Funds "franchise," and the individual portfolio managers' jobs, were at grave risk.  The risky portfolio positioning described above was an effort to mitigate *Allianz's* risks.  Assuming that there was no way to save themselves without a massive return in March 2020, AllianzGI positioned the portfolio as described above—making a last, desperate gamble to save their once lucrative franchise—putting at further risk the funds ATRS entrusted to Allianz, which should never have been exposed to such a loss in the first place.

16.     The dire situation Allianz faced with respect to its business interests in the Alpha Funds was based on a combination of the Alpha Funds' perception in the market and the Funds' fee structures.  After failing to prevent the type of losses that the Alpha Funds' strategy was supposed to avoid, Allianz knew the entire family of funds would suffer massive redemptions, reducing the size of their asset base and Allianz's ability to generate fee income.  The nature of the fee structure for the Alpha Funds further exacerbated that problem, as Allianz knew by February 2020 that it would have also been hard-pressed to earn any income from the Funds.  Specifically, the Funds' fee structure (described further below) would have made it impossible for Allianz to earn any fees for its management of the Funds for the foreseeable future if the losses experienced

in February were not recovered by the end of March.  Faced with these realities and motivated by self interest, Defendants risked client assets to recover these short-term losses—but only excerabated the losses they had already caused the Funds to incur.

17.     In a March 31, 2020, analysis of AllianzGI's mismanagement of the Alpha Funds, ATRS's investment consultant Aon explained that "active management missteps" and a "profound breakdown in risk management" drove the Alpha Funds' "extremely disappointing" results.  Aon chastised AllianzGI for a "lack of transparency into the events that unfolded," which "perpetuated . . . lost confidence in the risk management process" and a loss of "trust in the [AllianzGI] investment team."  Moreover, AllianzGI has refused to explain to ATRS the investment decisions that led to the implosion of the Alpha Funds.

18.     As a result of AllianzGI's breaches, between January 1, 2020 and March 27, 2020, ATRS lost at least $774 million that it had invested in the Alpha Funds.  On April 6, 2020, ATRS filed notices of redemption to withdraw all of its remaining investment from the Alpha Funds on the next redemption date, April 30, 2020.  Through this action, ATRS seeks to recover the damages caused by AllianzGI's negligence and breaches of its contractual and fiduciary duties to the System.

## II.   PARTIES

### A.   Plaintiff Arkansas Teacher Retirement System

19.     Plaintiff ATRS is a pension fund trust organized under the laws of the State of Arkansas.  Plaintiff ATRS is headquartered in Little Rock, Arkansas, has its principal place of business at 1400 West Third Street, Little Rock, Arkansas 72201, and each of the members of its Board of Trustees reside in Arkansas.

### B.     The Allianz Global Investors Defendants

20.     Defendant Allianz Global Investors U.S. LLC ("AllianzGI") is a Delaware limited liability company and registered investment adviser with its principal place of business at 1633 Broadway, New York, New York.  AllianzGI is a direct, wholly-owned subsidiary of Allianz Global Investors U.S. Holdings LLC (defined below).  AllianzGI is the investment manager for the Alpha Funds.

21.     Defendant Allianz Global Investors U.S. Holdings LLC ("AllianzGI Holdings") is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York.  AllianzGI Holdings is the direct, 100% owner and sole member of AllianzGI.

22.     Defendant Allianz Asset Management of America L.P. ("AAMA LP") is a Delaware limited partnership with its principal place of business in Newport Beach, California.  AAMA LP is the direct, 100% owner and sole member of AllianzGI Holdings.

23.     Defendant Allianz Asset Management of America LLC ("AAMA LLC") is the sole general partner of AAMA LP and is a Delaware limited partnership with its principal place of business in Newport Beach, California.

24.     Defendant PFP Holdings Inc. ("PFP"), a limited partner of AAMA LP, is incorporated in Delaware and has its principal place of business in Newport Beach, Californiaa.

25.     Defendant Allianz Asset Management of America Holdings Inc. ("AAMA Holdings") is a Delaware corporation with its principal place of business in Newport Beach, California.  AAMA Holdings holds a 0.1% managing interest in AAMA LLC.

26.     Defendants AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, PFP, AAMA LLC, and AAMA Holdings are part of what Defendants branded the "Allianz Global Investors"— Allianz Group's global asset management business—and are sometimes referred to collectively herein as the "AGI Defendants."

9

27.    Defendant Allianz of America Inc. ("Allianz of America") is a Delaware corporation with its principal place of business in Novato, California that holds a 99.8% non-managing interest in AAMA LLC.  Allianz of America is a wholly-owned indirect subsidiary of Allianz SE.

28.    Defendant Allianz Asset Management GmbH ("AAM GmbH") is incorporated and headquartered in Munich, Germany and is the asset management division of Allianz SE.  AAM GmbH is the direct, 100% owner of AAMA Holdings and holds a 0.1% non-managing interest in AAMA LLC.  In 2019, Allianz SE reported €7.164 billion in operating revenue from the Allianz Asset Management business organized under AAM GmbH, substantially including revenues derived from AAM GmbH's activities and interests in managing the Alpha Funds through the operation of Allianz Global Investors, which AAM GmbH controlled at all times relevant hereto.  Given AAM GmbH's control and management of Allianz Global Investors, AAM GmbH was responsible for the sale, marketing, operation and risk management of the Alpha Funds sold to ATRS.

29.    Defendant Allianz SE is a multinational insurance and financial services holding company incorporated and headquartered in Germany that provides asset management services to 82 million clients in over 70 countries.  Allianz SE refers to itsef and its subsidiaries as the "Allianz Group."  Allianz SE holds a direct, nearly 75% interest in AMA GmbH and an indirect, 100% interest in Allianz of America.  According to the Allianz SE Statutes, or articles of incorporation, Allianz SE's "corporate purpose" is "the direction of an internal group of companies, which is active in the areas of insurance, banking, asset management, and other financial, consulting, and similar services."  Allianz SE, through its control over Allianz Global Investors, engaged in

substantial management and business activities associated with the sale, distribution, supervision and risk management of the Alpha Funds, as marketed and sold to ATRS.

30.     A chart reflecting the citizenship and corporate relationships among the Defendants is attached hereto as Appendix A.

31.     The personnel and operational overlap of the above Defendants establishes the principal-agency relationship between each entity and AllianzGI, which is also evidenced by their shared ownership, shared directors and officers, and a unilateral reporting structure.  For example, AllianzGI's sole and direct corporate parent, AllianzGI Holdings, shares numerous overlapping directors and executives, as well as the same business address and phone number with AllianzGI. Specifically, Gemesh Pushpaharan is both the COO and Managing Director of AllianzGI, and a member of the Executive Committee of AllianzGI Holdings.   Paul Koo is both the Chief Compliance Officer of AllianzGI and a director of AllianzGI Holdings.  As such, he executed AllianzGI's Forms 13G filed with the SEC on behalf of both AllianzGI and AllianzGI Holdings.

32.     Further, numerous individuals held director or managing director positions at both AllianzGI and AllianzGI Holdings: Barbara Claussen, John Carroll; David Jobson; Erin Bengtson-Olivieri, Christopher Cieri, Joseph Quirk, Steven Ricci, Frank Garofalo, Bruce Goodman, David Hood, Douglas Forsyth, Peter Bonanno, and Joseph Scull.

33.     Further establishing the chain of control among these entities, AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, AAMA Holdings, and PFP, under current and prior entity names, have had shared directors and officers, including:

- John Maney: COO and Managing Director of AAMA LP and AAMA LLC, and Managing Director of AllianzGI.
- James Funaro: Senior Vice President of AllianzGI, AAMA LP, AAMA LLC, AAMA Holdings, and AllianzGI Holdings, and SVP of Tax Matters for PFP.

- Tony Burg: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and AllianzGI Holdings.

- Kellie Davidson: Secretary of AllianzGI, AAMA LLC and AAMA LP; Assistant Secretary of AAMA Holdings, AllianzGI Holdings.

- Tucker Fitzpatrick: Senior Vice President and Secretary of AAMA Holdings; Senior Vice President and General Counsel of AAMA LP, Assistant Secretary of AllianzGI Holdings and Allianz GI.

- Michael Puntoriero: CFO of AAMA Holdings, AllianzGI Holdings; Managing Director and CFO of AllianzGI, AAMA LLC, AAMA LP and PFP.

- Vinh Nguyen: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.

- Colleen Martin: SVP and Controller of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.

- John Viggiano:  Managing Director and US General Counsel with Allianz Global Investors, and who previously served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for AAM GmbH.

34.    The positions held by these individuals in various subsidiaries within Allianz Group, including AllianzGI, are summarized in the chart below:

| | AllianzGI | AllianzGI Holdings | AAMA LP | AAMA LLC | AAMA Holdings | PFP Holdings | AAM GmbH |
|---|---|---|---|---|---|---|---|
| John Maney | X | | X | X | | | |
| James Funaro | X | X | X | X | X | X | |
| Tony Burg | X | X | X | X | X | | |
| Kellie Davidson | X | X | X | X | X | | |
| Tucker Fitzpatrick | X | X | X | | X | | |
| Michael Puntoriero | X | X | X | X | X | X | |
| Vinh Nguyen | X | | X | X | X | X | |
| Colleen Martin | X | | X | X | X | X | |
| John Viggiano | X | | | | | | X |

35.    These overlapping relationships among Defendants' employees, officers and directors are consistent with Allianz Global Investors' branding, and Allianz SE's corporate filings explain the important role the ultimate parent company—Allianz SE—plays in establishing and enforcing the risk framework and procedures that failed in the case of the Alpha Funds.  For example, Allianz SE's Board of Directors is charged with "setting business objectives and the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system," including "risk controlling processes" set by the Board that required "regular reporting to [Allianz] Group."  Board members of both Allianz SE and the Allianz Group sat on a "Group Investment Committee" responsible for "implementing the Group investment strategy, including monitoring group-wide investment activities" and "approving investment-related frameworks and guidelines[.]"  According to those filings, Allianz Group runs its "operating entities"—including the Defendant subsidiaries here that comprise its asset management division—"via an integrated management and control process," which includes Allianz Group reviewing the operating entities' "business strategies and goals."

36.    Allianz SE acknowledges that it exercises controlling power over each of the other Defendants and relies on their business activities in assessing its own solvency under applicable European insurance regulations.  Specifically, according to Allianz Group's 2019 Solvency and Financial Condition Report, Allianz SE exercises a "dominant" influence over, has 100% voting rights in and capital share with, and uses 100% of the financials for the establishment of Allianz Group's consolidated accounts and solvency calculation of each of Defendants AllianzGI, AllianzGI Holdings, AAMA LP, PFP, AAMA LLC, AAMA Holdings, and AAM GmbH— confirming the ultimate control Allianz SE exerts over the AGI Defendants.

### III.    JURISDICTION AND VENUE

37.    This Court has jurisdiction over the cause of action asserted in this Complaint pursuant to 28 U.S.C. § 1332(a)(3) (diversity of citizenship) because the dispute is between a citizen of Arkansas and citizens of different U.S. states and of Germany, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

38.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because, under the Agreement, the parties consented to submit to the jurisdiction of the United States District Court for the Southern District of New York "in the event of any dispute arising out of the terms and conditions" of the agreements governing ATRS's investments in the Alpha Funds (defined below).  In addition, actions that AllianzGI and the other Defendants undertook in managing the Alpha Funds occurred in the New York, New York headquarters of AllianzGI, in this District.

### IV.    FACTUAL ALLEGATIONS

#### A.    Background of the Allianz Global Investors Enterprise

39.    Allianz solicited investments in the Alpha Funds based on the proclaimed ability to provide attractive investment opportunities and consistent returns protected by Allianz SE's purportedly sophisticated and "rock-solid risk management."   Branded as "Allianz Global Investors"—the marketing name for the Allianz Group's global asset management business— Allianz presented itself as a single unitary enterprise, under the leadership of its corporate holding parent Defendant Allianz SE, that operated on a coordinated basis throughout the world.

40.    As explained in marketing materials on its website and presented to ATRS, Allianz Global Investors repeatedly highlighted the benefits of its relationship with Allianz SE and its reputation for superior risk management and track record.  For example, Allianz Global Investors claimed that its "ability to manage risk for investors is a direct reflection of our own business" at AllianzGI's parent company—Allianz SE—"where we practice the highest standards of enterprise

risk management." Similarly, Allianz Global Investors touted in marketing materials that it is a "globally integrated investment manager" that "has a strong parent with a track record of strategic investment for the long term."

41. Further reinforcing the notion that investors could rely on the "rock-solid risk management" and benefits of that global enterprise, Allianz Global Investors presents its investment performance and assets under management in marketing materials as the combined activities of the Defendants named herein. Allianz Global Investors defined itself as a group of entities that "coordinate their research, investment and/or trading activities" qualifying as a "firm" under the Global Investment Performance Standards ("GIPS"), a set of international standards governing the disclosure and representation of investment performance results. Doing so enabled Allianz Global Investors to advertise to investors that they would benefit from the strength and stability of over 780 investment professionals in 25 offices worldwide and management of over USD 560 billion in assets. As explained in marketing materials, Allianz Global Investors' "global investment platform brings together professionals from across asset classes and investment styles, enabling them to collaborate to generate unique insights for the benefit of clients while maintaining distinct investment processes."

42. The ability to draw from the experience, risk management expertise and asset base of the global Allianz Global Investment platform and Allianz SE was a core feature of the Alpha Funds investment proposition. In fact, Deborah Zurkow ("Zurkow"), the Global Head of Investments at Allianz Global Investors, said one of the benefits of investing in liquid alternatives (like the Alpha Funds) through Allianz was that Allianz Global Investors' broad scale and asset base provided protection during times of financial turmoil. As Zurkow explained, Allianz Global Investors has "an entrepreneurial culture that sits inside a stable parent"—a particularly

"important" feature in alternatives given "investors' concern that the smaller hedge funds or alternatives teams won't be able to maintain the kind of counter-party liquidity required if we hit a crisis."  By suggesting that Allianz Global Investors, and its ultimate parent, Allianz SE, would step in to support the Funds in the event of "counter-party" illiquidity, Defendants sought to market the Funds not only based on the skills and resources of Allianz Global Investors but more specifically based on the capital and liquidity support Defendants could collectively provide.

43.     Tracking these representations, AllianzGI's SEC filings state that AllianzGI coordinates its activities with the Allianz Global Investors affiliates, each of which is also a directly or indirectly a wholly-owned subsidiary of Allianz SE.  For example, those filings explain that AllianzGI shares employees with and provides other services to the Allianz Global Investors affiliates (including the AGI Defendants) and similarly receives services in return, including in legal and compliance, risk management, human resources, finance, information technology, trade support and sales and marketing.  In addition, AAMA LP, the direct parent company and 100% owner of AllianzGI Holdings (the direct parent of AllianzGI), provides technology, business systems, human resources, legal and finance to AllianzGI.  Similarly, AAMA LLC, the sole general partner of AAMA LP, shares a business address and phone number with AAMA LP.  Employees, directors and officers of AllianzGI, AllianzGI Holdings, AAMA LP, and AMMA LLC are subject to discipline under a common Code of Business Conduct and Code of Ethics.

44.     In fact, rather than a mere marketing name, Allianz Global Investors has its own "Global Executive Committee" and "Global Investment Management Committee" and "executive leadership team" that manages and oversee the activities of the Allianz Global Investors entities. Those executives include CEO Tobias Pross ("Pross"), Zurkow, and Global Head of Projects,

Operations and Technology Alexandra Auer, who was recently promoted from her position as COO of Defendant AAM GmbH.

45.     The actual management and oversight of the Alpha Funds, as well as the interrelationships between the related AGI Defendants here, followed the unified "global entity" Allianz portrayed to investors.  The portfolio managers responsible for the Alpha Funds—Greg Tournant ("Tournant"), Stephen G. Bond-Neslon, and Trevor L. Taylor—are Managing Directors at AllianzGI.  Tournant, in turn, reports to Zurkow, Global Head of Investments at Allianz Global Investors, who is employed by Allianz Global Investors GmbH, UK Branch, an affiliate of AllianzGI.  Zurkow is specifically identified as an "associated person" of AllianzGI under the Investment Adviser Act of 1940 in AllianzGI's Form ADV filing.  Chris Grix, Allianz Global Investors' U.S. Head of Risk, who reports to Wolfram Peters, Allianz Global Investors' Global Head of Risk, were both involved in overseeing the Alpha Funds performance in February and March 2020.  And John Viggiano, Managing Director and US General Counsel at Allianz Global Investors, who also served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for Defendant AAM GmbH, later communicated with Alpha Funds investors about their performance during this time period.

46.     Following the disastrous performance of the Alpha Funds in February and March of 2020, Allianz Global Investors announced that the CEO of AllianzGI, Douglas Eu, would be leaving the firm on June 30 after 14 years with Allianz, including as the U.S. CEO of Allianz Global Investors GmbH.  In connection with his departure, Allianz installed Malie Conway, moving her from her role as Chief Investment Officer of Global Fixed Income Strategies in London to be the head of Allianz Global Investors' U.S. distribution operations in New York.  She will

report to Pross, the global CEO of Allianz Global Investors in London.  Allianz disclosed that it will not appoint a new CEO to replace Douglas Eu.

**B.      AllianzGI's Duties to ATRS and the Alpha Funds Mandate**

47.     AllianzGI—the investment manager for the Alpha Funds—acted as a fiduciary to ATRS in managing ATRS's investments in the Alpha Funds pursuant to a series of contracts, most recently, the Sixth Amended and Restated Limited Liability Company Agreement Of AllianzGI Structured Alpha U.S. Equity 250 LLC dated December 31, 2017 (the "Alpha 250 LLC Agreement"); AllianzGI Structured Alpha U.S. Equity 250 LLC Confidential Private Placement Memorandum dated December 31, 2017 (the "Alpha 250 Private Placement Memorandum"), the AllianzGI Structured Alpha U.S. Equity 250 Subscription Agreement (the "Alpha 250 Subscription Agreement"), and several Side Letter Agreements (the "Alpha 250 Side Letters").

48.     The Alpha 250 LLC Agreement, Alpha 250 Private Placement Memorandum, the Alpha 250 Subscription Agreement, and Alpha 250 Side Letters (collectively, the "Alpha 250 Agreements") are substantively identical in all material aspects to the corollary relevant provisions found in the the agreements for the Alpha 350 and Alpha 500 Funds (collectively the "Agreements").  The Agreements include the AllianzGI Structured Alpha Global Equity 350 LLC Confidential Private Placement Memorandum dated December 31, 2017 and the AllianzGI Structured Alpha Global Equity 500 LLC Confidential Private Placement Memorandum dated December 31, 2017 (collectively with the Alpha 250 Private Placement Memorandum, the "Private Placement Memoranda").

49.     AllianzGI is the Managing Member of the Alpha Funds and is responsible for the general management of the Alpha Funds, with a focus on active management.

50.     AllianzGI purported to operate the Alpha Funds with a specific investment objective: to outperform each Alpha Fund's respective benchmark index by a certain number of

18

basis points, or one hundredth of one percent.  Specifically, Alpha 250's investment objective was to outperform the Standard and Poor's 500 Composite Stock Index (the "S&P 500") by approximately 375 basis points, or 3.75%, gross of fees and expenses.  Reducing the net return to investors by the incentive allocation and expenses for Alpha 250, AllianzGI expected to outperform the S&P 500 by approximately 2.5%.

51.     Alpha 350's investment objective was to outperform the MSCI ACWI Investable Market Index (the "IMI") by approximately 4 to 6%, gross of fees and expenses.  Reducing the net return to investors by the incentive allocation and expenses for Alpha 350, AllianzGI expected to outperform the IMI by approximately 3.5%.

52.     Alpha 500's investment objective was to outperform the IMI by approximately 7.5%, gross of fees and expenses.  Reducing the net return to investors by Alpha 500's incentive allocation and expenses, AllianzGI expected to outperform the IMI by approximately 5%.

53.     According to the Alpha Funds' marketing materials provided to ATRS, AllianzGI and Allianz Global Investors intended to achieve the investment objectives of the Alpha Funds by investing in an alpha component and a beta component of the strategy.  The beta component consisted of a futures trading program, cash investments, exchange traded funds ("ETFs"), equity swaps or securities to achieve broad exposure to the S&P or the IMI.  The beta component for Alpha 250 was primarily comprised of investments in the iShares Core S&P 500 ETF (IVV), which tracks the S&P 500 Index.  The beta component for Alpha 350 and Alpha 500 was primarily comprised of investments in short-term U.S. Treasury Bills and the iShares MSCI ACWI ETF (ACWI), which tracks the IMI.

54.     The alpha component was designed to generate "[a]bsolute return in any environment" with the "ability to benefit from high volatility."  The alpha component specifically

consisted of investments in puts and calls on equity indexes as well as options directly on the VIX using a proprietary model to construct the option spreads. The alpha component purportedly used a diversified options overlay strategy to create profit zones that, upon expiration of the options, would capture positive payoffs if the level of the underlying index was within the profit zone. The alpha component was to optimize spread positions and profit zones based on factors including targeted positive return potential, structural risk protections, collateral management, and flexibility to restructure profit zones if necessary. Through the alpha component, the Alpha Funds were purportedly structured to be "uncorrelated" with the "direction of equities and volatility," *i.e.*, market-neutral; "protect[ed] against a market crash, hedging against extreme downside market moves"; and subject to significant risk management through "daily optimisation process," monitoring equity index behavior and bid-ask spreads, scenario and stress testing, and firm-level independent oversight by Allianz Global Investors. In sum, AllianzGI's "alpha" option overlay strategy purportedly aimed to capture volatility premiums and deliver consistent absolute returns that were not dependent on the direction of equity markets, while also offering tail protection against large market declines.

55.     AllianzGI's head portfolio manager, Greg Tournant, described AllianzGI's options strategy as akin to selling insurance, where a premium is paid for the rights provided by the option and a premium is collected to provide that right. While the strategy would earn a net premium from selling both put and call options, the portfolio was stated to always hold more long put option contracts relative to the number of put options sold. By doing so, AllianzGI purportedly protected against downside exposure in a tail risk event or significant market decline, as AllianzGI would be able to exercise or sell those positions in a declining price environment.

56.     Option values are directly affected by the expected volatility of the underlying asset.  The values of both put and call options increase as the expected volatility of the underlying asset increases.  Thus, the price of the "insurance" that AllianzGI was selling to the markets through its options trading would increase as expected market volatility increased.  When expected market volatility went up, the funds would make money on its long positions in S&P 500 options and lose money on its short positions.[2]  Thus, when volatility was high, AllianzGI could potentially make more money by selling options, while the cost of the options it purchased to hedge its exposure would be higher.

57.     In executing its options overlay strategy, AllianzGI implemented three types of trades through combinations of option positions that were meant to complement each other: the range-bound spread trades, the directional spread trades, and hedges.  The range-bound spread, the type of trade that typically generated the Alpha Funds' excess returns, included combinations of options positions that would make money if the underlying asset stayed in a particular range but would lose money if the price of the underlying asset landed outside the range.  This can be thought of as similar to selling insurance against the price of the underlying asset landing outside the range.  If the market remained stable, AllianzGI could sell protection against upside or downside "tail risk"—the possibility that the market could go up or down by an extreme amount—without having to pay anything out.

─────────────────────────

[2] The "long" side of an option position is the buyer of the option who has paid for the right but not the obligation to exercise the option.  The "short" side of the option is the seller who has sold the right and who must complete the agreed upon transaction if and only if the long side chooses to exercise.  One can think of the short side as the seller of insurance against a particular event happening (e.g. the price of the underlying asset dropping), and who gets to keep the premium if the event does not happen.

58.     The directional spread strategy—which was intended to be a diversifier that provided returns when the market behaved unusually—is the opposite of the range-bound spread. A directional trade is a bet that the underlying asset will move in a particular direction. The directional spread trade would generate positive returns if asset prices moved in one direction or the other. The Alpha Funds' strategy historically used more discretion when setting directional spread trades, aiming to take advantage of mispricing in the options market.

59.     Finally, AllianzGI purportedly maintained a constant hedge against large equity market sell-offs by holding long, out-of-the-money puts which—AllianzGI claimed—would protect against any sudden market declines. Critically, these hedging positions were a "key part" of the Alpha Funds "risk management strategy" and were specifically designed to protect against downward market moves—not to generate "outperformance":

**Allianz** (ⅲ)
Global Investors

## Hedging Positions

- Buy put options – in a greater quantity than sold – to protect the portfolio in the event of a market crash/closure
  - Crash defined as a short-term equity-market decline of 15% or more
- The puts are laddered for various market outcomes to the downside
- These positions are designed for tail risk protection, not for outperformance potential, but are a key feature of the strategy's risk management

60.     In addition to trading in options on the S&P 500 and similar indices, AllianzGI also took positions on volatility using options on volatility products such as the VIX Index. If the VIX goes up (meaning investors expect more volatility), a call option on the VIX would increase in value and a put option would lose value. If the VIX goes down (meaning investors expect less volatility), a call option on the VIX would lose value and a put option would go up.

61.     This three-part approach was to be effectively market-neutral and "agnostic to implied levels of volatility." AllianzGI emphasized that it was "[p]ositioned for all market

environments" and "able to weather different market environments due to the continual optimization of [these] three types of building blocks," which aimed to provide "consistent, uncorrelated returns regardless of the direction of equities and volatility." Further to that point, Allianz Global Investors represented that the Funds had an "[a]bility to perform whether equity market are up or down, smooth or volatile." As such, AllianzGI characterized its approach as a "confident strategy with an insurance spirit," saying "[t]his focus on reliable returns [was] demonstrative of Allianz's business as a whole—as both an asset manager and an insurer." However, as noted above, and described further below, during February and March 2020—when the Funds were highly sensitive to market volatility—they were positioned contrary to the Funds' investment mandate, short volatility during a time of extreme volatility in the markets, and lacked adequate hedging to protect against market downturns.

### C.   AllianzGI's Duties to ATRS Included Ensuring That the Alpha Funds Were Adequately Hedged to Protect Investors Against Downside Risk

62.   AllianzGI described risk management as a core feature of its investment strategy. Specifically, AllianzGI claimed that the Alpha Funds' investment objective was to "protect against a market crash, hedging against extreme downside market moves." The Alpha Funds purportedly held long, out-of-the-money puts "in place at all times, exclusively for risk management purposes" to protect against severe market declines. A long, out-of-the-money put is, essentially, catastrophe insurance that protects an investment against dramatic downward price moves in the market.

63.   AllianzGI also purported to offer "tail-risk protection, risk reduction, and/or volatility smoothing" based on "rigorous scenario testing." AllianzGI also claimed that risk was continuously managed and monitored at both the portfolio level by the investment team and the firm level by an independent risk management group.

64.     At the portfolio level, AllianzGI purported to utilize real-time risk management and monitoring based on statistical equity index behavior; proprietary scenario and stress testing models; and consistent monitoring of bid-ask spreads for options to ensure execution.  Marketing materials for Alpha 250 stated, "Indeed, one of the most unique characteristics of our approach is the combination of both long- and short-volatility positions at all times.  The option portfolio seeks to capitalize on the return-generating features of selling options (short volatility) while simultaneously benefiting from the risk-management attributes associated with buying options (long volatility) and to continually optimize the balance between these two types of exposures."

65.     AllianzGI's purported risk management process was beneficial to investors because, it claimed, certain option positions were always in place as protection, which created a floor against significant market declines.

66.     In fact, Tournant spoke at length in a May 2016 interview, featured on AllianzGI's website, about the risk-mitigating features purportedly inherent in AllianzGI's investment strategies for the Alpha Funds.  When asked about the risk-management strategy for the Alpha Funds, Tournant said, "The way we construct the strategy is we have a wide range of positions.  Some positions are designed to make money if the market goes up, some will make money if the market goes down and some will make money [if the market] is in range bound.  They exist in the portfolio all the time so therefore our objective is never to guess the direction of the market, not be dependent on the direction of the market, and hopefully we have a statistical outcome that will allow us to generate profits regardless of market directions."

67.     Analogizing the Alpha Funds strategies to the functioning of an insurance company that would have to pay out only when there is a "catastrophic event," Tournant continued, "I would

also add the fact that given the positions that we buy to protect ourselves against those catastrophic shocks, those kinds of risk insurance positions, that you could label those as reinsurance."

68.     That is, even if a large market downturn were to occur, Tournant explained that the Alpha Funds had "risk insurance positions" that would "***further protect [the] portfolio*** and business."

69.     Tournant reiterated the portfolio's "market neutral" strategy in an October 2015 video presentation, telling investors that the Alpha Funds were able to generate "consistent returns over the past ten years" and performed well "regardless of market conditions," as the positions were designed to generate returns whether the market was "up, flat or down." For example, Tournant explained that prudent, active management of the portfolio enabled the Alpha Funds to "weather the recent storm" following a substantial "increase in market volatility" in October 2015 by being "able to manage actively our profit zone."

70.     At the firm level, Defendants purported to regularly evaluate portfolio and counterparty risk, business risk, operational risk, and reputational risk.   The Alpha Funds purportedly deployed an independent enterprise risk management function, which was apparently responsible for overseeing independent portfolio risk, monitoring daily trade activity, and analyzing weekly risk profiles. AllianzGI also engaged an external, independent risk management service provider to provide analysis and reporting services, with additional "VaR related risk analytics" provided by AllianzSE subsidiary IDS GmbH.

71.     Materials provided to ATRS outline the various layers of risk control protections for the Alpha Funds as follows:



72.     The involvement of the related Allianz entities and global Allianz Global Investors enterprise and their experienced and coordinated risk management apparatus was crucial to the Alpha Funds' investment proposition.  For example, in assessing a fund run by the Structured Alpha team responsible for the Alpha Funds, Morningstar analysts cited the benefits from the "broader resources at Allianz Global Investors," including the "firm's independent risk management function [which] oversees the structure alpha platform, monitoring daily trading activity."  According to Morningstar, the "team's disciplined focus on risk management—through limits on leverage, perennial crash protection through put option hedges, position diversity across expirations, and the managers' ability to adjust the risk profile during volatile markets—gives us confidence this strategy can continue to overcome such short-term setbacks" such as those can accompany unexpected volatility spikes. Critical to that risk management analysis was Morningstar's observation that the Structured Alpha team not only "performs a daily quantitative risk analysis, which includes a variety of stress tests" but "benefits from ***Allianz Global Investors' independent risk oversight with real-time positioning monitoring***."

### D.   AllianzGI Abandoned Needed Risk Protections Amid Widespread Evidence of an Impending Market Downturn

73.    The coronavirus began to be widely covered by major U.S. news outlets as early as January 8, 2020, with numerous reports of a developing virus that had caused dozens of people in central China to fall ill.

74.    On January 21, 2020, equity prices worldwide dropped due to fears that the coronavirus outbreak could slow global economic growth.  Specifically, the Dow Jones Industrial Average dropped 152.06 points, or 0.5%, to 29,196.04, its first decline in six sessions; the S&P 500 fell 8.83 points, or 0.3%, to 3,320.79; and the Nasdaq Composite lost 18.14 points, or 0.2%, to close at 9,370.81. That day, a man in Washington state was confirmed as the first case of coronavirus in the U.S.

75.    By January 30, 2020, the World Health Organization (the "WHO") declared the coronavirus to be a public health emergency, a declaration based—at that point—on approximately 7,700 confirmed and 12,000 suspected cases of the virus in China alone.

76.    On February 3, 2020, Mohamed El-Erian, chief economist for AllianzSE, appeared on CNBC to comment on the impact of the spread of coronavirus.  El-Erian said, "The coronavirus is different… it is big.  It's going to paralyze China.  It's going to cascade throughout the global economy.  And, importantly, it cannot be countered…by central bank policies.  So, I think we should pay more attention to this, and we should try and resist our inclination to buy the dip."

77.    Indeed, the VIX Index, which measures the market's expectations of volatility based on the S&P 500—and which increases in a market downturn—was at a historic high of 40 at the end of February 2020 and leading into March 2020.

78.    As volatility in the market increased, however, throughout February and March 2020, AllianzGI made a series of investments that positioned the Funds' portfolio to generate

returns if volatility *subsided*.  Specifically, as the market began to slide in February 2020, and the Alpha Funds began incurring losses, AllianzGI structured the Alpha Funds' portfolios to recoup those losses, taking aggressive positions that deviated from the investment strategy and abandoning the risk controls Allianz was required to have in place.  By the end of February 2020, AllianzGI positioned the portfolio to generate returns if the market stabilized and volatility levels declined—effectively gambling that the Alpha Funds would reap substantial returns by selling an immense amount of high-premium insurance that would never result in any claims from the investors who bought coverage.  This positioning was contrary to the requirement that the Funds always "[b]uy put options—in a greater quantity than sold—to protect in the event of a market crash/closure."

79.     Alpha 250's holdings as of February 29, 2020, reveal that Alpha 250 had a net short put position, meaning the Alpha Funds would produce returns if the markets became *less* volatile— which left Alpha 250 severely exposed to the soaring volatility that accompanied the March 2020 market decline.

80.     As of February 29, 2020, the Alpha 250 Fund had sold short equity put options worth $117 million, while purchasing (long) equity put options worth only $67 million.  By being net short, the Fund would lose money on the put options if the market fell substantially, which it did.  If the market rose, the Fund would have kept the premiums it had received from selling the puts, which would not have been exercised.  The Fund was net long on equity calls, which would increase in value if the market rose.  The total effect of the Alpha 250 Fund's net equity options position as of February 29, 2020 was that it was heavily weighted towards generating positive returns if the S&P 500 increased in value.  If the S&P 500 declined in value, these options would

generate a significant negative return.  The fund was not "market-neutral" it was betting on an increase in equity prices.

81.    The Fund's position in volatility options was similarly not "market-neutral," it was positioned to decline in value if there was an increase in volatility.  The $16 million short position in volatility calls would lose money when volatility rose, which typically happens when the market suffers a sharp decline.

**Alpha 250's Option Positions as of 2/29/2020**

| Option position | Position value | Impact of market fall |
|---|---|---|
| Long equity puts | $67 million | Gains value |
| **Short equity puts** | **-$117 million** | **Loses value** |
| Long equity calls | $18 million | Loses value |
| Short equity calls | -$5 million | Gains value |
| Long volatility puts | 0 | |
| Short volatility puts | -$2 million | Gains value |
| Long volatility calls | 0 | |
| Short volatility calls | -$16 million | Loses value |
| Net position: | -$55 million | Loses value |

**Alpha 250's Equity Options Holdings As of 2/29/2020**



**Alpha 250's Volatitliy Options Holdings As of 2/29/2020**



82.    What the above data illustrate is that, rather than having positions that would protect investors in the event of a market downturn, as AllianzGI was required to maintain, Alpha 250 was

not hedged against a normal market decline, much less a major drawdown amid continuing volatility.

83.     The Alpha 250 Fund's position in volatility options was similarly heavily weighted to a market rebound, or a decrease in volatility.  This, again, was contrary to the investment mandate that the Funds be "market-neutral" and hedged against volatility and equity market declines.  On February 29, 2020, VIX futures were priced at around 40, and those prices increase as volatility increases.  As illustrated in the chart below, as of February 29, 2020, Alpha 250 was positioned so that declines in VIX (indicating that investors were less interested in buying protection against volatility) would yield modestly positive returns, whereas any increases in VIX (investors are more interested and paying more for protection against volatility) would cause returns to plummet—demonstrating a lack of basic risk management.

**Change in Alpha 250 Portfolio's Intrinsic Value
as a Function of Change in VIX Closing Prices Based on 2/29/2020 Holdings**



84.     Moreover, it appears that, as of the end of February 2020, Alpha 250 was not even hedged against normal price changes in the S&P 500 with non-crisis-levels of volatility.  As set forth in the chart below, even assuming no changes in VIX, Alpha 250's portfolio was structured such that a downward change in the S&P 500 would cause a significant decline in the value of the

portfolio. For example, a 20% decline in the S&P 500 would cause Alpha 250 to decline by 40%, even without accounting for increased volatility.



**Change in Alpha 250 Portfolio's Intrinsic Value
as a Function of Change in S&P 500 Based on 2/29/2020 Holdings**

85.     Whereas the Alpha Funds should have had a diversified option overlay strategy with proper risk modeling, AllianzGI took large, extremely risky positions that assumed equity prices would rise and volatility would fall—a reckless bet to obtain high returns on the baseless and counter-factual premise that VIX would decline back to more normalized levels in the face of a burgeoning global pandemic.

86.     Instead, the opposite occurred.  VIX would continue to increase in March 2020 as the economic impact of the coronavirus caused a multiweek stock market decline.  As a result, AllianzGI's "put hedges" did not sufficiently appreciate.

87.     Alpha 350 and Alpha 500, managed by the same head portfolio managers and investment team as the Alpha 250, suffered extraordinary losses based on the same mismanagement, deviation from the funds' purported strategy, and lack of basic risk management that drove the disastrous performance of Alpha 250.  Indeed, Allianz Global Investors' public

marketing materials present one "Allianz Structured Alpha" strategy that it applies to its multiple Structured Alpha investment funds.

### E.   AllianzGI's Imprudent Investments and Self-Interested Mismanagement in March 2020 Locked in the Alpha Funds' Losses

88.    Not only did AllianzGI fail to properly hedge for an ongoing market downturn in late February 2020, AllianzGI again abandoned its investment mandate in March 2020 and positioned the Funds' portfolios in a manner that exacerbated the Alpha Funds' losses.

89.    AllianzGI tried to reverse the Alpha Funds' February 2020 losses by doubling down on its prior bet, and attempted to "recoup" those losses by increasing the portfolios' spreads based on the (incredibly risky) assumption that the market would not continue to decline.  AllianzGI has now admitted that in early March 2020, it embarked on this new approach, which it has referred to, ironically, as "de-risking."   In this case, "de-risking" apparently meant (a) buying back short positions in a falling market (at significant cost), (b) further shorting volatility, and (c) failing to hedge the Funds' portfolios to protect against further losses.  This "de-risking" move was a total abandonment of the investment strategy, hedging and risk management practices that AllianzGI had promised to ATRS.

90.    On March 9, 2020, amid growing fears about the spreading coronavirus, the S&P 500 declined by 7% within five minutes of the opening bell.  As AllianzSE's chief economist had warned, the markets worsened and remained highly volatile—the exact opposite of what AllianzGI had bet.

91.    On March 11, 2020, after the coronavirus spread from China to over 100 other countries, the WHO declared the outbreak a global pandemic.

92.    On March 13, 2020, ATRS's investment consultant, Aon, issued a "Flash Report," notifying ATRS that Aon had determined to place the Alpha Funds "in review." Aon noted that

"amid the extremely sharp equity market decline over the past few weeks, the [Alpha Funds] strategies have experienced a drawdown that significantly exceeds our expectations." Aon's memorandum calculated that, as of March 13, 2020, the Alpha 250's year-to-date performance was down 11%; the Alpha 350's year-to-date performance was down 15%; and the Alpha 500's year-to-date performance was down 22%.

93.     Against the backdrop of the broad market decline, the returns on AllianzGI's Alpha Funds for the first quarter of 2020 severely underperformed their benchmark indices.

94.     Specifically, and as shown in the charts below, March 2020 returns were -41.59% for Alpha 250 compared to -12.35% for the S&P 500, and -52.18% for Alpha 350 and -72.3% compared to -14.39% for the IMI.  First quarter returns were -48.53% for Alpha 250 compared to -19.60% for the S&P 500, and -60% for Alpha 350 and -77.81% for Alpha 500 compared to -22.44% for the IMI.





95.     The Alpha Funds did not only severely underperform their benchmark indexes—they performed disastrously as compared to funds with very similar strategies, demonstrating the severe impact of AllianzGI's departure from the Alpha Funds' mandate and its irresponsible and imprudent re-positioning efforts in March 2020.  For example, as reported by Bloomberg on April 8, 2020, funds with comparable options trading strategies, such as those that make up the CBOE Eurekahedge Relative Value Volatility Hedge Fund Index—an equally weighted index of 17 funds with relative value or opportunistic volatility strategies (like the Alpha Funds)—increased by 11.1% in March 2020 (from the end of February 2020), its best month since 2005.  On an overall basis, during March 2020 the funds included in that Index had a positive return of 3.5%.  Similarly, QVR Advisors, which employed a "market-neutral" volatility options strategy similar to the one the Alpha Funds purportedly followed, posted a 52.6% return in March 2020 following a 6.1% return in February.

96.     AllianzGI also failed to conduct adequate stress tests.  Adequate stress testing for dramatic market movements—which Allianz Global Investors and AllianzGI management team purported to perform for the Alpha Funds regularly—would have highlighted the risks of a severe, multi-week decline like that which occurred in March 2020.

97.     Instead, in breach of its duties of loyalty and care, AllianzGI took the massive risk of "doubling down" on its prior failed strategy in March 2020, without regard for the potential to increase ATRS' losses, because AllianzGI needed to reverse the Funds' existing losses by March 31, 2020, or it would be unable to collect performance-based management fees from ATRS and the other investors in the Alpha Funds for the foreseeable future.

98.     Pursuant to the Agreements (and as included in the Funds' Private Placement Memoranda), AllianzGI did not receive a flat management fee, but rather received a performance fee of 25% or 30% of the "Net Capital Appreciation" for each Alpha Fund during each calendar quarter in which the Alpha Fund exceeded the performance of the applicable benchmark indices. For example, if the S&P 500 increased by 10% in a calendar quarter, and the value of Alpha 250 increased by 12%, AllianzGI was entitled to 30% of the 2% overperformance.

99.     However, as a result of a "high-water mark" provision, Allianz received no fees for the management of a Fund if the Fund underperformed the applicable benchmark index.  In addition, Allianz was required to recover the amount of the underperformance through overperformance in future quarters before it could begin receiving fees again.

100.     Pursuant to the Funds' Agreements, the amount by which a Fund underperformed its benchmark index at the end of a calendar quarter was added to a "Recovery Account." AllianzGI received no management fees unless the value of the "Recovery Account" was zero.  If the Recovery Account was greater than zero, any overperformance amount at the end of a calendar quarter would be subtracted from the Recovery Account until it reached zero.  Upon reaching zero, AllianzGI would be entitled to begin receiving performance fees again on any end-of-quarter overperformance.  Therefore, a substantial underperformance, like the one experienced in February and March 2020, would cause a substantial increase in the Recovery Account amount,

which would need to be offset by massive overperformance before AllianzGI would begin to receive fees again.

101.    Allianz faced this situation at the end of February 2020, with Alpha 250 underperforming the S&P 500 by 5% and Alpha 350 and Alpha 500 underperforming the IMI by 7% and 10%, respectively. AllianzGI needed to correct this underperformance by the end of March 31, 2020 or else it would be required to recover these substantial losses before it could receive any new fees, which would be extremely difficult in a volatile and declining market environment that had exposed the flaws in Allianz Global Investors' management of the Alpha Funds.

102.    In light of the losses that the Alpha Funds had suffered by the end of February 2020, Allianz knew its management of the Alpha Funds would not be profitable for the foreseeable future—unless it could reverse the losses before March 31, 2020, the end of the calendar quarter. These losses put the entire Alpha Funds' strategy at grave risk as the management of the funds and risk management was perceived to be severely deficient.  Indeed, the Alpha Funds' family's structured strategy, with several billions of dollars invested, was extremely lucrative for Allianz, generating substantial profits annually and likely hundreds of millions in fees over its lifespan.  As noted below, investor redemptions across the Alpha Funds' family had begun and would only accelerate.

103.    Given the narrowing prospects for profitability, Allianz was willing to take the high-risk gamble it embarked upon in February 2020—which could result in catastrophic losses for Alpha Funds' investors like ATRS—because AllianzGI was in a position where management of the Alpha Funds likely would not be profitable in the foreseeable future.  Accordingly, AllianzGI took this unsuccessful gamble throughout March 2020, and continued to short volatility, without any meaningful hedges, at the same time that it was clear to the market that volatility remained

high.   Volatility continued to increase throughout March 2020 and the Alpha Funds' losses worsened.

104.    Allianz's desperation to generate gains and avoid losses across the entire family of Alpha Funds during March 2020 created the incentive to take extreme risks, and futher deviate from the mandated investment strategy, including by potentially trading options in order to drive down the settlement price of the VIX futures contract on March 18, 2020.

105.    The Structured Alpha portfolios (including both the Funds defined above and others) would benefit from such trading because they had sold a significant number of call options on the VIX that matured on March 18, 2020, with exercise prices around $25-$30.   If the VIX Futures contract expiring on March 18 settled at $75, each contract would have cost the Structured Alpha funds about 50 times the index multiplier of 100, or around $5,000 per contract.   A higher VIX futures settlement price would increase those losses substantially, whereas a lower VIX opening price on March 18 would allow the holder of the March 18 expiring call options contracts to decrease losses significantly.

106.    Between the close of March 17 and and the close on March 18, the spot VIX Index futures changed little, reflecting little overall change in investors' pricing of volatility.   Specifically, on March 17, the VIX Index closed at $75.91.   On March 18, the VIX Index closed at $76.45, an increase of just 0.7%.   In fact, in extended session trading prior to the open on March 18, the VIX Index futures traded as high as $81.95, representing an increase of 8% from the March 17, 2020 closing price  This increase reflected investors' expectations that the VIX Index would open near $81.95, further signaling an increase in volatility.

107.    However, on March 18 the VIX Index opened at $69.37, the low for the day, and at a substantial decline of 8.6% from the March 17, 2020 close, and, critically, a decline of $12.58,

or 18%, from the extended session trading occurring immediately before the open.  The opening price on March 18, which was anomalous to the pricing on the prior day, or at any time after the open on March 18, was used to calculate the settlement price of the March VIX Index futures and option contracts and thus determine the value of the options that Allianz had sold.  The drop at the opening, followed by a rebound during the trading day, is one indicator of potential manipulation of the open.

108.   On March 18, 2020, the opening auction to calculate the final settlement price for the monthly March 2020 VIX Futures and option contracts expiring that day was conducted.  In this March 18 opening auction, there was an exceedingly high volume of trading in the S&P Index options used to calculate the VIX Futures settlement price (compared to historical volume data), Also, options of very low strike prices, which have a significant influence on the calculation of the VIX, were traded in high volumes and at low prices.  The trading in the March 18, 2020 auction is consistent with an effort to lower the settlement price of the March expiring VIX Index futures. An investor who had significant exposure to positions affected by the VIX Index March futures settlement price on March 18 would have a clear motive to lower the VIX settlement price on that date—a motivation possessed by Allianz through its management of its Structured Alpha product family, including the Funds in which ATRS invested.

109.   The trading described above would have violated both the investment mandate and the Agreements governing ATRS's investments in the Alpha Funds.

110.   On March 27, 2020, AllianzGI announced that two other funds in AllianzGI's Structured Alpha portfolio (in which ATRS did not invest)—the Structured Alpha 1000 and Structured Alpha 1000 Plus, which together managed nearly $2.3 billion—would be liquidated

after sustaining significant losses. Allianz executives announced that one of those funds was down about 97% since the start of 2020.

111.    The dramatic losses that the Alpha Funds suffered throughout the market downturn were at odds with the structural risk protections that AllianzGI was required to have in place for the Alpha Funds. Moreover, adequate stress testing for dramatic market movements—which the AllianzGI management team and Allianz Global Investors were required to perform for the Alpha Funds regularly—should have highlighted the risks of a severe, multi-week decline and sudden uptick in volatility like that which occurred in February and March 2020.

112.    Indeed, the market downturn in February and March 2020 was hardly unprecedented, and resembled a pattern that has repeated numerous times in numerous contexts. The Great Depression saw an 89% decline over a period of about 34 months and the Great Recession saw the markets fall by 49% over a period of 16 months. On October 19, 1987, commonly known as "Black Monday," the Dow Jones Industrial Average declined over 22%, the largest single-day decline in history.

113.    In comparison, on March 16, 2020, the date of the biggest one-day drop of the coronavirus-related downturn, the Dow dropped just under 13%. Over the span of several weeks from mid-February through March 2020, the Dow lost about 35% of its value. Indeed, a March 31, 2020 research note by AllianzGI acknowledged, "Even though US equity markets have fallen around 25% this year, previous down-turns were worse: markets fell about 50% from peak to trough in 2001 and 2008[.]"

114.    Similarly, periods of sudden spikes in volatility are common and occur at least once a decade. VIX repeatedly peaked during the period of August 2011 to October 2018, including reaching a high of 50.3 in February 2018 compared to an average of 10.8 for the 30 prior trading

days. On February 5, 2018, a day that would come to be known as "Volmageddon," VIX jumped by a record 20 points. AllianzGI specifically drew a comparison to that "volatility surge" in its fourth-quarter 2019 commentary for the Alpha Funds, stating, "Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move" as "refinements we have implemented since then as part of our ongoing R&D process have made the option portfolio more resilient."

115.    By late February 2020, as coronavirus-related fears weighed on the markets, media outlets drew comparisons to February 2018, noting a "brutal sell-off in stocks" was causing the SPDR S&P 500 ETF Trust, which tracks the S&P 500, to head for "its biggest weekly drawdown in two years" since the "biggest-ever volatility spike in an event that came to be known as 'Volmageddon.'"

116.    And yet, despite the ample historical precedent for a market drawdown and sudden volatility surge like what occurred in February and March 2020, and contrary to its purported superior and "proprietary" risk management acumen, AllianzGI's management of the Alpha Funds' portfolios only increased the likelihood of catastrophic losses. As an investment manager charged with being prepared for market downturns and to have "reinsurance" against catastrophic shocks, AllianzGI was required to have proper hedging positions in place to protect its clients' investments in the event of a sudden downturn. AllianzGI also should have maintained proper risk management protocol and stress testing to ensure that it remained disciplined with its downside protections.

117.    In late March 2020, in an implicit admission of the failure of the Alpha Funds' recent strategy, Allianz proposed a new portfolio structure that would attempt to capitalize on an attractive volatility environment. But given AllianzGI's failure to adhere to the Fund mandate, its lack of proper risk management measures, and its disastrous attempt to salvage the portfolio, Aon

recommended that ATRS terminate its investment in the Alpha Funds and "redeem all assets currently invested in [the Alpha Funds] at the next available redemption date."

118.    Aon noted, specifically, that "active management missteps," and a "profound breakdown in risk management" drove the "extremely disappointing" results the Alpha Funds suffered.   Aon further chastised AllianzGI for a "lack of transparency into the events that unfolded," which "perpetuated . . . lost confidence in the risk management process" and a loss of "trust in the [AllianzGI] investment team."   Indeed, AllianzGI refused repeated requests for information from Aon and other investors in its Structured Alpha products, and throughout February and March 2020 failed to provide ATRS with the information required under the Side Letter Agreements about the drastic departure from the Funds' mandate.

119.    On April 6, 2020, ATRS submitted requests to withdraw its investments in full from the Alpha Funds.

120.    On April 7, 2020, Morningstar highlighted AllianzGI's negligence in a report titled "A failure in risk management," downgraded the Alpha Funds to "Negative" across all share classes, and recommended that investors avoid the Alpha Funds.   As Morningstar noted, AllianzGI's attempts to restructure the Alpha Funds "exposed a serious weakness in the strategy" and that risk management failures and imprudent restructuring efforts actually "locked in the strategy's . . . losses."

121.    By the time ATRS redeemed its investments in the Alpha Funds, ATRS lost over $774 million of its investment in the Alpha Funds due to AllianzGI's negligent mismanagement of the Alpha Funds.

## COUNT I
## CLAIM FOR NEGLIGENCE

122.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

123.    As Managing Member of the Alpha Funds, AllianzGI owed a duty of care to ATRS based on the special relationship, or "privity," arising out of the LLC Agreements, Subscription Agreements, and Side Letter Agreements between AllianzGI and ATRS regarding each of the Alpha Funds.

124.    In addition, the Private Placement Memoranda for the Alpha Funds provided that AllianzGI was "responsible for the general management of the investment portfolios of the Fund[s] under the Operating Agreement[s]."

125.    AllianzGI breached its duty to ATRS by failing to exercise reasonable care in properly protecting the Alpha Funds against a severe market downturn.

126.    Specifically, AllianzGI failed to conduct adequate stress tests to assess the ability to trade the Alpha Funds' portfolios during times of low market liquidity or disregarded the results of the tests it conducted.

127.    In addition, AllianzGI abandoned the put spread strategy that it was supposed to have in place to provide structural risk protections to the Alpha Funds in any market environment.

128.    AllianzGI also made unreasonable assumptions for changes in VIX leading up to and during the market downturn in the first quarter of 2020 in light of the contrary evidence undermining those assumptions, or disregarded the assumptions it had in fact made about VIX performance.

129.    AllianzGI further was negligent by taking actions during the downturn—including restructuring the Alpha Funds portfolio and strategies—that locked in and exacerbated the Alpha Funds' negative returns.

130.    AllianzGI's mismanagement of the Alpha Funds runs contrary to AllianzGI's duty to build "structural risk protection" into its portfolios, as Allianz GI—as Managing Member of the Alpha Funds—was obligated to do on behalf of its investors.

131.    Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

132.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

133.    Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Funds through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE

134.    As a direct and proximate result of the actions and omissions by Defendants set forth above, ATRS has sustained actual damages in an amount to be proven at trial.

## COUNT II
## CLAIM FOR BREACH OF FIDUCIARY DUTY

135.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

136.    As Managing Member and Investment Manager of the Alpha Funds, AllianzGI owed a fiduciary duty to ATRS.

137.    In the Side Letter Agreements entered into by AllianzGI and ATRS, AllianzGI confirmed and acknowledged that it owed "a fiduciary duty to [ATRS] in connection with [ATRS's] investment in the [Alpha Funds] and that such fiduciary duty will not be restricted, evaded or eliminated in any form or fashion."

138.    In addition, the LLC Agreements and Subscription Agreements appointed AllianzGI as ATRS's representative and attorney-in-fact with respect to the Alpha Funds, a designation that imposes the fiduciary duty of loyalty on the attorney-in-fact.

139.    AllianzGI had an obligation to carry out its fiduciary duties with respect to the Alpha Funds with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and with experience and familiarity with options trading, portfolio strategy and market risks would use in a similar situation.  Here, that meant AllianzGI was required, among other things, to conduct stress testing of the portfolio to anticipate potential losses in market conditions similar to those that existed in the first half of 2020, to respond prudently in response to the results of those stress tests, to have the trading sophistication and proficiency to navigate and protect Fund assets in a wide range of market conditions, including those which existed in the first half of 2020, and to prudently respond in the face of declining Fund performance.

140.    AllianzGI breached its fiduciary duty to ATRS by failing to structure adequate risk protections into the Alpha Funds' portfolios, failing to conduct or respond to portfolio stress testing, and by failing to act prudently in the face of declining Fund performance.

141.    Specifically, AllianzGI failed to hedge the Alpha Funds' holdings against a severe market downturn and failed to build structural risk protection into the Alpha Funds' portfolio.

142.    AllianzGI also failed to conduct adequate stress tests to assess the ability to trade the Alpha Funds' portfolios during times of low market liquidity or disregarded the results of the tests it conducted.

143.    In addition, AllianzGI abandoned the put spread strategy that it was supposed to have in place to provide structural risk protections to the Alpha Funds in any market environment.

144.    AllianzGI also made unreasonable assumptions for changes in VIX leading up to and during the market downturn in the first quarter of 2020 in light of the contrary evidence undermining those assumptions, or disregarded the assumptions it had in fact made about VIX performance.

145.    Moreover, AllianzGI breached its fiduciary duty to ATRS by taking defensive hedging measures that exacerbated ATRS's losses instead of prudently exiting losing positions. AllianzGI did so, for among other reasons, because AllianzGI would have been unable to obtain fees from ATRS or the other Alpha Funds investors for the foreseeable future if it had prudently exited losing positions, but may have been able to continue to receive them if it had successfully executed a high-risk strategy to reverse the decline before the end of the quarter.

146.    Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its

routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

147.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

148.    Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Funds through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

149.    As a direct and proximate result of the actions and omissions by Defendants set forth above, ATRS has sustained actual damages in an amount to be proven at trial.

<u>**COUNT III**</u>
<u>**CLAIM FOR BREACH OF CONTRACT**</u>

150.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

151.    AllianzGI held contractual obligations to ATRS under the Alpha Funds Agreements, including the Private Placement Memoranda for each Fund, which was incorporated by reference into the Side Letter Agreements entered into by AllianzGI and ATRS.  Under the Private Placement Memoranda, AllianzGI as Managing Member was obligated to set up a beta component for each Fund consisting of "a futures trading program, cash investments, exchange traded funds, equity swaps or securities to achieve exposure to" benchmark indexes.

152.    Moreover, the Funds' alpha components were supposed to "consist of investments in puts and calls on equity indexes through the use of a proprietary model to construct option

spreads." This strategy's stated objective was to "create option based profit zones that, upon expiration of the options, will capture positive payoffs if the level of the underlying index (or other instrument) ends up within the profit zone." AllianzGI was obligated to "optimize spread positions and profit zones based on (a) targeted positive return potential, (b) structural risk protections, (c) collateral management, and (d) flexibility to restructure profit zones if necessary."

153.    In addition, under the Side Letter Agreements between AllianzGI and ATRS, AllianzGI was obligated "to provide [ATRS] with prompt notice of any fundamental change in the investment strategy of the [Alpha Funds] from that as described in the [Alpha Funds'] governing documents and/or Confidential Private Placement Memorandum."

154.    Under the Agreements, AllianzGI could not take any unlawful action in connection with the management of Fund assets.

155.    AllianzGI breached these contractual obligations by failing to build proper risk protections into the Alpha Funds' portfolios and failing to promptly notify ATRS of the fundamental—and, as evidenced by the severe underperformance of the Alpha Funds as compared to benchmark indexes, material—change in its investment strategy it undertook as the market downturn began in February 2020.

156.    Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

157.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the

power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

158.    Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Funds through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

159.    As a direct and proximate result of the actions and omissions by Defendants set forth above, ATRS has sustained actual damages in an amount to be proven at trial.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.  A declaration that Defendants are liable for negligence in connection the management of the Alpha Funds, causing Plaintiff's loss;

2.  A declaration that Defendants are liable for breach of fiduciary duty to Plaintiff in the course of the management of the Alpha Funds, causing Plaintiff's loss;

3.  A declaration that Defendants are liable for breach of contract to Plaintiff in connection with the management of the Alpha Funds, causing Plaintiff's loss;

4.  A money judgment against Defendants in an amount exceeding $75,000.00, the amount to be determined at trial;

5.  An Order awarding pre- and post-judgment interest to Plaintiff;

6.  An Order awarding to Plaintiff any such equitable/injunctive or other further relief as the Court may deem just and proper.

## VI.    JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Dated:  July 20, 2020                                  Respectfully submitted,

*/s/ Hannah Ross*
**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**

Hannah Ross
Avi Josefson
James Harrod
Michael Blatchley
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*/s/ Frederic S. Fox (with consent)*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Donald R. Hall
Melinda Cambpell
Aaron Schwartz
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Co-Counsel for Plaintiff Arkansas Teacher
Retirement System*

# APPENDIX A

