# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM,<br><br>       Plaintiff,<br><br>       v.<br><br>ALLIANZ GLOBAL INVESTORS U.S. LLC, *et al.*,<br><br>       Defendants. | 20 Civ. 5615 (KPF)<br><br>ORAL ARGUMENT REQUESTED<br><br>(captions continue on following pages) |

## OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT ALLIANZ GLOBAL INVESTORS U.S. LLC'S MOTIONS TO DISMISS

Robert A. Skinner
Amy D. Roy
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199

Robert J. Giuffra, Jr.
Stephanie G. Wheeler
Ann-Elizabeth Ostrager
Hilary M. Williams
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004

*Counsel for Defendant Allianz Global Investors U.S. LLC*

February 25, 2021

RETIREMENT PROGRAM FOR
EMPLOYEES OF THE TOWN OF
FAIRFIELD, *et al.*,

      Plaintiffs,

          v.

ALLIANZ GLOBAL INVESTORS U.S. LLC,

      Defendant.

20 Civ. 5817 (KPF)

---

LEHIGH UNIVERSITY,

      Plaintiff,

          v.

ALLIANZ GLOBAL INVESTORS U.S. LLC,

      Defendant.

20 Civ. 7061 (KPF)

---

TEAMSTER MEMBERS RETIREMENT
PLAN, *et al.*,

      Plaintiffs,

          v.

ALLIANZ GLOBAL INVESTORS U.S. LLC,

      Defendant.

20 Civ. 7154 (KPF)

---

BLUE CROSS AND BLUE SHIELD
ASSOCIATION NATIONAL EMPLOYEE
BENEFITS COMMITTEE,

      Plaintiff,

          v.

ALLIANZ GLOBAL INVESTORS U.S. LLC,
*et al.*,

      Defendants.

20 Civ. 7606 (KPF)

METROPOLITAN TRANSPORTATION
AUTHORITY DEFINED BENEFIT PENSION
PLAN MASTER TRUST, *et al*.,

       Plaintiffs,

           v.

ALLIANZ GLOBAL INVESTORS U.S., LLC,

       Defendant.

20 Civ. 7842 (KPF)

---

CHICAGO AREA I.B. OF T. PENSION PLAN
& TRUST, *et al.*,

       Plaintiffs,

           v.

ALLIANZ GLOBAL INVESTORS U.S. LLC,

       Defendant.

20 Civ. 07952 (KPF)

---

THE EMPLOYES' RETIREMENT SYSTEM
OF THE CITY OF MILWAUKEE,

       Plaintiff,

           v.

ALLIANZ GLOBAL INVESTORS U.S. LLC,
*et al*.,

       Defendants.

20 Civ. 8642 (KPF)

---

CHICAGO & VICINITY LABORERS'
DISTRICT COUNCIL PENSION FUND, *et al*.,

       Plaintiffs,

           v.

ALLIANZ GLOBAL INVESTORS U.S. LLC,
*et al*.,

       Defendants.

20 Civ. 9478 (KPF)

| | |
|---|---|
| THE BOARDS OF TRUSTEES FOR THE CARPENTERS HEALTH AND SECURITY TRUST OF WESTERN WASHINGTON AND FOR THE GROUP INVESTMENT TRUST OF THE CARPENTERS INDIVIDUAL ACCOUNT PENSION TRUST OF WESTERN WASHINGTON AND CARPENTERS RETIREMENT TRUST OF WESTERN WASHINGTON,<br><br>　　　　Plaintiffs,<br><br>　　　　　　v.<br><br>ALLIANZ GLOBAL INVESTORS U.S. LLC, *et al.*,<br><br>　　　　Defendants. | 20 Civ. 9479 (KPF) |
| PAUL SCHAEFER; ROBERT O'TOOLE; MARC PARKER; BRIAN JORDAN; MARK JACOBS; AND WILLIAM R. SEEHAFER, as trustees of the United Food & Commercial Workers Unions & Employers Midwest Pension Fund, on behalf of the Plan,<br><br>　　　　Plaintiffs,<br><br>　　　　　　v.<br><br>ALLIANZ GLOBAL INVESTORS U.S. LLC, *et al.*,<br><br>　　　　Defendants. | 20 Civ. 9587 (KPF) |
| BOARD OF TRUSTEES OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL NO. 38 PENSION FUND PENSION PLAN,<br><br>　　　　Plaintiff,<br><br>　　　　　　v.<br><br>ALLIANZ GLOBAL INVESTORS U.S. LLC,<br><br>　　　　Defendant. | 20 Civ. 10028 (KPF) |

# TABLE OF CONTENTS

*Page*

**GUIDE TO OMNIBUS BRIEF AND GLOSSARY** ..................................................... ix

**PRELIMINARY STATEMENT** ............................................................................. 1

**ALLEGATIONS OF THE COMPLAINTS** ............................................................. 8

    A.    The Plaintiffs ................................................................................ 8

    B.    The Funds' Governing Documents ................................................ 9

        1.    The LLC Agreements ........................................................ 9

        2.    Subscription Agreements ................................................ 12

        3.    Side Letters .................................................................... 13

        4.    The PPMs ...................................................................... 13

    C.    The February and March 2020 Covid-19 Market Crash ................. 20

    D.    The Complaints .......................................................................... 23

        1.    "Short Volatility" Allegations ......................................... 23

        2.    Hedging Allegations ....................................................... 24

        3.    Risk Management Allegations .......................................... 25

        4.    Self-Dealing Allegations ................................................ 25

**ARGUMENT** .................................................................................................... 26

**I.**    **BECAUSE PLAINTIFFS CANNOT ASSERT CLAIMS BASED ON DUTIES OWED TO THE FUNDS THEMSELVES, PLAINTIFFS ARE LIMITED TO DIRECT CLAIMS UNDER ERISA OR THE PARTIES' CONTRACTS.** ............................................................................... 26

**II.**    **ERISA EXPRESSLY PREEMPTS ERISA PLAINTIFFS' COMMON LAW CLAIMS.** ............................................................................ 30

**III.**    **PLAINTIFFS ALLEGE EXPRESS OR IMPLIED CONTRACTUAL OBLIGATIONS THAT DO NOT EXIST OR ARE TOO SPECULATIVE TO STATE A CLAIM.** .............................................................. 32

    A.    Plaintiffs' Contract Claims Impermissibly Rely on Out-of-Context Statements That Do Not Constitute Contractual Obligations. ............. 32

    B.    Plaintiffs Fail to Allege a Breach of Contract Based on Failure to Notify of a Supposed Change in Investment Strategy. .......................... 37

C.      Plaintiffs Fail to Identify Any "Gap" in the Parties' Agreement to Support a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing...................................................................................39

IV.    **PLAINTIFFS' BREACH OF FIDUCIARY DUTY AND NEGLIGENCE CLAIMS ARE BARRED BY THE GOVERNING AGREEMENTS OR OTHERWISE FAIL AS A MATTER OF LAW.** ..........................................41

A.      Plaintiffs' Negligence Claims Are Impermissibly Duplicative of Their Contract Claims. .......................................................................41

B.      Plaintiffs Fail to Identify Any Claim for Breach of Fiduciary Duty That Is Independent of Section 2.12 of the LLC Agreements. ........................................43

1.      The Parties Expressly Agreed That Section 2.12 Replaced "Default" Fiduciary Duties Under Delaware Law....................................44

2.      Plaintiffs Assert Breach of Fiduciary Duty Claims That Are Expressly Duplicative of Section 2.12 of the LLC Agreements................46

3.      Plaintiffs Disclaimed That AllianzGI Owed Fiduciary Duties as an Investment Advisor..................................................47

4.      The Limited Power of Attorney Granted to AllianzGI Cannot Support Plaintiffs' Claims for Breach of Fiduciary Duty. .........................50

5.      Side Letters Provide No Support for an Independent Fiduciary Duty Claim..................................................................52

6.      The Safe Harbor Under Section 28(e) of the Securities Exchange Act Is Irrelevant. .........................................................52

C.      The Economic Loss Doctrine Independently Bars Plaintiffs' Tort Claims. .........54

V.     **PLAINTIFFS' FLAWED THEORY OF SELF-DEALING DOES NOT STATE A CLAIM.**...........................................................56

A.      Plaintiffs Cannot State Claims for Common Law Breach of Duty of Loyalty Because Their Claims Arise Under ERISA or Section 2.12. ...................57

B.      Plaintiffs' Conclusory Allegations of Motive Based on AllianzGI's Performance Fee Are Implausible and Fail to State a Claim.................................57

C.      Plaintiffs May Not Convert a Routine Performance-Based Fee Structure Into a "Prohibited Transaction" Under ERISA § 406(b). ......................................59

**CONCLUSION** ...................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Health Inc.* v. *Davila*,
542 U.S. 200 (2004)................................................................................................5, 31

*AHW Inv. P'ship* v. *Citigroup Inc.*,
980 F. Supp. 2d 510 (S.D.N.Y. 2013)..............................................................42, 48

*Albert* v. *Alex Brown Mgmt. Servs.*,
2005 WL 2130607 (Del. Ch. Aug. 26, 2005) .........................................................27

*Antell* v. *United Healthcare Ins. Co. of N.Y.*,
2012 WL 13042822 (S.D.N.Y. Mar. 16, 2012) ......................................................31

*Aretakis* v. *Caesars Ent.*,
2018 WL 1069450 (S.D.N.Y. Feb. 23, 2018).....................................................7, 55

*Ark. Dev. Fin. Auth.* v. *Wiley*,
2020 Ark. 395, 611 S.W.3d 493 (2020)............................................................ 37-38

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA)
Litig.*,
756 F. Supp. 2d 330 (S.D.N.Y. 2010)....................................................................30

*Barilli* v. *Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019).....................................................................21

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 554 (2007)...................................................................................... 58-59

*Berg* v. *Empire Blue Cross & Blue Shield*,
105 F. Supp. 2d 121 (E.D.N.Y. 2000) ....................................................................31

*BlackRock Allocation Target Shares: Series S. Portfolio* v. *Wells Fargo Bank,
Nat'l Ass'n*,
247 F. Supp. 3d 377 (S.D.N.Y. 2017)....................................................................54

*Blackrock Core Bond Portfolio* v. *U.S. Bank Nat'l Ass'n*,
165 F. Supp. 3d 80 (S.D.N.Y. 2016).......................................................................55

*Brasby* v. *Morris*,
2007 WL 949485 (Del. Super. Ct. Mar. 29, 2007) .................................................54

*Campbell* v. *Plant Health Intermediate, Inc.*,
2020 WL 3127809 (S.D.N.Y. June 12, 2020) ........................................................41

*Chambers* v. *Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)..................................................................................3

*Chau* v. *Hartford Life Ins. Co.*,
    167 F. Supp. 3d 564 (S.D.N.Y. 2016)..................................................................31

*City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020)..................................................................36

*Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*,
    70 N.Y.2d 382 (1987) ........................................................................................43

*Cohen* v. *Avanade, Inc.*,
    874 F. Supp. 2d 315 (S.D.N.Y. 2012)..................................................................42

*Cooper* v. *Gottlieb*,
    2000 WL 1277593 (S.D.N.Y. Sept. 8, 2000)........................................................37

*Cunningham* v. *Cornell Univ.*,
    2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017)....................................................9, 58

*de Kwiatkowski* v. *Bear, Stearns & Co.*,
    306 F.3d 1293 (2d Cir. 2002)............................................................................50

*Debussy LLC* v. *Deutsche Bank AG*,
    2006 WL 800956 (S.D.N.Y. Mar. 29, 2006) ....................................................27, 28

*Del. State Univ. Student Hous. Found.* v. *Ambling Mgmt. Co.*,
    556 F. Supp. 2d 367 (D. Del. 2008)................................................................44, 52

*In re Eaton Vance Mut. Funds Fee Litig.*,
    380 F. Supp. 2d 222, 233-34 (S.D.N.Y. 2005) ....................................................53

*In re Encore Energy Partners LP Unitholder Litig.*,
    2012 WL 3792997 (Del. Ch. Aug. 31, 2012) ......................................................40

*Feldman* v. *Cutaia*,
    951 A.2d 727 (Del. 2008) ..................................................................................27

*Ferguson* v. *Ruane Cunniff & Goldfarb Inc.*,
    2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019)....................................................8, 58

*Finom Mgmt. GmbH* v. *Celerion Holdco, LLC*,
    2019 WL 4451980 (D. Del. Sept. 17, 2019)........................................................47

*Fisk Ventures, LLC* v. *Segal*,
    2008 WL 1961156 (Del. Ch. May 7, 2008)..........................................................29

*G.L.M. Sec. & Sound, Inc.* v. *LoJack Corp.*,
2011 WL 4594825 (E.D.N.Y. Sept. 30, 2011) ........................................................42

*Gentry* v. *Kaltner*,
2020 WL 1467358 (S.D.N.Y. Mar. 25, 2020) ........................................................21

*Gottsch* v. *Eaton & Van Winkle LLP*,
343 F. Supp. 3d 372 (S.D.N.Y. 2018).....................................................................57

*Great Lakes Chem. Corp.* v. *Pharmacia Corp.*,
788 A.2d 544 (Del. Ch. 2001)................................................................................36

*Hudson's Bay Co. Luxembourg, S.A.R.L.* v. *JZ LLC*,
2011 WL 3082339 (Del. Super. Ct. July 26, 2011) ...............................................36

*Int'l Brotherhood of Elec. Workers Local No. 129 Benefit Fund* v. *Tucci*,
70 N.E.3d 918 (2017)..............................................................................................53

*Kagan* v. *HMC-New York, Inc.*,
939 N.Y.S.2d 384 (N.Y. App. Div. 1st Dep't 2012) ...................................45, 46, 47

*Kuhbier* v. *McCartney, Verrino & Rosenberry Vested Producer Plan*,
95 F. Supp. 3d 402 (S.D.N.Y. 2015).......................................................................30

*LoPresti* v. *Terwilliger*,
126 F.3d 34 (2d Cir. 1997)......................................................................................32

*Marubeni Spar One, LLC* v. *Williams Field Servs. - Gulf Coast Co.*,
2020 WL 64761 (Del. Ch. Jan. 7, 2020) ................................................................39

*Metro. W. Asset Mgmt., LLC* v. *Magnus Funding, Ltd.*,
2004 WL 1444868 (S.D.N.Y. June 25, 2004) ............................................. 6, 41-42

*MHS Cap. LLC* v. *Goggin*,
2018 WL 2149718 (Del. Ch. May 10, 2018)...............................................44, 45, 46

*MidCap Funding X Tr.* v. *Graebel Cos.*,
2020 WL 2095899 (Del. Ch. Apr. 30, 2020) ..........................................................39

*Moore Bus. Forms, Inc.* v. *Cordant Holdings Corp.*,
1995 WL 662685 (Del. Ch. Nov. 2, 1995) .............................................................37

*N.J. Carpenters Annuity Fund* v. *Meridian Diversified Fund Mgmt., LLC*,
2011 WL 1842772 (S.D.N.Y. May 11, 2011) .........................................................32

*NanoMech, Inc.* v. *Suresh*,
2013 WL 4805692 (W.D. Ark. Sept. 9, 2013).........................................................39

*Nat'l Credit Union Admin. Bd.* v. *Deutsche Bank Nat'l Tr. Co.*,
410 F. Supp. 3d 662 (S.D.N.Y. 2019)....................................................................54

*Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*,
2016 WL 796850 (S.D.N.Y. Feb. 25, 2016)..........................................................55

*Newman* v. *Fam. Mgmt. Corp.*,
530 F. App'x 21, 27 (2d Cir. 2013) .......................................................................27

*In re Optimal U.S. Litig.*,
813 F. Supp. 2d 351 (S.D.N.Y. 2011)....................................................................28

*Oxbow Carbon & Mins. Holdings, Inc.* v. *Crestview-Oxbow Acquisition, LLC*,
202 A.3d 482 (Del. 2019) .........................................................................6, 39, 40

*Pac. Life Ins. Co.* v. *Bank of N.Y. Mellon*,
2018 WL 1382105 (S.D.N.Y. Mar. 16, 2018) ...............................................55, 56

*Palatkevich* v. *Choupak*,
152 F. Supp. 3d 201 (S.D.N.Y. 2016)....................................................................38

*Pedre Co.* v. *Robins*,
901 F. Supp. 660 (S.D.N.Y. 1995) ........................................................................32

*Partner Reinsurance Co.* v. *RPM Mortg., Inc.*,
2019 WL 3802235 (S.D.N.Y. Aug. 13, 2019).......................................................33

*Reklam* v. *Bellator Sport Worldwide LLC*,
2017 WL 5172397 (D. Del. Nov. 8, 2017) ............................................................40

*Sacerdote* v. *N.Y. Univ.*,
2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ............................................ 7, 57-58

*San Diego Cnty. Emps. Ret. Ass'n* v. *Maounis*,
749 F. Supp. 2d 104 (S.D.N.Y. 2010).......................................................27, 28, 35

*Shemian* v. *Rsch. In Motion Ltd.*,
2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) .......................................................35

*Shields* v. *Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994).............................................................................8, 59

*Steinbeck* v. *Steinbeck Heritage Found.*,
400 F. App'x 572 (2d Cir. 2010) .................................................................... 51-52

*DeBlasio* v. *Merrill Lynch & Co., Inc.*,
2009 WL 2242605 (S.D.N.Y. July 27, 2009) ........................................................48

*Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*,
  845 A.2d 1031 (Del. 2004) ....................................................29

*Toussaint* v. *JJ Weiser & Co.*,
  2005 WL 356834 (S.D.N.Y. Feb. 13, 2005) ...............................32

*Trump* v. *Vance*,
  977 F.3d 198 (2d Cir. 2020) ...................................................59

*Trusa* v. *Nepo*,
  2017 WL 1379594 (Del. Ch. Apr. 13, 2017) ..............................51

*United Teamster Fund* v. *MagnaCare Admin. Servs., LLC*,
  39 F. Supp. 3d 461 (S.D.N.Y. 2014)........................................31

*Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015)........................................9

*In re WeWork Litig.*,
  2020 WL 6375438 (Del. Ch. Oct. 30, 2020) ..........................43, 44

*Zazzali* v. *Alexander Partners, LLC*,
  2013 WL 5416871 (D. Del. Sept. 25, 2013) ..............................35

*Zhu* v. *HSBC Bank USA*,
  2019 WL 6998782 (C.D. Cal. July 24, 2019) ............................48

*Zorbas* v. *U.S. Tr. Co.*,
  48 F. Supp. 3d 464 (E.D.N.Y. 2014) ........................................50

**Statutes, Rules, and Administrative Authorities**

15 U.S.C. § 78bb...........................................................52, 53, 54

15 U.S.C. § 78j....................................................................4

29 U.S.C. § 1001..................................................................4

29 U.S.C. § 1002........................................................... 10, 48-49

29 U.S.C. § 1104.........................................................10, 11, 56, 57

29 U.S.C. § 1106...........................................................56, 59, 60

29 U.S.C. § 1109.................................................................29

29 U.S.C. § 1132.................................................................29

29 U.S.C. § 1144..............................................................5, 31

6 Del. Code § 18-1101 ................................................................................11, 12, 29, 45

17 C.F.R § 230.501 .................................................................................................19

17 C.F.R § 275.205-3 ..............................................................................................19

29 C.F.R. § 2510.3-101............................................................................................10, 29

Fed. R. Civ. P. 23.1 ..................................................................................................28

Fed. R. Evid. 201 .....................................................................................................21

DOL Advisory Opinion, No. 89-31A, 1989 WL 224560 (Oct. 11, 1989)...................60

**Other Authorities**

Dan B. Dobbs, LAW OF REMEDIES § 12.4(2) (2d ed. 1993) ........................................38

Fred Imbert, *S&P 500 and Nasdaq jump to record high*s,
    CNBC (Feb. 19, 2020, 4:07 PM) ........................................................................21

Michael Bloom et al., *'Circuit breaker' triggered again to keep stocks from
    falling through floor. What you need to know,*
    CNBC (Mar. 12, 2020, 9:53 AM) .......................................................................22

Yun Li, *Dow sinks 2,000 points in worst day since 2008, S&P 500 drops more
    than 7%,*
    CNBC (Mar. 9, 2020, 5:18 PM) .........................................................................22

Yun Li, *Wall Street's fear gauge closes at highest level ever, surpassing even
    financial crisis peak,*
    CNBC (Mar. 16, 2020 6:33 PM) ........................................................................22

## GUIDE TO OMNIBUS BRIEF AND GLOSSARY

Defendant Allianz Global Investors U.S. LLC follows the conventions below throughout this Memorandum of Law in Support of AllianzGI's Motions to Dismiss ("Omnibus Brief") in each of the actions captioned above ("Related Actions").

### A.   Plaintiff Key and Citations to Complaints

Each Part of the Argument section in this Omnibus Brief includes a "Plaintiff Key" identifying the Plaintiffs to which the arguments in that Part apply.   References to particular Plaintiffs and citations to the Complaints follow the conventions below:

| Plaintiff Acronym | Plaintiffs in Action | Citation to Complaint in Omnibus Brief | Full Citation to Complaint |
|---|---|---|---|
| ATRS | Arkansas Teacher Retirement System | ATRS Compl. | Complaint in *Arkansas Teacher Retirement System* v. *Allianz Global Investors U.S. LLC, et al.*, No. 20-cv-05615 (ECF No. 1) |
| BCBS | Blue Cross and Blue Shield Association National Employee Benefits Committee | BCBS Compl. | Complaint in *Blue Cross and Blue Shield Association National Employee Benefits Committee* v. *Allianz Global Investors U.S. LLC, et al.*, No. 20-cv-07606 (ECF No. 1) |
| CLPF | Chicago & Vicinity Laborers' District Council Pension Fund<br><br>Chicago & Vicinity Laborers' District Council Health & Welfare Fund<br><br>Fund Administrator | CLPF Compl. | Complaint in *Chicago & Vicinity Laborers' District Council Pension Fund, et al.* v. *Allianz Global Investors U.S. LLC, et al.*, No. 20-cv-09478 (ECF No. 1) |
| CMERS | The Employes' [*sic*] Retirement System of the City of Milwaukee | CMERS Compl. | Complaint in *The Employes' Retirement System of the City of Milwaukee* v. *Allianz Global Investors U.S. LLC, et al.*, No. 20-cv-08642 (ECF No. 1) |

| Plaintiff Acronym | Plaintiffs in Action | Citation to Complaint in Omnibus Brief | Full Citation to Complaint |
|---|---|---|---|
| CPPT | Chicago Area I.B. of T. Pension Plan & Trust and its Trustees<br><br>Local 703 I.B. of T., Grocery and Food Employees' Pension Plan & Trust and its Trustees | CPPT FAC | First Amended Complaint in *Chicago Area I.B. of T. Pension Plan & Trust, et al.* v. *Allianz Global Investors U.S. LLC, et al.*, No. 20-cv-07952 (ECF No. 62) |
| CTWW | Board of Trustees for the Carpenters Health and Security Trust of Western Washington<br><br>Board of Trustees for the Group Investment Trust of the Carpenters Individual Account Pension Trust of Western Washington and Carpenters Retirement Trust of Western Washington | CTWW Compl. | Complaint in *The Boards of Trustees for the Carpenters Health and Security Trust of Western Washington, et al.* v. *Allianz Global Investors U.S. LLC, et al.*, No. 20-cv-09479 (ECF No. 1) |
| FFLD/NEHC[1] | Retirement Program for Employees of the Town of Fairfield; Retirement Program for Fairfield Police and Firemen's Retirement System<br><br>New England Health Care Employees Pension Fund and its Board of Trustees | FFLD/NEHC SAC | Second Amended Complaint in *Retirement Program for Employees of the Town of Fairfield, et al.* v. *Allianz Global Investors U.S. LLC*, No. 20-cv-05817 (ECF No. 46) |

---

[1]     Certain arguments apply only to New England Health Care Employees Pension Fund and its Board of Trustees ("NEHC") as the only Named Plaintiff subject to ERISA, in which case only NEHC is identified in the Plaintiff Key.

| Plaintiff Acronym | Plaintiffs in Action | Citation to Complaint in Omnibus Brief | Full Citation to Complaint |
|---|---|---|---|
| IBEW | Board of Trustees of the International Brotherhood of Electrical Workers, Local No. 38 Pension Fund Pension Plan | IBEW FAC | First Amended Complaint in *Board of Trustees of the International Brotherhood of Electrical Workers, Local No. 38 Pension Fund Pension Plan* v. *Allianz Global Investors U.S. LLC*, No. cv-10028 (ECF No. 36) |
| Lehigh | Lehigh University | Lehigh FAC | First Amended Complaint in *Lehigh University* v. *Allianz Global Investors U.S. LLC*, No. 20-cv-07061 (ECF No. 46) |
| MTA | Metropolitan Transportation Authority Defined Benefit Pension Plan Master Trust<br><br>Metropolitan Transportation Authority Other Postemployment Benefits Plan<br><br>Manhattan and Bronx Surface Transit Operating Authority (MaBSTOA) Pension Plan | MTA FAC | First Amended Complaint in *Metropolitan Transportation Authority Defined Benefit Pension Plan Master Trust, et al.* v. *Allianz Global Investors U.S. LLC, et al.*, No. 20-cv-07842 (ECF No. 44) |
| TMRT/BLYR | Teamster Members Retirement Plan and its Board of Trustees<br><br>Bricklayers and Masons' Local Union No. 5, Ohio Pension Fund, and its Board of Trustees<br><br>Rasmani Bhattacharya and Claude Pumilia | TMRT/BLYR SAC | Second Amended Complaint in *Teamster Members Retirement Plan, et al.* v. *Allianz Global Investors U.S. LLC*, No. 20-cv-07154 (ECF No. 61) |

| Plaintiff Acronym | Plaintiffs in Action | Citation to Complaint in Omnibus Brief | Full Citation to Complaint |
|---|---|---|---|
| UFCW | Trustees of the United Food & Commercial Workers Unions & Employers Midwest Pension Fund | UFCW Compl. | Complaint in *United Food & Commercial Workers Unions & Employers Midwest Pension Fund, et al.* v. *Allianz Global Investors U.S. LLC et al.*, No. 20-cv-09587 (ECF No. 1) |

**B.     Citations to Governing Documents**

As set forth in the accompanying Declaration of Robert J. Giuffra, Jr., in Support of Defendant AllianzGI's Motions to Dismiss, dated February 25, 2021 ("Giuffra Declaration"), in asserting claims, the Complaints incorporate by reference and rely on the documents that govern each Plaintiff's investment(s) in the relevant Funds, consisting of (i) an LLC Agreement; (ii) a Subscription Agreement; (iii) a Private Placement Memorandum (together, the "Governing Documents"); and, in certain cases, (iv) a side letter agreement ("Side Letter"). These documents are included as Exhibits 1-3 and 7-110 to the Giuffra Declaration. All references to "Ex." in this Omnibus Brief are to exhibits to the Giuffra Declaration.

For ease of review, the Omnibus Brief quotes from and cites to the Governing Documents for Structured Alpha 1000 LLC using the defined terms below.

| CITATIONS TO GOVERNING DOCUMENTS | |
|---|---|
| LLC Agreement | AllianzGI Structured Alpha 1000 LLC Fourth Amended and Restated Limited Liability Company Agreement, Dated as of December 31, 2017  (Ex. 1) |
| PPM | AllianzGI Structured Alpha 1000 LLC Confidential Private Placement Memorandum, Effective as of December 31, 2017 (Ex. 2) |
| Subscription Agreement | Exemplar AllianzGI Structured Alpha 1000 LLC Subscription Agreement, Dated December 2017 (Ex. 3) |

### C.    Appendices

To assist the Court's review, AllianzGI has included the following appendices to the Giuffra Declaration:

Appendix A:  Summary of Grounds for Dismissal

Appendix B:  Summary of Plaintiffs' Initial Investments

Appendix C:  Common Law and ERISA Counts in the Complaints

Appendices D1, D2 and D3:  Comparison of LLC Agreement, PPM and Subscription Agreement for AllianzGI Structured Alpha 1000 LLC to the LLC Agreements, PPMs and Subscription Agreements for Other At-Issue Funds

Appendices D1, D2 and D3 compare the relevant provisions from the Governing Documents for Structured Alpha 1000 LLC to Governing Documents for the other Structured Alpha Funds at issue in the Complaints.  These Appendices reflect that, consistent with Plaintiffs' allegations,[2] these provisions are substantially identical, except for BCBS's investments in the Multi-Beta Series Structured Alpha Funds, which differ in certain respects not relevant to these motions.  All references to "App." or "Appendix" in this Omnibus Brief are to an Appendix to the Giuffra Declaration.

---

[2]    *See, e.g.*, FFLD/NEHC SAC ¶ 84 (alleging, on behalf of putative class, that LLC Agreement, Private Placement Memorandum and Subscription Agreement for Structured Alpha 1000 LLC "are substantively identical to those entered into by investors across the Structured Alpha Funds portfolio"); TMRT/BLYR SAC ¶ 18 n.2 (same, for putative class).

## PRELIMINARY STATEMENT

Plaintiffs are all highly sophisticated investors that elected to invest in "speculative" and "high risk" private funds ("Funds") pursuing an options-based trading strategy. (PPM at 2, 20.) In order to invest, each Plaintiff represented that it "underst[ood]" the risks (including the risk of "complete loss") and could "afford" to lose their entire investment. (*See* PPM at 20; Subscription Agreements §§ II (K), (L).) Through these twelve Related Actions, Plaintiffs seek to recoup the losses that the Funds incurred during the start of the Covid-19 pandemic in February and March 2020, when equity markets experienced one of the most severe downturns in history, and market volatility soared to unprecedented heights. In the wake of the Covid-19 market crash, Plaintiffs now contend—with the benefit of hindsight—that Allianz Global Investors U.S. LLC ("AllianzGI"), as the investment manager, "mismanaged" the Funds' assets and reacted "imprudently" to highly volatile market conditions that gyrated almost daily over the course of weeks.

Plaintiffs were invested in the Funds for years (some for more than a decade) (*see* App. B) and generally enjoyed positive returns. During prior market downturns, Plaintiffs experienced how market volatility could cause the Funds to incur losses and understood that the Funds were vulnerable to big market swings. (*See* TMRT-BLYR SAC ¶¶ 53, 81-86.) In simplest terms, the Funds generated most of their returns by collecting fixed up-front fees or "premiums" when selling "put" and "call" options contracts to third-party purchasers, which provided those purchasers with protection—essentially insurance—against movements (up or down) in market indices, primarily the Standard & Poor's 500 Composite Stock Index ("S&P 500 Index"). (TMRT/BLYR SAC ¶¶ 36-37.) The Funds sold options with durations of typically a few weeks and "strike prices" (*i.e.*, the prices at which the option purchaser could exercise the option) within a certain "range" above and below the S&P 500 Index's current levels. (*Id.* ¶ 41-42.) As long as the S&P 500 Index stayed

within this range while the options were in place, the strike prices would not be reached and the options purchasers would not exercise their options. The Funds would then keep the premiums as profit (just as an insurance company keeps premiums so long as the insured risk does not materialize). These premiums generated the primary investment return for Plaintiffs. (*Id*. ¶ 42; *see* PPM. at 1 (explaining that Funds "will capture positive payoffs *if the level of the . . . [I]ndex . . . ends up within the profit zone*") (emphasis added).)

These options—referred to as "range-bound spreads"—were designed to "generate excess returns *in normal market conditions*." (Ex. 4 at 1 (Structured Alpha Strategy Overview) (emphasis added); *see also* Ex. 5 at 12 (Dec. 2018 Lehigh Pitchbook).) AllianzGI used "proprietary scenario and stress testing models" to estimate the risk that the options' "range" would be exceeded and the impact of market movements on the Funds. (ATRS Compl. ¶ 64.) But extreme movements outside the range could cause the Funds to incur significant losses, because, as a seller of "insurance" to market participants, the Funds had to make payments to options holders when those movements materialized during the life of the options. (*See* PPM at 25 (purchaser of put option had "the right to receive *a cash payment* equal to *any depreciation in the value* of the [I]ndex *below the strike price*" (emphasis added).) If the market movement were steep and rapid (as unexpectedly—and repeatedly—occurred in February and March 2020), the Funds' losses could be significant.

The Funds had positions in place to mitigate the risk of loss when market conditions were not "normal," including hedging positions. (*See*, *e.g.*, TMRT-BLYR SAC ¶¶ 50-51.) The hedges consisted of options that the Funds themselves purchased to try to "cabin" (not eliminate) investment losses in the event of "sharp market declines" (*id*. ¶ 51), specifically "short-term" or "overnight" losses. (Ex. 6 at 31 (Apr. 2, 2019 Presentation to BCBS).) But as disclosed to Plaintiffs, the Funds' ability to "[r]estructur[e] when necessary *[wa]s a vital component* of [the]

risk management process."  (Ex. 5 at 16 (emphasis added).)  In other words, in a "falling market," the Funds "reduc[ed] risk" by "re-center[ing]" the options that they sold to third parties around a new range to stay a step ahead "in response to the falling market."  (TMRT-BLYR SAC ¶ 54.)

The PPMs expressly warned Plaintiffs that "even a well-conceived and well-executed options program may be adversely affected by market behavior or unexpected events," and cautioned that the strategy "depend[ed] on" the "smooth functioning of the options exchanges," and that "*[u]nexpected volatility* . . . could impair the Fund's ability to carry out its business or *cause it to incur losses*."  (PPM at 20, 24, 29 (emphasis added).)  In February and March 2020, these disclosed risks materialized, when the S&P 500 Index repeatedly suffered some of the steepest drops in its history during a period of  unprecedented market volatility, causing the Funds to incur losses as a result of their obligations to third-party holders of the options that the Funds sold.  (*See* Part C, *infra*.)

In their Complaints, Plaintiffs rely extensively on the parties' agreements and the PPMs, but they ignore every risk warning in the PPMs, their own contractual representations, and significantly, the terms in the LLC Agreements and governing law restricting the claims Plaintiffs may bring against AllianzGI.[1]   Instead, Plaintiffs seek to second-guess the judgments of AllianzGI's portfolio managers and allege that the Funds should not have been "short volatility," even though the Funds repeatedly disclosed to Plaintiffs that the Funds' range-bound options were

---

[1]     "[O]n a motion to dismiss, a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference . . . or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit,'" and "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  As such, all the governing documents for Plaintiffs' investments in the Funds are properly considered by this Court in deciding AllianzGI's motions to dismiss.

*designed* to be short volatility and were designed for "*normal* up, down, or flat" market movements. (*See* Ex. 5 at 12 (emphasis added).)  Relying on hindsight, Plaintiffs further contend that AllianzGI should have purchased more or different hedging positions, even though AllianzGI disclosed that these hedges were intended to be only a partial offset to "overnight" or short-term market crashes.  (Ex. 5 at 12, 14.)  Plaintiffs also challenge AllianzGI's "risk management" or stress-testing, without addressing the Covid-19 market crash's impact on the Funds' ability to restructure its options-trading positions.  Finally, Plaintiffs implausibly charge that AllianzGI engaged in supposedly "self-interested" trading of the Funds' assets in March 2020 to try to recoup performance fees, when those fees (and the Fund's success) were directly aligned with the interests of investors.

To narrow the reach of these blunderbuss Complaints to their legally cognizable scope, this Court should trim Plaintiffs' claims significantly for the following reasons.

*First*, the Court should hold that Plaintiffs' claims against AllianzGI for alleged mismanagement of the Funds' assets are "paradigmatic" derivative claims under Delaware law. (*See* cases cited *infra*, Part I). To bring claims based on AllianzGI's supposed imprudent management of the Funds' assets, Plaintiffs must state a claim for breach of duty owed to them *directly*, not derivatively.  Because the only basis for Plaintiffs' direct claims against AllianzGI are duties owed under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., or the LLC Agreements, the Court should hold that Plaintiffs may not seek to impose tort duties of care or fiduciary duties not based on ERISA or those Agreements.[2]

---

[2]     Notably, only one Plaintiff in the above-captioned Related Actions—Lehigh University—asserts claims based on common law fraud, Section 10(b) of the Securities Exchange Act, and negligent misrepresentation, which fail for the reasons stated in Defendant's Supplemental Brief in Support of its Motion to Dismiss the Amended Complaint filed in the *Lehigh* action, 2020 Civ. 7061 ("Lehigh Supplemental Brief").

*Second*, the Court should dismiss as preempted under ERISA the common law negligence, breach of fiduciary duty and/or breach of contract claims of those Plaintiffs that are ERISA fiduciaries responsible for the oversight of ERISA retirement plans.   These ERISA fiduciaries elected to invest substantial sums in a high-risk strategy that they affirmatively represented was "suitable" for those plans.  ("ERISA Plaintiffs").  (Subscription Agreement §§ II (K), (L).)   Because of ERISA's "extraordinary pre-emptive power," those ERISA Plaintiffs alleging that AllianzGI acted as an ERISA fiduciary in managing the Funds cannot assert state common law claims alongside their ERISA claims.  *Aetna Health Inc.* v. *Davila*, 542 U.S. 200, 209 (2004) (quotations omitted); *see* 29 U.S.C. § 1144(a).  (*See* cases cited *infra*, Part II.)

*Third*, the Court should dismiss the breach of contract claims of those Plaintiffs who pointedly ignore the controlling terms of the LLC Agreements, which specify contractually prescribed standards of care that the parties agreed AllianzGI would meet in "discharg[ing] its duties" as the Funds' investment manager and "extended" those obligations to the Funds' members.   Specifically, Section 2.12 of the LLC Agreements provides that, in managing the Funds' assets, AllianzGI would meet ERISA fiduciary standards when the Funds were subject to ERISA, and only the ERISA "prudence" standard of care when they were not, yet only four Complaints assert breach of contract claims based on Section 2.12 (or similar provisions in Side Letters).   The remaining Plaintiffs otherwise bring breach of contract claims based on out-of-context snippets from the PPMs, claiming, for example, that AllianzGI was somehow obligated to adhere strictly to the PPM's description of the Funds' investment strategy at all times, including during the Covid-19 market crash.   The full context of the PPMs makes clear that the PPMs, in fact, say no such thing and instead disclosed the *opposite*—that AllianzGI had broad discretion to "***change any of [the Funds'] investment strategies without prior consent of, or notice to, the***

*Members*."  (PPM at 2, 19-20 (emphasis added).)

Certain Plaintiffs also assert claims for breach of the implied covenant of good faith and fair dealing—a "limited and extraordinary legal remedy"—but "the implied covenant does not apply when the contract addresses the conduct at issue," and is not "truly silent" on that conduct. *Oxbow Carbon & Mins. Holdings, Inc.* v. *Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (quotations omitted).  This Court should not imply some extra-contractual duty, because Section 2.12 of the LLC Agreements specifies precise contractual standards of care governing AllianzGI's performance of its duties.

*Fourth*, this Court should reject tort claims asserted by every Plaintiff (except BCBS, which relies solely on ERISA and contract claims and does not assert such tort claims) for failure to identify any duty owed independent of the parties' governing contracts.  Plaintiffs try to plead negligence claims by imagining a duty of care in *tort* "arising out of the LLC Agreements, Subscription Agreements, and Side Letter Agreements."  (ATRS Compl. ¶¶ 123-24 (alleging that AllianzGI owed a duty of care arising from its "*responsibil[ity]* for the general management of the investment portfolios . . . *under the [LLC] Agreement[s]*") (emphasis added).)  Because these negligence claims "'do[] no more than assert violations of a duty which is identical to and indivisible from the contract obligations'" in Section 2.12 of the LLC Agreements, the Court should dismiss those claims.  *Metro. W. Asset Mgmt., LLC* v. *Magnus Funding, Ltd*., 2004 WL 1444868, at *9 (S.D.N.Y. June 25, 2004) (Buchwald, J.) (quoting *Luxonomy Car, Inc.* v. *Citibank, N.A*., 408 N.Y.S.2d 951, 954 (N.Y. App. Div. 2d Dep't 1978)).

The Court should similarly reject Plaintiffs' attempt to avoid the parties' contracts and assert claims for breach of fiduciary duty on theories ranging from AllianzGI's role as the Funds' investment manager; to AllianzGI's supposed "duties" as an "investment advisor" to Plaintiffs; to

a limited power of attorney to sign specific documents on behalf of investors; and even to regulations applicable to the Funds' payments of broker commissions.  Each of Plaintiffs' theories fails as a matter of law because  (1) he parties dispensed with common law "default" fiduciary duties under Delaware law; (2) these claims impermissibly duplicate AllianzGI's obligations under Section 2.12 of the LLC Agreements; (3) Plaintiffs expressly disclaimed that AllianzGI was providing any investment advice to them; and/or (4) Plaintiffs may not rely on duties that are not relevant to AllianzGI's conduct as investment manager.

In any event, even if these Plaintiffs could state a non-duplicative claim for negligence or breach of fiduciary duty (and they cannot), the economic loss doctrine independently bars all such tort claims, because Plaintiffs "do[] not seek damages for injuries to [their] person or property, but for an alleged injury that is quintessentially economic," and thus the proper subject of contract claims.  *Aretakis* v. *Caesars Ent.*, 2018 WL 1069450, at *13 (S.D.N.Y. Feb. 23, 2018) (Failla, J.).

*Finally*, this Court should dismiss claims that AllianzGI breached a fiduciary duty of loyalty or engaged in "prohibited transactions" under ERISA based on legally implausible allegations that AllianzGI exposed the Funds to increased risk in March 2020 to try to recoup its performance fees.  Plaintiffs fail to allege, as they must to state such claims, any facts to show that AllianzGI acted "for the purpose" of benefiting itself in continuing to manage the Funds' assets in March 2020.  *Sacerdote* v. *N.Y. Univ.*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017) (Forrest, J.).  Plaintiffs instead ask this Court to infer breaches of the duty of loyalty by alleging that AllianzGI acted imprudently, based solely on the fact that AllianzGI was compensated exclusively for positive performance, and then presuming that AllianzGI must have been acting for an improper, self-interested motive in managing the Funds through the Covid-19 market upheaval.  In this Circuit, courts long ago rejected "[i]ncentive compensation" as a motive for

wrongdoing, *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (quotation omitted), and routinely dismiss claims for breach of the duty of loyalty where, as here, those claims "merely ride the coattails of Plaintiffs' duty-of-prudence" and the complaint is "devoid of factual allegations supporting *purposeful* action" by defendant to benefit itself.  *Ferguson* v. *Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *4 (S.D.N.Y. Sept. 18, 2019) (Carter, Jr., J.) (emphasis original).[3]

### ALLEGATIONS OF THE COMPLAINTS

#### A.      The Plaintiffs

With hundreds of millions or billions under management,[4] Plaintiffs are sophisticated institutional investors[5] who, typically with the advice and assistance of experienced investment

---

[3]      AllianzGI's motion to dismiss seeks to limit the Complaints to legally cognizable claims. Given the massive scope of the Complaints, AllianzGI cannot feasibly address all infirm allegations or claims in this Omnibus Brief, including, for example, obviously hypothetical and speculative allegations suggesting that "somebody" engaged in market manipulation of the VIX on or around March 18, 2020, which are untethered to any legal theory.  (*See, e.g.*, FFLD/NEHC SAC ¶ 73 (citing an unidentified "industry expert," opining that '[s]omebody sold the options used to calculate the VIX" prior to the market open on March 18, 2020 and speculating that it would have been "'an institution.'"); *see also* ATRS Compl. ¶ 107; CMERS Compl. ¶ 125.)  AllianzGI reserves all of its rights with respect to any claims or allegations not addressed herein.

[4]      The only exceptions are two sophisticated individuals who invested jointly in the Funds and are named Plaintiffs in the TMRT-BLYR putative class action.  (TMRT/BLYR SAC ¶ 11.)

[5]      For example, ATRS has approximately $17.7 billion in assets under management ("AUM"); BCBS: approximately $5.6 billion in AUM; CLPF: approximately $3.3 billion in AUM; CMERS: approximately $5.5 billion in AUM; Lehigh: approximately $1.6 billion in AUM; MTA: approximately $3.3 billion in AUM (MaBSTOA Plan), and approximately $4.8 billion in AUM (MTA Defined Benefit Pension Plan Master Trust).  *See* ATRS February 3, 2020 Board of Trustees Meeting Packet at 24, available at https://tinyurl.com/o2qwjdsb; BCBS National Retirement Trust 2019 Form 5500 at Schedule H, p. 2, available at https://tinyurl.com/2ouaf4v9; Chicago Board of Trustees Laborers' Pension Fund 2018 From 5500, at Schedule H, p. 2, available at https://tinyurl.com/7iqocyj4; Employes' [*sic*] Retirement System of the City of Milwaukee 2019 Comprehensive Annual Financial Report at 19, available at https://tinyurl.com/19l1zvad; Lehigh Compl. ¶ 39; MaBSTOA Pension Plan 2019 Financial Statement at 4, available at https://new.mta.info/document/19121; MTA Defined Benefit Pension Plan 2019 Financial Statement at 4, available at https://new.mta.info/document/19131.  This Court may take judicial

consultants,[6] sought above-market returns by investing in the Funds' higher-risk options-based investment strategy.  Most Plaintiffs are fiduciaries themselves who owe obligations, whether under ERISA or otherwise, to their own beneficiaries.  As described below (*see* Part B.2., infra), each Plaintiff represented that (i) it had evaluated and understood the risks of investing in the Funds; (ii) the Funds were suitable investments, given Plaintiff's overall portfolios and investment objectives; and (iii) Plaintiff could "afford a complete loss" of its investment.

## B. The Funds' Governing Documents

### 1. The LLC Agreements

Each Fund was a separate Limited Liability Company ("LLC") organized under Delaware law.  To become a non-managing member of the LLC and to receive interests in a Fund, each Plaintiff agreed to "the terms and conditions set forth [in the Subscription Agreement], in the [PPM] of the Fund, as the same may be updated from time to time, and in the Limited Liability Company Agreement of the Fund, as the same may be amended from time to time."  (Subscription Agreement at 7.)   The Subscription and LLC Agreements are governed by Delaware law.  (*See* Subscription Agreement, Art. VI; LLC Agreement § 8.05.)

Each LLC Agreement was entered into by Plaintiffs (as non-managing members), the relevant Fund, and AllianzGI.  In the LLC Agreements, AllianzGI accepted appointment as the

---

notice of these facts, which were either posted to Plaintiffs' websites or publicly filed with a government agency. *See Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (Engelmayer, J.) (taking judicial notice of "information publicly announced on a party's website"); *Cunningham* v. *Cornell Univ.*, 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017) (Castel, J.) (taking judicial notice of information "filed with a government regulatory agency," including Forms 5500).

[6]      *See* ATRS Compl. ¶ 17 (referencing "ATRS's investment consultant Aon"); CLPF Compl. ¶ 20 (referencing CLPF's "investment consultant, Segal Marco Advisors"); CMERS Compl. ¶ 19 (referencing "CMERS's investment consultant, Callan"); CTWW Compl. ¶ 19 (also Callan); BCBS Compl. ¶ 10 (referencing "Aon, [BCBS's] fiduciary investment adviser").

managing member of each Fund ("Managing Member"), with broad authority to "conduct the day-to-day administration of the [Fund]" and "the power . . . to carry out any and all of the objects and purposes of the [Fund]." (LLC Agreement § 2.02.) AllianzGI separately "accept[ed] appointment as the investment manager of the [Fund]" ("Investment Manager"), with "duties" that included "managing *the [Fund's] assets*." (*Id.* § 2.03.)

The LLC Agreements defined contractually how AllianzGI would discharge its "duties" as Investment Manager. *First*, when the Funds' assets were considered ERISA "plan assets" (*i.e.*, when 25% or more of the Fund's assets were invested by ERISA benefit plans (the "ERISA 25% Threshold")),[7] AllianzGI agreed in Section 2.12 to "discharge its duties" as Investment Manager "consistent with the standard of care imposed on fiduciaries under ERISA" (the "Contractual ERISA Standard of Care"). (LLC Agreement § 2.12.)[8] *Second*, when the Funds' assets did not meet or exceed the ERISA 25% Threshold, AllianzGI agreed to "use its reasonable best efforts to discharge its duties consistent with the [prudence] standard of care . . . under Section 404(a)(1)(B)

---

[7]     *See* 29 C.F.R. § 2510.3-101(a)(2)(ii), (f) (providing that ERISA plan's investment of plan assets in equity interests of another entity, such as the Funds, is deemed "significant" when the ERISA 25% Threshold is met, such that "any person who exercises authority or control respecting the management or disposition of such underlying assets . . . is a fiduciary of the investing plan").

[8]     ERISA imposes four duties on plan fiduciaries: (1) to act solely in the interests of the plan; (2) to act "with the care, skill, prudence and diligence" that a person familiar with like matters would employ; (3) to diversify plan assets; and (4) to act "in accordance with the documents and instruments governing the plan." 29 U.S. Code § 1104(a). ERISA Plaintiffs could delegate these duties to AllianzGI as an investment manager with the "power to manage, acquire, or dispose of" plan assets, 29 U.S.C. § 1002(38). The Governing Documents make clear that the investing ERISA Plaintiffs (not AllianzGI) "*determined* that an investment in the Fund is prudent . . . considering . . . the composition of the Plan's total investment portfolio *with regard to diversification*." (Subscription Agreement, Sched. V., Part III(c) (emphasis added).) Moreover the PPMs made clear that the Funds would not follow plan documents, stipulating that "[w]hether or not the plan is subject to ERISA, . . . the Managing Member necessarily *will not take the investment objectives of any particular Non-Managing Member that are not consistent with those of the Fund into account* in managing Fund investments." (PPM at 55 (emphasis added).)

of ERISA," but "not any other provisions of ERISA" (the "Contractual Prudence Standard of Care").[9]  (*Id.*; *accord* PPM at 58.)  Section 2.12 makes clear that the right to enforce these contractual obligations "shall be extended to non-ERISA plan Members" and ERISA plan members alike.  (LLC Agreement § 2.12.)

The LLC Agreements also provided that when making decisions "in its 'discretion,'" AllianzGI was required to "consider only such interests and factors as it desires," and, when it was not subject to the Contractual ERISA Standard of Care (which included the ERISA duty of loyalty), AllianzGI could "consider its own interests and the interests of its Affiliates."  (LLC Agreement § 2.01.)  AllianzGI was further permitted to enter into individualized "side letters or similar agreements" with any non-managing member that could "alter[] or supplement[]" the terms of the LLC Agreement, including "different . . . [f]ee[s] . . . and information rights."  (*Id.* § 2.13.)  As Managing Member, AllianzGI could "devote so much of [its] time to the affairs of the [Fund] as in [its] judgment" was reasonably required, could "exercis[e] investment responsibility for any other business," and could "deal with the [Fund] in the same manner and to the same extent as any other person," so long as the dealings were "commercially reasonable."  (*Id.* § 2.05.)

Finally, as expressly permitted under the Delaware Limited Liability Act, 6 Del. Code § 18-1101(c), the parties agreed that "[t]o the fullest extent permitted by law, the provisions of th[e LLC] Agreement . . . to the extent that they modify, restrict or eliminate the duties (including fiduciary duties) and liabilities or rights and powers of any person . . . with respect to matters expressly provided for in this Agreement, *are agreed by the parties hereto to replace such **other***

---

[9]     Section 404(a)(1)(B) sets out ERISA's "Prudent Man Standard of Care," requiring the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

*duties and liabilities of such person*."  (LLC Agreement § 2.07 (emphasis added).)

### 2.    Subscription Agreements

In subscribing for its interests in the Funds, each Plaintiff made representations that it (i) was not relying on AllianzGI for any investment advice; (ii) had fully evaluated and understood the risks of investing in the Funds; and (iii) could "afford *a complete loss*" of its investment.

Although certain Plaintiffs claim that AllianzGI owed fiduciary duties as Plaintiffs' "investment adviser," each Plaintiff represented in the Subscription Agreements that "in making its [independent] decision to subscribe for an Interest, the [Plaintiff] relied solely upon the [PPM], the [LLC Agreements] and independent investigations made by the [Plaintiff]."  (Subscription Agreement § II(E).)  Each Plaintiff also expressly disclaimed reliance on the Structured Alpha Funds or AllianzGI "with respect to the legal, tax and other economic considerations involved" in its investment (*id*.), and further represented that:

- it was "provided an opportunity to obtain any additional information concerning the offering," and to "ask questions of, and receive answers from, the Managing Member concerning the terms and conditions of the offering and other matters pertaining to [its] investment" (*id*. § II(H));

- its "investment . . . is consistent with [its] investment purposes, objectives and cash flow requirements . . . and will not adversely affect [its] overall need for diversification and liquidity" (*id*. § II(N));

- it "(either independently or in collaboration with its consultants and advisors) has such knowledge and experience in financial and business matters that [it] is capable of evaluating the merits and risks of the [] investment . . . and is able to bear such risks, and has obtained . . . sufficient information from the Managing Member to evaluate the merits and risks of [the] investment" (*id.* § II(K)); and

- it had, in fact, "determined" that the Fund was "a suitable investment"; that it "underst[ood] there are substantial risks of loss" and that it could "***afford a***

*complete loss of the investment*" (*id.* §§ II(K), (L) (emphasis added)).

### 3.    Side Letters

Certain Plaintiffs entered into Side Letters with AllianzGI.  As relevant here, certain of those Side Letters included contractual obligations to meet prescribed standards of care that were either identical, or substantially similar, to Section 2.12 of the LLC Agreements.  (*See* Ex. 53 at 4-5; Ex. 74 at 2; Ex. 102 at 2.)

### 4.    The PPMs

The PPM for each Fund disclosed the Funds' investment objectives and options-based strategy, and the substantial risks associated with investing in the Funds.

#### (a)    *"Alpha" and "Beta" Components*

Each Fund had a similar overall investment strategy with two components: (1) a "beta" component, consisting of investments "that [sought] to deliver a return equivalent" to (or, in some Funds, that had direct exposure to) a specified "benchmark" index; and (2) the "alpha" component, which, "using the underlying investments of the [b]eta [c]omponent as collateral," sought to generate targeted outperformance over and above the benchmark index.  (PPM at 1-2; *see* ATRS Compl. ¶ 53; TMRT/BLYR SAC ¶¶ 28-30.)  For example, Structured Alpha 1000 LLC sought to generate approximately 1000 basis points (or 10%) of "alpha" outperformance, net of AllianzGI's fees (*i.e.*, 14% to 16% in gross returns) over the BofA Merrill Lynch 3-Month U.S. Treasury Bill Index (*see* CMERS Compl. ¶ 54; PPM at 1), whereas Structured Alpha U.S. Equity 250 LLC sought to generate approximately 250 basis points (or 2.5%) of "alpha" outperformance, net of AllianzGI's fees (*i.e.*, 3.75% in gross returns) over the S&P 500 Index (*see* ATRS Compl. ¶ 50).

#### (b)    *Range-Bound Spreads*

The Funds "s[ought] to" achieve their alpha component through an options-based strategy. (PPM at 1.)  Specifically, in exchange for fixed "premium" payments, the Funds sold mostly short-

term "options" contracts to third-party options purchasers granting the purchaser the right (but not the obligation) to buy or sell "equity indices" (for example, shares in the S&P 500 Index) at set "strike" prices. (PPM at 1, 25; *see* TMRT/BLYR SAC ¶ 35.)[10] A "put" option gave the third-party purchaser "the right to receive a cash payment equal to any depreciation in the value of the [I]ndex below the strike price," and conversely a "call option" gave the purchaser the right to a cash payment equal to any appreciation over the strike price. (PPM at 25.)

Third-party market participants purchased put and call options from the Funds for many reasons, including to hedge against market movements that could adversely impact their own portfolios. At the same time, the Funds, as options sellers, were (obviously) betting that the S&P Index would *not* significantly "appreciate" or "depreciate" and would instead remain within the range of the options' strike prices over the short-term period that the options were in place. (*See* TMRT/BLYR SAC ¶¶ 41-42.) If that happened, the options would expire worthless or "out of the money" (*i.e.*, without the S&P 500 Index moving significantly enough up or down to hit the strike prices), and the Funds would retain any premium payments. (*See id*. ¶¶ 37-38, 41.) As disclosed to Plaintiffs, this options strategy sought to "capture positive payoffs *if the level of the underlying [I]ndex . . . ends up within the profit zone.*" (PPM at 1 (emphasis added); *see* Ex. 6 at 30 (diagram showing "loss zone" outside of +6% to -9% profit zone around exemplar S&P 500 Index levels based on "[s]ell[ing] options that have the greatest probability of expiring worthless").)

Most of the equity index put and call options that the Funds sold to third-party options purchasers were built around a range of strike prices above and below where the S&P 500 Index was currently trading (the "profit zone"). The Funds' marketing materials referred to these options

---

[10]     For some Funds, the benchmark index for the "beta component" was the S&P 500 Index, and the "alpha" component also involved trading options on the S&P 500 Index. (*See* Ex. 23 (Structured Alpha U.S. Equity 500 LLC PPM) at 1-2, 19.)

as "range-bound spreads."  (*See* Ex. 5 at 12-13; TMRT/BLYR SAC ¶ 42.)  Because "positive payoffs" to the Funds from the range-bound spreads depended on the S&P 500 Index staying within the "range," the Funds disclosed to Plaintiffs and other investors that these positions were necessarily "short" volatility (*i.e.*, they were betting *against* volatile equity market movements that could drive market levels outside the range).  (Ex. 5 at 12 (labeling range-bound spreads as "short volatility" positions).)  The Funds further disclosed that "range-bound spreads were "[d]esigned to generate returns in ***normal up, down or flat markets***"; that "[t]hese positions ha[d] contributed two-thirds of the portfolio's alpha since inception"; and that the spreads had an "85%" "probability of success."  (*Id*. at 12-13 (emphasis added).)

Thus, as Plaintiffs understood, the "range-bound spreads" necessarily exposed the Funds to losses, and potentially steep losses, if the equity markets rapidly moved outside the expected range—*i.e.*, if the markets experienced substantial "appreciation" or "depreciation"—causing the options to hit the "strike" prices and be "in the money."  (*See* TMRT/BLYR SAC ¶ 38.)  If that happened, options purchasers would exercise their options, and the Funds would be required to pay those purchasers on the difference between the strike price and S&P 500 Index value.  (*Id*.)  As the PPMs specifically warned, the Funds "w[ould] be responsible, during the option's life, for *any decreases in the value of the [I]ndex below the strike price of the put option[s]*" (or increases in value above the strike price of the "call options").  (PPM at 25 (emphasis added).)

Moreover, "[b]ecause the [options'] exercise *is settled in cash*, . . . the Fund[s would] be required to deliver an amount of cash" to pay that difference in value.  (*Id.* (emphasis added); *see also* Ex. 5 at 36 (in selling put options on the S&P 500 Index, the Funds "[bore] a risk of loss if the value of the [S&P 500] decline[d] below the exercise price").  As a result, "the exercise of . . . options sold by the Fund[s] may require the Fund[s] to sell portfolio securities to generate cash at

inopportune times or for unattractive prices." (PPM at 25.) As certain Plaintiffs concede, "the price of striving for returns that are consistently (and materially) greater than the return of a benchmark [index] . . . is that the *risk of incurring large losses will increase sharply* as the market moves increasingly *towards (and past) the extremities of the overall 'profit zones'* that the portfolio was originally built around." (TMRT/BLYR SAC ¶ 53 (emphasis added).)

Finally, because of the challenges involved in managing the Funds' options portfolios and the need to respond in real time to market conditions, the PPMs made clear that AllianzGI had broad discretion to "formulate new approaches" to the "Fund[s'] investment objective," and that the Funds could "*change any of [their] investment strategies without prior consent of, or notice to, the Members*." (PPM at 2, 19-20 (emphasis added).)

### (c)     *Directional Spreads and Hedging Positions*

The Funds engaged in two types of trading positions designed to offset partially the risks inherent in the range-bound spreads. These consisted of "directional spreads" and "hedging positions." (Ex. 5 at 13.) Directional spreads were "option positions that benefit[ed] from a large index move to the upside and/or downside." (*Id*. at 13.) In other words, these positions consisted of a smaller number of options that generated returns if the underlying equity index "fell outside the core profit zone established [by] the '[r]ange-[b]ound [s]pread[s].'" (TMRT/BLYR ¶ 48.) As disclosed to Plaintiffs, directional spreads had historically contributed about "one-third of the portfolio's alpha" and consisted of both "long [and] short volatility" positions. (*Id*. at 49; BCBS Compl. ¶ 26.)

Separately, the Funds had hedging positions in place to offer some protection against an "overnight" or "short-term equity-market crash." (Ex. 5 at 12, 14.) These hedging positions consisted of purchasing put options, *i.e*., options that would give the Funds, as the option *purchaser* (not as seller for these positions), the right to a cash payment if the S&P Index moved below the

strike price. (*See* TMRT/BLYR SAC ¶ 50.) The PPM explained that such "hedging against a decline in the value of a portfolio position does not . . . prevent losses" if the S&P 500 Index declined outside the range, "but establishes other positions designed to gain from those same developments." (PPM at 26.) And, as the Funds warned, the "the Managing Member may not seek or be able to establish a sufficiently accurate correlation between hedging instruments and the portfolio holdings being hedged," which could "expose the Funds to risk of loss." (*Id.*)[11]

Moreover, the Funds generated no "alpha" or investment return from these hedging positions, but instead incurred costs in purchasing these protective positions, which could be steep, in certain high-volatility market conditions. (*Id.*; *see also* Ex. 5 at 14 (estimating cost of hedges as "340-400 [basis points]" in a "[h]igh volatility (VIX 25+)" environment).) Plaintiffs were well aware that the Funds' hedging positions could partially offset losses if the market deteriorated suddenly, and only at significant cost. In February 2018, for example, the Funds incurred losses in a "sharply whipsawing [market] environment" and eventually recouped those losses in the following months as markets normalized. (TMRT/BLYR SAC ¶ 86.)[12]

### (d)   *The Substantial Risk Warnings to Plaintiffs*

The PPMs provided Plaintiffs with detailed information about the Funds, their investment objectives, AllianzGI's broad discretion in pursuing those objectives, investor eligibility

---

[11]   The disclosures regarding hedging positions appear in the PPM for Structured Alpha 1000 LLC but not other PPMs. Notably, however, 10 of the 20 Plaintiffs (in seven of the 12 Related Actions) invested in this Fund. (*See* App. B.) All Plaintiffs were nevertheless provided with information and presentations on the Funds' hedging strategy. (*See, e.g.*, Ex. 5 at 12, 14.)

[12]   *See* App. B (showing all Plaintiffs' initial investment well prior to 2018); TMRT/BLYR SAC ¶¶ 81-87 (describing "violent[]" disruption in equity markets in February 2018 "Volmageddon" event when S&P 500 Index plummeted and volatility soared, causing Funds to "underperform[]" or "decline" and that Funds had "recouped" losses "from the first quarter" after end of second quarter); BCBS Compl. ¶ 55 ("In February 2018, Structured Alpha underperformed relative to its beta benchmarks. Those short-term investment losses were recouped in the following months . . . ."); UFCW Compl. ¶ 57 (same); Lehigh FAC ¶ 175 (alleging losses in February 2018).

requirements, and, importantly, the very significant risks of investing in the Funds.  (PPM at 1-2, 6-7, 20-35.)

Specifically, the Funds warned, on the very first page of the PPMs, that "THE [FUNDS'] INVESTMENT PRACTICES, BY THEIR NATURE, MAY BE CONSIDERED TO INVOLVE A HIGH DEGREE OF RISK."  (*Id*. at ii (emphasis original).)  The PPMs gave "no assurance[s] that the Fund[s] will achieve [their] targeted returns," or that "the investment strategies to be used by the Fund[s] will be successful under all or any market conditions."  (*Id.* at 21, 22.)  The PPMs disclosed that the strategy was "speculative" and contemplated "significant[]" investments in complex financial instruments such as derivatives" which "involve[] risks different from, or possibly greater than, the risks associated with investing directly in securities and other traditional investments."  (*Id.* at 20, 23.)

The Funds further warned that "whether, when and how to use options involves the exercise of skill and judgment," and that "even a well-conceived and well-executed options program may be adversely affected by market behavior or unexpected events."  (*Id*. at 24.)  The PPMs explained that "[s]uccessful options strategies may require the anticipation of future movements in securities prices, interest rates and other economic factors," and gave "[n]o assurances" that "the Managing Member's judgments in this respect will be correct."  (*Id*.)

In fact, the Funds warned in the PPMs of the very risks that ultimately began to materialize in February 2020, cautioning that "*[u]nexpected volatility* . . . in the markets in which the Fund[s] directly or indirectly hold[] positions could impair the Fund[s'] ability to carry out [their] business or *cause [them] to incur losses*."  (*Id*. at 29 (emphasis added).)  The PPMs underscored the risks specific to the Funds' options-based trading strategy, warning that "success . . . depends on the Managing Member's ability . . . to predict future market movements"; that "[i]nvestments in the

-18-

[Funds] are dependent on the smooth functioning of the options exchanges"; and that "[i]f the options exchanges are not operating as expected, the option strategies herein could be adversely affected." (*Id*. at 21, 20.)  The Funds further cautioned that their proprietary models "may not correctly forecast future investment results" and "may not be able to effectively optimize the investment objective of given transactions and may result in losses." (*Id*. at 32.).

The PPMs further explained that the Funds were exempt from registration under the Securities Act of 1933 and the Investment Company Act of 1940 because (among other reasons) interests in the Funds were sold only to a limited number of sophisticated investors, under applicable rules, "who underst[ood] the nature of the investment, d[id] not require more than limited liquidity in the investment and *c[ould] bear the economic risks of the investment including loss of principal*." (*Id.* at 17-18, 35 (emphasis added).)  Investors were specifically required to be "an accredited investor" under the Securities Act and a "qualified client" under the Investment Advisers Act, which include, for example, (i) "any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state" for the benefit of its employees with total assets in excess of $5,000,000 (such as ATRS, CMERS, FFLD and MTA); or (ii) "any employee benefit plan" under ERISA with total assets over $5 million (such as the ERISA Plaintiffs here).  (*Id*. at 17-18; *see* 17 C.F.R. §§ 230.501(a)(1), 275.205-3(d)(1).)  The Funds imposed strict limitations on investors' ability to withdraw their interests that required them to "bear the economic risk of [their] investment . . . for an indefinite period of time." (PPM at 17.)  The PPMs warned that these restrictions meant that investors "may not be able to liquidate their investment in the event of an emergency or for any other reason." (*Id*. at 32.)

The Funds made clear that "in making an investment decision, investors must rely upon their own examination of the Fund[s] . . . including the merits and risks involved" (*id*. at ii), and

the Funds "urged" potential investors "to consult with [their] own advisers to determine the suitability of an investment . . . ."  (*Id.* at 18.)  The Funds specifically warned ERISA employee benefit plan investors (including nine of the Plaintiffs here)[13] that "neither [AllianzGI] nor the Fund[s] [are] responsible for determining, and neither of them makes any representation regarding, whether a purchase of interests is a prudent or suitable investment for any employee benefit plan." (*Id.* at 55.)  Nevertheless, to inform their decision-making, all prospective investors were "invited to meet with . . . representatives of the Fund[s] or [AllianzGI] to discuss with them, and to ask questions of and receive answers from them . . . and to obtain any [reasonably available] additional information . . . necessary to verify the information" in the PPM.  (*Id.* at iii.)

The PPMs also disclosed that AllianzGI, as Managing Member of the Funds, would receive for its services an "Incentive Allocation," or performance fee, equal to 30 percent of the Fund's quarterly "alpha" returns in excess of the benchmark index, but only if those returns exceeded the aggregate amount of any past *under*performance from prior periods when compared to the benchmark index (a so-called "high water mark" feature).  (PPM at 6-7.)  AllianzGI received no other compensation.

## C.     The February and March 2020 Covid-19 Market Crash

In February and March 2020, the Covid-19 pandemic resulted in unprecedented volatility in financial markets.  On February 19, 2020, the S&P 500 Index closed at a record high and the Chicago Board Options Exchange Volatility Index ("VIX") was relatively low, closing at 14.38.[14]

---

[13]     The ERISA Plaintiffs are:  BCBS, BLYR, CLPF, CRPT, CTWW, IBEW, NEHC (a named Plaintiff in FFLD/NEHC), TMRT, and UFCW.  These nine ERISA Plaintiffs are in eight actions because TMRT and BLYR are named Plaintiffs in a single putative class action.

[14]     The VIX represents market participants' "expectations for market volatility over the next 30 days and typically moves upward as equity markets experience downturns."  FFLD/NEHC SAC ¶ 40 n.27.)  In short, as the VIX increases, "so too does the risk associated with the underlying

(*See* Fred Imbert, *S&P 500 and Nasdaq jump to record high*s, CNBC (Feb. 19, 2020, 4:07 PM), https://tinyurl.com/uu2zvjmb; MTA FAC ¶ 88.)[15]   Just four trading days later, on Tuesday, February 25, 2020, in response to surging Covid-19 cases in Italy and South Korea, the S&P 500 Index closed down 7.6%.  (MTA FAC ¶ 88.)  With "stock indices [] plummeting, volatility in the options markets was on the rise" (IBEW FAC ¶ 65), and the VIX almost doubled to 27.85 by February 25, 2020 (MTA FAC ¶ 88).  Just three trading days later on Friday, February 28, 2020, the VIX soared from its February 19, 2020 level to a "historic high" of 40.11 (ATRS Compl. ¶ 77; MTA FAC ¶ 71), with the S&P 500 Index down nearly 13% from its record high ten days earlier (MTA FAC ¶ 70).

The markets were not in a persistent freefall, however.  Just three trading days into March, "[t]he S&P 500 [Index] [] briefly rallied" and had "*recoup[ed] nearly half of its losses*" by Wednesday, March 4, 2020 (TMRT/BLYR SAC ¶ 94 (emphasis added)), with the VIX declining substantially to 31.99.  (MTA FAC ¶ 88; *see also id*. ¶ 85; IBEW Compl. ¶ 80.)

The markets then reversed course again.  The VIX jumped back up and stayed around 40 on March 5 and 6, 2020, with the S&P 500 Index down 3.4% on March 5 and another 2% on March 6.  (MTA FAC ¶ 88.)  After trading resumed on Monday, March 9, 2020 the S&P 500 Index had "*declined by 7% within five minutes of the opening bell*" (ATRS Compl. ¶ 90 (emphasis

---

options products" (IBEW Compl. ¶ 65), because the likelihood of strike prices being hit increases as markets move unpredictably.

[15]   On a motion to dismiss, this Court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), including "'well-publicized stock prices.'"  *Barilli* v. *Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 248 n.11 (S.D.N.Y. 2019) (Swain, J.) (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000)).  The Court may also "take judicial notice of the publication of a news article" to establish "the fact that press coverage ... contained certain information, without regard to the truth of [its] contents."  *Gentry* v. *Kaltner*, 2020 WL 1467358, at *6 (S.D.N.Y. Mar. 25, 2020) (Karas, J.) (quotations and citation omitted).

added)), triggering a market-wide circuit breaker so that "trading was halted on the New York Stock Exchange." (FFLD/NEHC SAC ¶ 62). The VIX rose to 54.46, a 48% increase from March 3, 2020. (MTA FAC ¶88.) *See* Yun Li, *Dow sinks 2,000 points in worst day since 2008, S&P 500 drops more than 7%*, CNBC (Mar. 9, 2020, 5:18 PM), https://tinyurl.com/v9pz6tft.

The following trading days brought further volatility. "On March 9, 2020, the S&P 500 Index dropped 7.6%," but then "rallied by 4.9%" on March 10, 2020. (TMRT/BLYR SAC ¶ 113) On March 11, 2020, the World Health Organization announced that the spread of Covid-19 was officially a pandemic "due to the rapid increase in cases worldwide" and "[t]he markets collapsed." (MTA FAC ¶ 91.) "The S&P 500 fell 4.8% on March 11, 2020 and 9.5% on March 12, 2020," and "the VIX soared from 53 to 75." (*Id*.) The circuit breaker was triggered again minutes after the opening bell on March 12, 2020. *See* Michael Bloom et al., *'Circuit breaker' triggered again to keep stocks from falling through floor. What you need to know*, CNBC (Mar. 12, 2020, 9:53 AM), https://tinyurl.com/jxfpku4r.

The market then improved significantly on Friday, March 13, 2020. The VIX declined substantially to 57.83 and the S&P 500 Index gained back 9.3%, almost the entire amount shed the prior day. (MTA FAC ¶ 88; TMRT/BLYR SAC ¶ 113.) But the following trading day, Monday, March 16, 2020, the "United States equity markets experienced the second-biggest single day drop in history, behind only Black Monday of 1987." (FFLD/NEHC SAC ¶ 64). The VIX surged nearly 25 points in a single day, or almost 43%, to close at a record high of 82.69 (MTA FAC ¶ 88), by which point it was up approximately 500% for the year. *See* Yun Li, *Wall Street's fear gauge closes at highest level ever, surpassing even financial crisis peak*, CNBC (Mar. 16, 2020 6:33 PM), https://tinyurl.com/2kxnt7ac. The market rallied yet again the next day, regaining 6% (TMRT/BLYR SAC ¶ 113), but by that point the S&P 500 Index was down approximately

25% from its February 19, 2020 record and volatility levels remained high (MTA FAC ¶ 88), and in the course of these extreme, historic market events lasting almost a month, the Funds incurred significant losses.

**D.    The Complaints**

Plaintiffs variously allege that AllianzGI mismanaged the Funds by: (a) positioning the portfolios to be "short volatility"; (b) having insufficient hedging positions; (c) having inadequate risk management procedures; and (d) continuing to imprudently manage the Funds' assets in March 2020 after losses were incurred in February 2020, in an allegedly "self-interested" effort to recoup its performance fee.

**1.    "Short Volatility" Allegations**

By cherry-picking statements from Fund marketing materials, Plaintiffs allege that AllianzGI "abandoned" the Funds' investment strategy in February and March 2020 and made a "directional bet" by positioning the Funds to be "short volatility"—at a time "when the Funds were highly sensitive to market volatility."  (ATRS Compl. ¶¶ 2, 61, 78; *accord* BCBS Compl. ¶¶ 92, 111; CTWW Compl. ¶¶ 13, 15; CPPT FAC ¶¶ 12-14.)  Plaintiffs allege that this "bet against volatility" contravened the Funds' investment strategy of being "effectively market-neutral" and to "never make a forecast on the direction of equities or volatility."  (ATRS Compl. ¶¶ 10, 61; IBEW FAC ¶ 83; *see also* BCBS Compl. ¶ 91; IBEW FAC ¶ 83; Lehigh FAC ¶¶ 133, 147; MTA FAC ¶ 88.)

In making these allegations, Plaintiffs ignore the Funds' express disclosures that the range-bound spreads were "*short volatility*" positions (and so were always sensitive to volatility) (Ex. 6 at 29, 30 (emphasis added)); that these short volatility positions had "contributed two-thirds of the portfolio's alpha since inception" (*id.*); and that the Funds generated "positive payoffs" over the short term only if the S&P 500 Index stayed within the "profit zone."  (PPM at 1.) Accordingly,

-23-

most of the Funds' returns were *always* generated from short volatility positions.  (Ex. 6 at 27.)

Plaintiffs similarly ignore express warnings that the Funds could incur significant losses if there were "[u]nexpected volatility . . . in the markets," which is exactly what occurred in February and March 2020.  (PPM at 29.)  Both the PPMs and marketing materials further disclosed that the Funds' investment strategy was "dependent on the smooth functioning of the option exchanges" and warned that if the "option exchanges are not operating as expected, the option strategies herein could be adversely affected."  (*Id*. at 20.)  Plaintiffs represented that they had "evaluated" and "underst[ood]" these risks. (Subscription Agreement §§ II (K), (L).)

### 2.   Hedging Allegations

Plaintiffs allege that AllianzGI "promised that hedges would be in place 'at all times' to cap the downside risk" and "cabin investment losses to a 'defined maximum loss,'" but that in February and March 2020, AllianzGI "abandoned the hedging strategy . . . , leaving the portfolio almost entirely unhedged against a spike in market volatility."  (BCBS Compl. ¶¶ 3, 5; *see also* CTWW Compl. ¶¶113, 197; FFLD/NEHC SAC ¶¶ 41, 44, 147.)

Certain Plaintiffs allege that in 2019, AllianzGI adopted a new hedging "configuration" strategy focused on purchasing fewer, potentially more protective hedges in low-volatility environments.  (*See, e.g.*, UFCW Compl. ¶¶ 61-63; BCBS Compl. ¶¶ 72-74.)  According to these Plaintiffs, AllianzGI then improperly "abandoned" the new-configuration hedging positions and replaced them with less protective positions in February 2020.  (BCBS Compl. ¶¶ 151, 190; UFCW Compl. ¶ 81.)  But, as clearly stated in the Funds' presentation on the "new configuration" hedges, these positions were to be "enacted *only* when [the Funds] are building positions *in a low VIX environment*,"  (Ex. 6 at 13 (emphasis added), and would be "deploy[ed]" when the VIX was less than . . . 22; but if the VIX was above 22, the Funds would "deploy[]" the "original" configuration hedges.  (*See* BCBS Compl. ¶ 74.)  Because volatility levels in February and March 2020 soared,

with the VIX climbing *above 80*, the "new configuration" hedges were not meant to be in place at those levels of volatility.

### 3. Risk Management Allegations

The Complaints allege that AllianzGI failed to implement or to abide by certain risk management protocols by either failing to conduct adequate "stress tests" or disregarding the tests it did perform, and then speculate that those tests would have identified the risks that materialized in February and March 2020 and their impact on the Funds' portfolios. (*See, e.g.*, CMERS Compl. ¶ 107; CPPT FAC ¶ 89; MTA FAC ¶ 9.) With the benefit of hindsight, Plaintiffs allege lapses in risk management, but never explain how risk management or stress testing should have functioned during the Covid-19 market crash in February and March 2020 or how AllianzGI could have mitigated risks that such tests might have revealed during that market crash.

As the Funds disclosed to Plaintiffs, "[r]estructuring when necessary" was "vital" to the "risk management process." (Ex. 5 at 16.) In other words, in a declining market environment, the Funds would manage risk by closing out of existing options contracts and entering into new "restructure[d] profit zones" based on the equity markets' current position. (PPM at 1; *see* TMRT/BLYR SAC ¶ 54). Plaintiffs conclusorily allege that there is "no excuse" for AllianzGI's allegedly "[in]adequate" restructuring efforts, but they plead no facts showing how AllianzGI could have successfully restructured as the markets whipsawed up and down for weeks in February and March 2020. (TMRT/BLYR SAC ¶ 118.)

### 4. Self-Dealing Allegations

Finally, in every Complaint, Plaintiffs claim that AllianzGI acted out of self-interest in March 2020 and subjected the Funds to additional risk to try to recoup losses that the Funds had incurred in February 2020, not for the benefit of the Funds' investors, but in the hopes that, in reversing those losses, AllianzGI could eventually earn performance fees (even though those fees

were based directly on the Funds' profits).  Plaintiffs variously allege that AllianzGI "doubled down on its risky strategy" to "salvage" its fees, and that AllianzGI "bet [that] a market rebound" would reverse the Funds' underperformance so that it could "receive [] new fees."  (FFLD/NEHC SAC ¶¶ 71, 116; Lehigh FAC ¶¶ 203-06; *see also* ATRS Compl. ¶¶ 101-04; CPPT FAC ¶¶ 81, 87; UFCW Compl. ¶ 70.)

But Plaintiffs do not plead any additional facts to support the required inference that AllianzGI acted for a self-interested purpose in trading the Funds' assets in March 2020.  As shown above, when the Funds had underperformed their benchmarks in prior market dislocations, AllianzGI eventually recouped those losses and continued to earn its performance fees, with no suggestion of any self-dealing.  (*See* Ex. 6 at 11 (showing that as of April 2019, Fund had recovered most of the -6.12% negative return from Q4 2018).)  Plaintiffs now rely solely on the fact that AllianzGI was entitled (exclusively) to a performance fee as its compensation—an arrangement that aligned its interests with those of the Funds' investors—as a basis to claim that AllianzGI somehow acted disloyally in managing the Funds through a historic market dislocation.

## ARGUMENT

## I.    BECAUSE PLAINTIFFS CANNOT ASSERT CLAIMS BASED ON DUTIES OWED TO THE FUNDS THEMSELVES, PLAINTIFFS ARE LIMITED TO DIRECT CLAIMS UNDER ERISA OR THE PARTIES' CONTRACTS.

**Plaintiff Key:**    *All Actions*

In the LLC Agreements, AllianzGI accepted appointment as each Fund's Managing Member responsible for overall "management" and "day-to-day administration" (LLC Agreement §§ 2.01; 2.02), and as Investment Manager with duties that included "*manag[ing] [each] [Fund's] assets.*"  (*Id*. § 2.03.)  The gravamen of Plaintiffs' claims indisputably concerns AllianzGI's "management of the Funds' assets" in February and March 2020, and thus implicates duties that AllianzGI, as Investment Manager, owed *to the Funds* in which Plaintiffs, as non-managing

members of the LLCs, held passive interests.

Under governing Delaware law, "claims of mismanagement . . . are derivative in nature." *Feldman* v. *Cutaia*, 951 A.2d 727, 734-35 (Del. 2008) (citing *Kramer* v. *Western Pacific Indus., Inc.*, 546 A.2d 348, 354 (Del. 1988)); *see Albert* v. *Alex Brown Mgmt. Servs.*, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005) ("claims based on directors' or managers' alleged "mismanagement" of a corporate entity are "'paradigmatic derivative claim[s].''").[16]  In *Newman* v. *Family Management Corporation*, as here, plaintiffs, who were limited partners in an investment fund that suffered losses, brought breach of fiduciary duty and gross negligence claims "based on the alleged mismanagement of the [Fund] through the failure to conduct adequate due diligence." 530 F. App'x 21, 27 (2d Cir. 2013).  In affirming dismissal of those claims, the Second Circuit, applying Delaware law, held that such claims failed to allege any "unique injury" to plaintiffs, and that the claims accordingly "can only be asserted derivatively."  *Id*. (citing *Kramer* v. *W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del.1988) ("A claim of mismanagement . . . represents a direct wrong to the corporation that is *indirectly experienced* by all shareholders") (emphasis added).)

Similarly, plaintiff in *San Diego Cnty. Emps. Ret. Ass'n* v. *Maounis*, 749 F. Supp. 2d 104, 127 (S.D.N.Y. 2010) (Batts, J.), as in this case, sought to recoup losses on highly risky hedge fund investments, and alleged, among other things, that the fund managers breached fiduciary duties and were grossly negligent by "fail[ing] to control for risk" in the fund's "trading activities," "failing to properly manage the Fund," and "failing to exercise proper risk management . . . ." 749

---

[16]     Because the Funds are Delaware LLCs, Delaware law governs whether claims belong to the Funds such that they must be brought derivatively, or whether they belong directly to investors. *See Debussy LLC* v. *Deutsche Bank AG,* 2006 WL 800956, at *2 (S.D.N.Y. Mar. 29, 2006) (Stein, J.) ("When deciding . . . whether claims should be brought directly or derivatively, courts must look to the law of the fund's state of incorporation." (citation omitted)), *aff'd*, 242 F. App'x. 735 (2d Cir. 2007).

F. Supp. 2d at 126.  In dismissing those claims, the court, applying Delaware law, held that "[the] allegation[] that Defendants broke fiduciary duties . . . by failing to manage properly the Fund[] is, like [p]laintiff's gross negligence claims, *a classic claim of fund mismanagement that belongs to the Fund*, and is therefore derivative." *Id*. at 127 (emphasis added); *see also Debussy*, 2006 WL 800956, at *3 (applying Delaware law and finding "injury flowing from a claim of mismanagement . . . by the portfolio manager of the [corporation's] assets[,] is a wrong to the corporation") (citing *Dieterich* v. *Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004)); *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 377 (S.D.N.Y. 2011) (Scheindlin, J.) (dismissing breach of fiduciary duty and gross negligence claims based on "'fail[ure] to supervise . . . the investment of [a] [f]und's assets'" as claims "'that belong[] to the [f]und, and [are] therefore derivative'" (quoting *Maounis*, 749 F. Supp. 2d at 126-27)).

As in *Maounis*, Plaintiffs assert claims that arise from AllianzGI's alleged "mismanagement" of the Funds,[17] but do not assert any claims derivatively and accordingly have made no attempt to meet the requirements of Fed. R. Civ. P. 23.1.[18]  To state such claims in their own right, Plaintiffs—as LLC members akin to corporate shareholders—must allege a "direct injury" to them that is "independent of any alleged injury to the corporation" and "demonstrate

---

[17]     *See*, *e.g.*, ATRS Compl. ¶ 121 (alleging losses due to "negligent *mismanagement of the Alpha Funds*"); BCBS Compl. ¶ 9 (alleging losses "beyond what [BCBS] would have lost had Allianz *managed the funds* prudently"); CLPF Compl. ¶ 190 (alleging AllianzGI "fail[ed] to exercise reasonable care *in properly protecting the Alpha Funds*"); CMERS Compl ¶ 143 (alleging losses "due to AllianzGI's negligent *mismanagement of the Alpha Funds*"); CPPT FAC ¶ 15 (same); CTWW Compl. ¶ 153 (same); FFLD/NEHC SAC ¶ 77 (same); IBEW FAC ¶ 100 (same); Lehigh FAC ¶ 272 (same); MTA FAC ¶ 107 (same); TMRT/BLYR SAC ¶¶ 156-57 (same); UFCW Compl. ¶ 108 (same).

[18]     Rule 23.1 requires, among other conditions, that a complaint asserting derivative claims "be verified" and "state with particularity" attempts to obtain "the desired action" from management, and "the reasons for not obtaining the action or not making the effort."

that the duty breached was *owed to the [Plaintiffs]*," not to the Funds. *Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) (emphasis added). As shown below, the only viable bases in the Complaints of duties "owed to Plaintiffs" in connection with AllianzGI's management of the Funds' assets (*i.e.*, claims that are *not* "paradigmatic" derivative claims under Delaware law) are (i) ERISA or (ii) the parties' contracts.

*First*, by operation of law, when the ERISA 25% Threshold was met or exceeded, AllianzGI was subject to ERISA fiduciary duties in its management of those assets. *See* 29 C.F.R. § 2510.3-101(f)(2). ERISA provides a civil enforcement regime that permits ERISA plan fiduciaries (such as the nine ERISA Plaintiffs) to seek "appropriate relief," including recovery for losses, "resulting from" an investment manager's breach of those duties. *See* 29 U.S.C. §§ 1109, 1132(a)(2).

*Second*, because the Delaware Limited Liability Company Act ("LLCA") provides for "maximum . . . freedom of contract," 6 Del. Code § 18-1101(b), the parties to an LLC agreement, such as those governing the organization of each of the Funds, can establish direct rights by contract. *See Fisk Ventures, LLC* v. *Segal*, 2008 WL 1961156, at *1 (Del. Ch. May 7, 2008) ("Contractual language defines the scope, structure, and personality of limited liability companies."). Here, the parties to the LLC Agreements agreed in Section 2.12 that AllianzGI, when "discharg[ing] its duties" as Investment Manager, would be required to meet specific standards of care—namely, the Contractual ERISA Standard of Care or the Contractual Prudence Standard of Care (depending on whether or not the ERISA 25% Threshold was met) and "extended" these obligations to both ERISA and non-ERISA investors. (*See* Part B.1, *supra.*) Because Section 2.12 comprehensively governs AllianzGI's "discharge" of its duty to manage the Funds' assets, Plaintiffs' tort claims covering the very same subject matter are barred as a matter

of law.  (*See* Part IV, *infra*.)

Even though ERISA and Section 2.12 of the LLC Agreements (or substantially similar contractual provisions in certain Side Letters) are the only sources of AllianzGI's duties to Plaintiffs in connection with AllianzGI's management of the Funds' assets, Plaintiffs (as identified in the Plaintiff Keys below) impermissibly (i) assert common law claims that are preempted under ERISA (*see* Part II, *infra*); (ii) assert contract and implied covenant claims that have no basis in law or the governing agreements (*see* Part III, *infra*); (iii) assert duplicative negligence claims that are barred as a matter of law (*see* Part IV.A., *infra*); (iv) assert breaches of fiduciary duty that are duplicative, that were not owed to Plaintiffs, or that are irrelevant to AllianzGI's management of the Funds' assets (*see* Part IV.B., *infra*); and/or (v) assert breaches of the duty of loyalty and ERISA prohibited transactions unsupported by factual allegations and based on an implausible theory with no legal basis (*see* Part V, *infra*).  The Court should dismiss all of these claims.

## II.     ERISA EXPRESSLY PREEMPTS ERISA PLAINTIFFS' COMMON LAW CLAIMS.

**Plaintiff Key:**     *BCBS; CPPT; IBEW; NEHC; UFCW*[19]

Certain Plaintiffs allege that the ERISA 25% Threshold was met in February and

---

[19]     TMRT and BLYR assert ERISA claims (*see* TMRT/BLYR SAC ¶¶ 158-70), but do not allege when or whether the ERISA 25% Threshold was met, which alone is grounds for dismissal of the ERISA claims.  *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 756 F. Supp. 2d 330, 348 (S.D.N.Y. 2010) (Castel, J.) (dismissing ERISA claims where complaint lacked "factual allegations . . . to add support to the conclusory assertion that [defendant] was a fiduciary with respect to the management of the Plan's assets").  Plaintiffs CLPF and CTWW allege that the ERISA 25% Threshold was met when they initially invested in 2014, not when their claims allegedly arose in 2020, and plead their common law claims "in the alternative" to their ERISA claims.  (*See* CLPF Compl. ¶¶ 158, 171, 187, 201; CTWW Compl. ¶¶ 162, 175, 192.)  Because ERISA preemption cannot be resolved on a motion to dismiss without allegations to support the application of the statute, these four Plaintiffs are not included in this Part II for that reason only.  *See Kuhbier* v. *McCartney, Verrino & Rosenberry Vested Producer Plan*, 95 F. Supp. 3d 402, 418-19 (S.D.N.Y. 2015) (Karas, J.) (denying motion to dismiss claims where application of ERISA unclear).

March 2020 when their claims arose, and that AllianzGI, by operation of law, acted as an ERISA fiduciary in managing the Funds' assets during that time.[20]  As a result, even if those Plaintiffs' common law claims were not barred for the reasons shown in Parts III and IV, *infra*, their claims are preempted by federal law.

ERISA "provide[s] a uniform regulatory regime over employee benefit plans."  *Aetna Health Inc*. v. *Davila*, 542 U.S. 200, 208 (2004).  To achieve this policy goal, ERISA preempts "*any and all State laws* insofar as they . . . *relate to* any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a) (emphasis added).  As the Supreme Court held in *Davila*, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy," 542 U.S. at 209, necessarily "relate[s] to" an employee benefit plan, § 1144(a), and courts have thus "'consistently held that ERISA preempts state common law.'"  *Berg* v. *Empire Blue Cross & Blue Shield*, 105 F. Supp. 2d 121, 130 (E.D.N.Y. 2000) (Hurley, J.) (citation omitted).[21]

State law claims that "stem[] from" or "touch on" the acts of an ERISA fiduciary are subject to preemption.  *United Teamster Fund* v. *MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 473 & n.10 (S.D.N.Y. 2014) (Pauley III, J.).  Because all of Plaintiffs' common law claims necessarily "stem from" AllianzGI's alleged conduct as an ERISA fiduciary, and require this Court

---

[20]     *See* BCBS Compl. ¶ 144 (alleging that Funds' assets "were 'plan assets' under ERISA" (*i.e.*, met the ERISA 25% Threshold) at "all relevant times"); CPPT Compl. ¶ 120 (alleging that "[g]reater than 25%" of Funds' assets were "held by benefit plan investors" and were "therefore . . . plan assets subject to ERISA"); FFLD/NEHC SAC ¶ 138 (alleging "benefit plan investors held more than 25%" of Fund's "equity interests" during "January, February, and March 2020"); IBEW FAC ¶¶ 29, 141 (same); UFCW Compl. ¶ 132 (same).

[21]     *See also, e.g.*, *Chau* v. *Hartford Life Ins. Co*., 167 F. Supp. 3d 564, 571 (S.D.N.Y. 2016) (Woods, J.) (ERISA preemption "extends to state common-law contract and tort actions"); *Antell* v. *United Healthcare Ins. Co. of N.Y.*, 2012 WL 13042822, at *1 (S.D.N.Y. Mar. 16, 2012) (Sullivan, J.) ("[A]ll common law causes of action that 'relate to' an employee benefit plan fall under ERISA's express preemption clause" (citation omitted)).

to evaluate that conduct against a standard of care, which is the exclusive province of ERISA, their common law claims are preempted.[22]  *See LoPresti* v. *Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (finding ERISA preempted common law conversion claim because claim was "nothing more than an alternative theory for recovery for conduct actionable under ERISA" (quotations and citation omitted)); *Toussaint* v. *JJ Weiser & Co.*, 2005 WL 356834, at *14 (S.D.N.Y. Feb. 13, 2005) (Mukasey, J.) (finding breach of fiduciary duty claims "within the scope" of ERISA's preemptive reach); *Pedre Co.* v. *Robins*, 901 F. Supp. 660, 665 (S.D.N.Y. 1995) (Sotomayor, J.) ("Breach of fiduciary duty is necessarily an ERISA claim.").  Thus, courts routinely hold that common law claims against investment managers acting in an ERISA fiduciary capacity are preempted.  *See*, *e.g.*, *N.J. Carpenters Annuity Fund* v. *Meridian Diversified Fund Mgmt., LLC*, 2011 WL 1842772, at *5 (S.D.N.Y. May 11, 2011) (Griesa, J.) (breach of fiduciary duty claims against hedge fund manager for allegedly failing to monitor fund's investments preempted where "complaint ar[ose]" from management of "ERISA plan assets" (citing *Davila*, 542 U.S. at 213-14)).  The Court should do the same here.

## III.   PLAINTIFFS ALLEGE EXPRESS OR IMPLIED CONTRACTUAL OBLIGATIONS THAT DO NOT EXIST OR ARE TOO SPECULATIVE TO STATE A CLAIM.

### A.   Plaintiffs' Contract Claims Impermissibly Rely on Out-of-Context Statements That Do Not Constitute Contractual Obligations.

---

[22]   Tellingly, Plaintiffs explicitly invoke ERISA fiduciary standards in claiming that AllianzGI breached its duties.  *See* UFCW Compl. ¶ 122 (alleging breach of fiduciary duty based on alleged failure to manage Funds' assets "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity . . . would use"); CPPT Compl. ¶ 106 (same); FFLD/NEHC SAC ¶¶ 111, 123, 129 (same for breach of fiduciary duty breach of contract, and breach of implied covenant claims); IBEW FAC ¶¶ 106, 122, 127 (same for negligence, breach of implied covenant, and breach of fiduciary duty claims).  Indeed, BCBS's sole common law claim for breach of contract is virtually identical to its ERISA breach of fiduciary duty claim.  (*Compare* BCBS Compl. ¶ 151(a)-(j), *with* ¶ 190(a)-(j).)

**Plaintiff Key:** *All Actions except BCBS*[23]

To become a member of a Fund, each Plaintiff entered into a Subscription Agreement "upon the *terms and conditions*" in that Agreement, "in the [PPM]," "and in the [LLC] Agreement." (Subscription Agreement at 7 (emphasis added).)[24]  But rather than point to any "term or condition" in those documents (*i.e.*, statements amounting to rights or obligations), Plaintiffs rely on out-of-context statements in the PPMs that do not describe contractual obligations at all, and thus Plaintiffs fail to state a claim for breach of contract.[25]  *Partner Reinsurance Co.* v. *RPM Mortg., Inc.*, 2019 WL 3802235, at *5 (S.D.N.Y. Aug. 13, 2019) (Engelmayer, J.) (dismissing breach of contract claims and holding that where "the allegations of a pleading 'are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]'" (quoting *Sazerac Co.* v. *Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994) (Sweet, J.)).

*First*, Plaintiffs variously allege that AllianzGI was "obligated" to take specific actions and adhere to the investment strategy described in the PPMs.  For example, FFLD/NEHC and

---

[23]     Parts III, IV and V, *infra*, are moot as to BCBS; CPPT; IBEW; NEHC; and UFCW in the event this Court finds their common law claims preempted under ERISA.  (*See* Part II, *supra*.)

[24]     The LLC and Subscription Agreements are governed by Delaware law.  (*See* Ex. 1 at 30 (§ 8.05); Ex. 3 at 19 (§ VI.).)

[25]     To the extent not held preempted, AllianzGI does not seek to dismiss BCBS's breach of contract claim insofar as it is based on the alleged breach of Section 2.12 or of a "Contractual Fiduciary Standard of Care" in an Investment Management Agreement with BCBS that is substantially similar to the Contractual Standards of Care in Section 2.12.  (*See* BCBS Compl. ¶¶ 187-88; Ex. 47 at 4-5; App. C.)  AllianzGI also does not seek to dismiss similar breach of contract claims in TMRT/BLYR, FFLD/NEHC or MTA to the extent they are based on the Contractual Prudence Standard in Section 2.12 or a substantially similar provision in a Side Letter. (*See* TMRT/BLYR SAC ¶ 142; FFLD/NEHC SAC ¶ 123; MTA FAC Count III; App. C). BCBS's, TMRT/BLYR's, FFLD/NEHC's and MTA's remaining breach of contract claims fail for the reasons in Parts III.A., III.B., and/or III.C, as applicable.

TMRT/BLYR both allege that AllianzGI was "*required . . . to invest" each Fund's assets* "pursuant to" or "in accordance with" the "terms of the PPMs."   (FFLD/NEHC SAC ¶ 121; TMRT/BLYR SAC ¶ 138 (emphasis added).)   But in making this claim, Plaintiffs ignore disclosures in the PPMs—repeated *three times*—that "[t]he Managing Member may . . . *formulate new approaches* to carry out the Fund's investment objective[, and] [t]he Fund *may change any of its investment strategies without prior consent of, or notice to*, the [Non-Managing] Members." (PPM at 2, 19-20, 22 (emphasis added).)[26]

Other Plaintiffs similarly allege that AllianzGI was "*obligated . . .* to engage in a strategy *to 'consist of investments in puts and calls* on equity indices'"   (UFCW Compl. ¶ 110 (emphasis added); *see* MTA FAC ¶ 122; IBEW Compl. ¶ 114), or that "AllianzGI was *obligated* to '*optimize spread positions and profit zones*'" (ATRS Compl. ¶ 152 (emphasis added); *see* CLPF Compl. ¶ 203; CTWW Compl ¶ 208; CMERS Compl. ¶ 178; Lehigh FAC ¶ 279; UFCW Compl. ¶ 110). These allegations ignore AllianzGI's discretion to "formulate new approaches" to managing the Funds' assets.  (PPM at 2, 19, 22.)  Even worse, the Complaints distort the PPMs, which state only that "[AllianzGI] **seeks to** optimize spread positions and profit zones," and that the "alpha component" of the Funds' investment strategy "**will initially** consist of investments in puts and calls on equity indices."  (PPM at 1, 19 (emphasis added).)

Plaintiffs cannot state a breach of contract claim for failure to follow a generalized description of the investment strategy in the PPMs when AllianzGI had broad discretion to change

---

[26]    Four Plaintiffs (ATRS, CMERS, MTA, and UFCW) contending that AllianzGI was somehow obligated to follow a specific investment strategy also claim that AllianzGI breached provisions in Side Letter Agreements requiring "prompt notice *of any fundamental change in investment strategy*," thus conceding that AllianzGI was empowered to make such changes. (ATRS Compl. ¶¶ 153, 155 (emphasis added); *see* CMERS Compl. ¶¶ 181, 183; MTA FAC ¶ 124; UFCW Compl. ¶ 112.)  In any event, these Plaintiffs' claims based on alleged breach of such notice provisions are speculative and fail as a matter of law.  (*See* Part III.B., *infra*.)

the Funds' strategy.  As in *Maounis*, where Judge Batts dismissed an LLC member's contract claims against a hedge fund manager based on alleged failure to adhere to a particular investment strategy described in the governing documents, "no contractual obligation . . . sustain[s] Plaintiff's claims" and the PPM "put Plaintiff on due notice that [managing member] *had broad discretion and no formal requirements with regard to its investment . . . strategies*."  749 F. Supp. 2d at 128-29 n.7 (applying New York law) (emphasis added); *Zazzali* v. *Alexander Partners, LLC*, 2013 WL 5416871, at *12 (D. Del. Sept. 25, 2013) (dismissing breach of contract claims against securities brokers where plaintiff "failed to identify an actual contractual obligation . . . to which the defendants were subject").

*Second*, Plaintiffs who mischaracterize as an "obligation" the statement in the PPMs that "[AllianzGI] *seeks to optimize* spread positions and profit zones" (PPM at 1, 19 (emphasis added))[27] not only mangle the language of the PPM and ignore AllianzGI's discretion to change strategies, but further disregard that this is a forward-looking statement, on which Plaintiffs were expressly warned "*not [to] place undue reliance*."  (*Id*. at iv (stating that "forward-looking statements" in PPM are identified "by words like 'expect', 'intend' and by 'similar expressions'" and warning that such statements are *not "representation[s]" that "the results [] will actually be achieved*") (emphasis added).)  Plaintiffs cannot transform a statement about what the Funds "seek to" achieve into a contractual guarantee.  *See Shemian* v. *Rsch. In Motion Ltd*., 2013 WL 1285779, at *24 (S.D.N.Y. Mar. 29, 2013) (Sullivan, J.) (finding forward-looking statements inactionable under "bespeaks caution" doctrine where "investors were provided with substantial warnings" that plans "could be impacted by unforeseen circumstances"), *aff'd*, 570 F. App'x 32 (2d Cir. 2014);

---

[27]     *See* ATRS Compl. ¶ 152; CLPF Compl. ¶ 203; CTWW Compl ¶ 208; CMERS Compl. ¶ 178; UFCW Compl. ¶ 110; Lehigh FAC ¶ 279.

*City of Omaha Police & Fire Ret. Sys*. v. *Evoqua Water Techs. Corp*., 450 F. Supp. 3d 379, 396-97 (S.D.N.Y. 2020) (Nathan, J.) (finding statements "refer[ring] to expectations and predictions about the future" that were "accompanied by sufficient cautionary language" are "not actionable" (citation omitted)); *Great Lakes Chem. Corp.* v. *Pharmacia Corp.*, 788 A.2d 544, 556 (Del. Ch. 2001) (finding fraud claims "explicitly precluded" by disclaimers in contract).

*Third*, certain Plaintiffs allege that AllianzGI was obligated to "develop the appropriate systems and procedures to control *operational risk*" (IBEW FAC ¶ 115; MTA FAC ¶ 125; UFCW Compl. ¶ 113 (emphasis added)), while ignoring that the PPMs defined "operational risk" as "arising from," for example, "mistakes made in the confirmation or settlement of transactions," "transactions not being properly booked," or "mistakes in the development or applications of models" or "other similar disruptions *in the [Funds'] operations*." (PPM at 34 (emphasis added).) Plaintiffs do not contend that this kind of operational "mistake" caused their alleged investment losses. *See Great Lakes Chem. Corp.*, 788 A.2d at 549 (dismissing breach of contract claim where "[n]othing in the complaint links the alleged breach and the claimed injury"); *Hudson's Bay Co. Luxembourg, S.A.R.L.* v. *JZ LLC*, 2011 WL 3082339, at *3 (Del. Super. Ct. July 26, 2011) (dismissing claim for breach of representation in purchase agreement as "a *non-sequitur* because the injury does not logically flow from the breach" (quotation and citation omitted)).

*Finally*, CPPT alleges that AllianzGI "represented" that it would "*do all acts* for the preservation, protection, improvement, and enhancement in value of all assets," and that "[f]ailing to implement risk management procedures . . . would be a breach of *that obligation*." (CCPT FAC ¶ 113 (emphasis added).) In fact, the LLC Agreement provides that AllianzGI "*shall have the power*" (*i.e.*, the authority, not the obligation, and certainly not a "representation") to "*do all acts* for the preservation" of the Funds' assets. (LLC Agreement § 2.02(s) (emphasis added).) The

grant of a power or right under a contract to take future unspecified actions does not provide a basis for liability.  *See Cooper* v. *Gottlieb*, 2000 WL 1277593, at *6 (S.D.N.Y. Sept. 8, 2000) (Koeltl, J.) (granting summary judgment to defendants on plaintiffs' breach of contract claims under both New York and Delaware law where defendants failed to vote shares on certain issues because "[t]he clear terms of the [v]oting [a]greement did not require the defendants to vote the shares on all issues, but rather gave them the authority and power to do so"), *aff'd*, 12 F. App'x 28 (2d Cir. 2001).

> ### B.   Plaintiffs Fail to Allege a Breach of Contract Based on Failure to Notify of a Supposed Change in Investment Strategy.
>
> **Plaintiff Key:**   *ATRS; BCBS; CMERS; MTA; UFCW*

In their Complaints, certain Plaintiffs allege that AllianzGI breached obligations in Side Letters "to provide [Plaintiff] with prompt notice of any fundamental change in the investment strategy . . . from that as described in the [Funds'] governing documents."  (*See* ATRS Compl. ¶¶ 153, 155).[28]  Even assuming *arguendo* that some kind of a "change" in strategy occurred, Plaintiffs do not allege, as required to state a breach of contract claim, when, in retrospect, such notice allegedly should have been given, or how a supposed failure to give notice caused their claimed damages.  *See Moore Bus. Forms, Inc*. v. *Cordant Holdings Corp*., 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995) ("a complaint stating a claim for breach of contract must identify . . . resulting damage to the plaintiff")); *Ark. Dev. Fin. Auth.* v. *Wiley*, 2020 Ark. 395, at 5, 611 S.W.3d 493, 498 (2020) (breach of contract claim "must assert . . . damages resulting to plaintiff from the

---

[28]    *See* CMERS Compl. ¶¶ 181,183 (same); MTA FAC ¶ 124 (alleging AllianzGI failed to "inform [Plaintiffs] promptly in writing of . . . any material change in the investment strategies disclosed in the [Fund] Documents"); UCFW Compl. ¶ 112 (same as MTA FAC).

breach").[29]

In failing to plead when AllianzGI should have given "notice," Plaintiffs ignore the limitations on their right to withdraw capital from the Funds. (*See* PPM at 7 (withdrawals generally permitted as of end "of each calendar month" if request received by "fifth . . . [b]usiness [d]ay" of the month, with requests after fifth day deferred to end of following month).)  Plaintiffs do not plead when or even whether they would or could have submitted a withdrawal request during the chaotic market events of February and March 2020 that would have reduced their investment losses.  Plaintiffs also ignore the warnings in the PPM that Plaintiffs' interests in the Funds would be "illiquid"; that Plaintiffs "may not be able to liquidate their investment in the event of an emergency or for any other reason"; and that withdrawals could be completely suspended in "extraordinary circumstances," including where the "market for . . . derivative instruments . . . are otherwise sufficiently disrupted."  (PPM at 32, 44-45.)

Without any allegations to tie AllianzGI's alleged failure to notify Plaintiffs of a supposed strategy change to any claimed losses, Plaintiffs' breach of contract claims are speculative and must be dismissed.  *See Palatkevich* v. *Choupak*, 152 F. Supp. 3d 201, 219 (S.D.N.Y. 2016) (McMahon, J.) (granting summary judgement to defendant on breach of contract claim under Delaware law because plaintiff "suffered no damage from the lack of notice" where plaintiff could not have affected outcome "even if he received prior notice"); Dan B. Dobbs, LAW OF REMEDIES § 12.4(2) (2d ed. 1993) (plaintiff cannot recover losses "which would have resulted even if the defendant had not breached"); *Kuroda* v. *SPJS Holdings*, L.L.C., 971 A.2d 872, 884 (Del. Ch.

---

[29]     ATRS's Side Letters are governed by Arkansas law.  (*See* Exs 43 at 12; Ex. 45 at 13.)  The CMERS and UFCW Side Letters are governed by Delaware law.  (*See id*., Ex. 57 at 8; Ex. 109 at 8.)  The MTA Side Letters do not include a choice of law provision, and BCBS improperly relies on the LLC Agreement, governed by Delaware law.  (*See infra*, n. 30.)

2009) (the "possibility" of "speculative harm is not sufficient to state a claim for breach of contract"); *NanoMech, Inc.* v. *Suresh*, 2013 WL 4805692, at *4-5 (W.D. Ark. Sept. 9, 2013) (applying Arkansas law and dismissing breach of contract claim where "damages as a result of the breach" were not alleged), *aff'd on other grounds*, 777 F.3d 1020 (8th Cir. 2015).[30]

    **C.**    **Plaintiffs Fail to Identify Any "Gap" in the Parties' Agreement to Support a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.**

    **Plaintiff Key:**    *FFLD/NEHC; IBEW; Lehigh; MTA; TMRT/BLYR.*

As the Delaware Supreme Court has repeatedly held, the implied covenant of good faith and fair dealing is a "'limited and extraordinary legal remedy'" and a "'cautious enterprise'" that may be used to "'imply[] terms in the agreement'" in order to "analyze unanticipated developments or to fill gaps in the contract's provisions.'" *Oxbow Carbon & Mins. Holdings, Inc.* v. *Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 506-07 (Del. 2019) (quoting *Nemec* v. *Shrader*, 991 A.2d 1120, 1125, 1128 (Del. 2010); *Dunlap* v. *State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)). Courts apply this doctrine rarely and only in narrow circumstances where, unlike here, a plaintiff can show that the parties to an agreement "*failed to address an issue*, but it is clear what the parties would have done had they considered the issue." *Marubeni Spar One, LLC* v. *Williams Field Servs. - Gulf Coast Co.*, 2020 WL 64761, at *9 (Del. Ch. Jan. 7, 2020) (emphasis added). But the implied covenant "'does not apply when the contract addresses the conduct at issue,'" and

---

[30]    BCBS conclusorily alleges that AllianzGI's obligation "to provide advance notice of any material adverse amendment *to the [LLC] Agreements*" (*see* LLC Agreement § 8.03 (emphasis added)) somehow also "required advance notice of changes to the . . . investment strategy." (BCBS Compl. ¶¶ 193-94). Like other Plaintiffs, BCBS ignores that the Funds could change "any of [their] investment strategies without prior consent of, or notice to" the non-managing members (PPM at 2, 19-20; *see id.* at 30)—which is why certain Plaintiffs separately negotiated for notice of a "material" or "fundamental" change in investment strategy in Side Letters. "Consistent with Delaware's pro-contractarian policy," BCBS "'may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table.'" *MidCap Funding X Tr.* v. *Graebel Cos.*, 2020 WL 2095899, at *10 (Del. Ch. Apr. 30, 2020) (citation omitted).

instead the contract must be "'truly silent concerning the matter at hand.'"  *Oxbow*, 202 A.3d at 507 (citations omitted).  Plaintiffs fail to state a claim for breach of the implied covenant for at least the following reasons.

*First*, as shown above (*see* Part I, *supra*), the LLC Agreements comprehensively and specifically address how AllianzGI agreed to perform its duties as Investment Manager—either in accordance with the Contractual ERISA Standard of Care or the Contractual Prudence Standard of Care.  Plaintiffs' claims for breach of the implied covenant concern this very subject matter— *i.e.*, *how* AllianzGI was allegedly to perform its duties.  (*See*, *e.g.*, Lehigh FAC ¶¶ 293-94 (alleging AllianzGI breached implied covenant by making investment decisions "unreasonably and in bad faith"); FFLD/NEHC SAC ¶ 128 (alleging breach based on "exposing . . . investors to significant risk" and "abandoning . . . prudent risk controls"); TMRT/BLYR SAC ¶ 148 (same); MTA FAC ¶ 143 (alleging AllianzGI engaged in "arbitrary and unreasonable conduct in direct conflict with the [investment] strategy"); IBEW Compl. ¶ 122 (same).)  In fact, these Plaintiffs assert breaches of the *existing contractual obligations* in Section 2.12 of the LLC Agreements, which expressly prescribes the standards applicable to AllianzGI's duties as Investment Manager and thus leaves no "gap" for Plaintiffs' implied covenant claims to fill.  *Reklam* v. *Bellator Sport Worldwide LLC*, 2017 WL 5172397, at *6-7 (D. Del. Nov. 8, 2017) (holding that "the implied covenant of good faith and fair dealing does not apply as a matter of law" to provisions already in contract), *report adopted by* 2017 WL 5985562; *Kuroda*, 971 A.2d at 888-89 (granting motion to dismiss implied covenant claim where "the express terms of the contract . . . control[led] such a claim").

*Second*, the implied covenant is not a "'free-floating duty' of objective fairness" or good faith, particularly where, as here, the LLC Agreements set the governing standards of care.  *In re Encore Energy Partners LP Unitholder Litig.*, 2012 WL 3792997, at *12 (Del. Ch. Aug. 31, 2012);

*see Campbell* v. *Plant Health Intermediate, Inc.*, 2020 WL 3127809, at \*4 (S.D.N.Y. June 12, 2020) (Halpern, J.) ("[a] plaintiff cannot rely on 'general allegations of bad faith conduct'" to state claim for breach of implied covenant (quoting *Kuroda*, 971 A.2d at 888)).  Plaintiffs' claims for breach of the implied covenant impermissibly tack on a "free-floating" good faith duty to AllianzGI's obligations as Investment Manager, even though Section 2.12 of the LLC Agreements sets the standards for AllianzGI's "discharge [of] its duties."  (LLC Agreement § 2.12.)  Because, when entering into the LLC Agreements, the parties covered this subject matter, Plaintiffs cannot now invoke, years later, the implied covenant to interpose new or different obligations or standards on AllianzGI, and their claims should be dismissed.

## IV.  PLAINTIFFS' BREACH OF FIDUCIARY DUTY AND NEGLIGENCE CLAIMS ARE BARRED BY THE GOVERNING AGREEMENTS OR OTHERWISE FAIL AS A MATTER OF LAW.

This Court should reject Plaintiffs' scattershot attempts to plead around Section 2.12 of the LLC Agreements to try to assert tort claims.  As shown below: (i) Plaintiffs' negligence claims are impermissibly duplicative of their contract claims; (ii) Plaintiffs' various theories of fiduciary liability are equally duplicative or have no application to the conduct alleged in the Complaints; and (iii) all Plaintiffs' tort claims are barred by the economic loss doctrine.

### A.  Plaintiffs' Negligence Claims Are Impermissibly Duplicative of Their Contract Claims.

**Plaintiff Key:**     *All Actions except BCBS*

Under longstanding New York law, where a negligence claim "'do[es] no more than assert violations of a duty which is identical to and indivisible from . . . contract obligations,'" the negligence claim must be dismissed.  *Metro. W. Asset Mgmt., LLC* v. *Magnus Funding, Ltd*., 2004 WL 1444868, at \*9 (S.D.N.Y. June 25, 2004) (Buchwald, J.) (quoting *Luxonomy Car, Inc.* v.

*Citibank, N.A.*, 408 N.Y.S.2d 951, 954 (N.Y. App. Div. 2d Dep't 1978)).[31]  As Judge Furman held, "New York law . . . does not recognize a cause of action for the negligent performance of a contract" and that "to prevail on a negligence claim," plaintiff "must demonstrate that [d]efendants breached a duty independent from their obligations under the contract."  *Cohen* v. *Avanade, Inc.*, 874 F. Supp. 2d 315, 326 (S.D.N.Y. 2012) (Furman, J.) (citation omitted).  Because Plaintiffs explicitly ground their negligence claims in contractual duties, this Court should dismiss their duplicative tort claims.

Specifically, Plaintiffs contradictorily allege that AllianzGI owed "a duty of care" *in tort* "arising out of the *LLC Agreements, Subscription Agreements*" (and, as applicable, "*Side Letter Agreements*").  (ATRS Compl. ¶¶ 123-24 (further alleging that AllianzGI owed a duty of care arising from its "responsib[ility] for the general management of the investment portfolios . . . *under the [LLC] Agreement[s]*") (emphasis added).)[32]  FFLD/NEHC and TMRT/BLYR similarly claim that AllianzGI owed a duty of care based on "the *privity . . . established by the Subscription Agreements, PPMs and LLC Agreements*."  (FFLD/NEHC SAC ¶ 101 (emphasis added); *see* TMRT/BLYR SAC ¶¶ 152-53 (same).)  IBEW, MTA and UFCW specifically invoke AllianzGI's

---

[31]     Because Plaintiffs claim that allegedly tortious conduct—AllianzGI's supposed mismanagement of the Funds—took place in New York City where AllianzGI is headquartered, New York law governs Plaintiffs' negligence claims.  (*See, e.g.*, ATRS Compl. ¶ 38.)  *AHW Inv. P'ship* v. *Citigroup Inc.*, 980 F. Supp. 2d 510, 524 (S.D.N.Y. 2013) (Stein, J.) (in context of tort claims, "[w]herever the loss was felt, New York is the jurisdiction with the greatest interest in litigation . . . regarding conduct based in New York. Accordingly, New York law governs these claims"), *aff'd sub nom. AHW Inv. P'ship, MFS, Inc.* v. *Citigroup Inc.*, 661 F. App'x 2 (2d Cir. 2016).  New York law likewise governs whether the negligence claims are duplicative of the breach of contract claims.  *See G.L.M. Sec. & Sound, Inc.* v. *LoJack Corp.*, 2011 WL 4594825, at *6 (E.D.N.Y. Sept. 30, 2011) (Seybert, J.) (concluding that substantive law applicable to tort claim governed whether it was duplicative of breach of contract claim governed by other state's law), *on recons. in part*, 2012 WL 4512499 (E.D.N.Y. Sept. 28, 2012).

[32]     *See* CLPF Compl. ¶¶ 188-89 (same); CPPT FAC ¶¶ 98-99 (same); CMERS Compl ¶¶ 145-146 (same); CTWW Compl. ¶¶ 193-94 (same).

-42-

"*agree[ment]* to 'exercise the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use'" in similar circumstances—which precisely tracks the Contractual Prudence Standard provided for in Section 2.12.  (IBEW FAC ¶ 107 (emphasis added); *see* MTA FAC ¶ 115 (same); UFCW Compl. ¶ 103 (same); *see also* Lehigh FAC ¶ 271 (alleging "AllianzGI failed to act as a reasonably prudent investment manager by mismanaging the Funds").)[33]

The negligence claims rest on purported tort duties—in short, to manage the Funds' assets prudently or reasonably—that are "indivisible" from the Contractual Standards of Care imposed on AllianzGI in Section 2.12 of the LLC Agreements.  Because it is "well-established" that a tort claim must be based on a "legal duty independent of the contract itself," and because Plaintiffs fail to identify any such duty (and indeed, expressly rely on contractual duties), their negligence claims must be dismissed.  *Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987).

### B.   Plaintiffs Fail to Identify Any Claim for Breach of Fiduciary Duty That Is Independent of Section 2.12 of the LLC Agreements.

**Plaintiff Key:**   *All Actions except BCBS*

It is a "'well-settled principle'" of Delaware law "'that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim,' and 'any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous.'"  *In re WeWork Litig.*, 2020 WL 6375438, at *11 (Del. Ch. Oct. 30, 2020) (quoting *Nemec*, 991 A.2d at 1129); *see id.* ("[T]o allow a fiduciary duty claim to coexist in parallel with a contractual claim, would undermine the primacy of contract law

---

[33]     Lehigh also asserts a negligence claim based on AllianzGI's purported duties as "Managing Member" of the Fund and as an "investment advisor," and asserts claims for breach of fiduciary duty on nearly identical grounds.  (*Compare* Lehigh FAC ¶¶ 257-58 *with* ¶¶ 268-69.)  Those claims fail for the reasons discussed in Parts IV.B.1 and B.3, *infra*.

over fiduciary law in matters involving . . . contractual rights and obligations." (alteration in original) (quotations omitted)).  Thus, "a plaintiff bringing a claim based entirely upon a breach of the terms of a contract generally must sue in contract" to "prevent[] gratuitous 'bootstrapping' of contract claims into tort claims."  *Del. State Univ. Student Hous. Found*. v. *Ambling Mgmt. Co.*, 556 F. Supp. 2d 367, 377 (D. Del. 2008) (quotations and citation omitted); s*ee also MHS Cap. LLC* v. *Goggin*, 2018 WL 2149718, at *8 (Del. Ch. May 10, 2018) (where breach of fiduciary duty claim "arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim" (quoting *Nemec*, 991 A.2d at 1129)).

Delaware law "recognize[s] a narrow exception" to this rule such that breach of contract and breach of fiduciary duty claims may arise from the same "nucleus of operative facts" only "[w]here there is an independent basis for the fiduciary duty claims apart from the contractual claims."  *In re WeWork*, 2020 WL 6375438, at *12 (quotations omitted).  Because (i) the parties expressly agreed to replace Delaware "default" fiduciary duties with the duties in the LLC Agreements, and (ii) Plaintiffs' breach of fiduciary duty claims are otherwise duplicative of Section 2.12, or are based on purported fiduciary duties having no application here, the Court should dismiss Plaintiffs' fiduciary duty claims.

### 1.    The Parties Expressly Agreed That Section 2.12 Replaced "Default" Fiduciary Duties Under Delaware Law.

**Plaintiff Key:**    *All Actions except BCBS*

In the Complaints, Plaintiffs recite that AllianzGI owed them fiduciary duties "as Managing Member" or "Investment Manager" of the Funds.  (*See*, *e.g.*, ATRS Compl. ¶ 136; CLPF Compl. ¶ 172; CMERS Compl. ¶ 159.)[34]  This claimed theory of liability ignores that by

---

[34]    *See also* CPPT FAC ¶ 106; CTWW Compl. ¶ 178; FFLD/NEHC SAC ¶ 109; IBEW FAC ¶ 127; Lehigh FAC ¶ 257; MTA FAC ¶ 148; TMRT/BLYR SAC ¶ 128; UFCW Compl. ¶ 118.

defining Contractual Standards of Care in Section 2.12 for the management of the Funds' assets, the parties displaced any "default" fiduciary duties owed under governing Delaware law.[35]

Specifically, in keeping with the "maximum . . . freedom of contract" allowed under the LLCA (6 Del. Code §18-1101(b)), the parties to an LLC agreement may modify and even "eliminate[]" an LLC managing member's common law fiduciary duties. *Id*. §§ 18-1101(c), 1104.[36]  The LLC Agreements, in language that tracks the LLCA, expressly provide that any provisions "modify[ing], restrict[ing] or eliminat[ing] the duties (*including fiduciary duties*) . . . of any person . . . *with respect to matters expressly provided for in this Agreement* are agreed by the parties hereto *to replace such other duties and liabilities of such person*."  (LLC Agreement § 2.07 (emphasis added).)

In *Goggin*, as here, the parties set out a contractual standard of care whereby the LLC manager agreed to "discharge his . . . duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believes to be in the best interests of the [LLC]."  2018 WL 2149718, at *3.  The court dismissed fiduciary duty claims, holding that because the manager's obligations were "defined in . . . the [LLC] agreement," which set a specific standard of care, "[a]ll of the conduct that could conceivably form the basis of a fiduciary duty claim . . . is clearly covered by the duties spelled

---

[35]     To the extent AllianzGI's purported fiduciary duties arise under Delaware law from its role as a managing member of or investment advisor to the Funds, Delaware law also governs whether that claim is duplicative of contract claims. *See Kagan* v. *HMC-New York, Inc*., 939 N.Y.S.2d 384, 387 (N.Y. App. Div. 1st Dep't 2012) (holding that trial court "reli[ed] correctly on Delaware law" in dismissing a breach of fiduciary duty claim as duplicative of a breach of contract arising from Delaware LLC agreement).

[36]     The LLCA's only limitation is that parties may not contract out of the "implied contractual covenant of good faith and fair dealing." 6 Del. Code § 18-1101(c).  Plaintiffs' claims for breach of the implied covenant equally fail for the reasons shown above.  (*See* Part III.C., *supra*.)

out in the [LLC] agreement." *Id.* at *8.  As in *Goggin*, the parties to the LLC Agreements defined how AllianzGI was to "discharge its duties" in Section 2.12, leaving no basis for an extra-contractual breach of fiduciary duty claim.

Similarly, in *Kagan*, applying Delaware law, the Appellate Division expressly found that an LLC agreement that limited liability of managers who "'act in good faith and in the best interest of the Company'" sufficed to "*eliminat[e] the traditional fiduciary duties imposed under Delaware law*" and "impose[d] only [those] specific limited contractual obligations on the managers."[37]  939 N.Y.S.2d at 388 (emphasis added).  The court held that allowing those defunct fiduciary duties to be "resurrect[ed] . . . would simply and impermissibly allow the plaintiff to plead his breach of contract claims under a different guise."  *Id.*

Because, as in *Goggin* and *Kagan*, Section 2.12 of the LLC Agreements "modif[ied]" common law fiduciary duties and because the parties expressly agreed that such duties were "replaced" by the terms of the contract (LLC Agreement § 2.07), Plaintiffs' claims based on breach of default fiduciary duties under Delaware law should be dismissed.

### 2.    Plaintiffs Assert Breach of Fiduciary Duty Claims That Are Expressly Duplicative of Section 2.12 of the LLC Agreements

**Plaintiff Key:**    *ATRS; CLPF; CMERS; CPPT; CTWW; FFLD/NEHC; IBEW; MTA; TMRT/BLYR; UFCW*

Under Delaware law, "[t]o determine whether there is an independent basis for fiduciary claims arising from the same general events on which a breach of contract claim is based, the Court

---

[37]    Certain Plaintiffs concede that the LLC Agreements "modified" AllianzGI's default fiduciary duties, while ignoring that, under Delaware law and Section 2.07, those "modifications" replaced such duties.  (*See, e.g.*, MTA FAC ¶¶ 149-50 (acknowledging that "[t]he scope of [AllianzGI's fiduciary duty as Managing Member] was *further modified by the [] Fund Agreements*" and describing the Contractual Standards of Care from Section 2.12); IBEW FAC ¶¶ 128-29 (same).)

inquires whether the fiduciary duty claims 'depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy.'" *Finom Mgmt. GmbH* v. *Celerion Holdco, LLC*, 2019 WL 4451980, at *5 (D. Del. Sept. 17, 2019) (quotations and citation omitted).

Rather than assert claims that are "broader in scope," Plaintiffs explicitly rest their breach of fiduciary duty claims on AllianzGI's contractual duties.  Indeed, echoing the Contractual Prudence Standard, Plaintiffs allege that "AllianzGI had an obligation to carry out its fiduciary duties with respect to the Alpha Funds with the care, skill, prudence, and diligence under the circumstances" as a prudent person "in a like capacity" and familiar with options trading "would use in a similar situation."  (ATRS Compl. ¶ 139; CLPF Compl. ¶ 176; CMERS Compl. ¶ 164; CTWW ¶ 176; UFCW Compl. ¶ 122 (referencing "Contractual Fiduciary Standard of Care"); MTA FAC ¶¶ 149-50 (citing expressly to Contractual Standards of Care); IBEW FAC ¶¶ 128-29 (same).[38]  The Court should dismiss these plainly duplicative claims.  *Finom*, 2019 WL 4451980, at *5 (dismissing breach of fiduciary duty claims that were "essentially duplicative" of contract claims and "predicated on" the alleged failure to meet contractual obligations); *Kagan*, 939 N.Y.S.2d at 388 ("Since the fiduciary claims are substantially identical to the breach of contract claims they were properly dismissed." (citing *Nemec*, 991 A.2d at 1129)).

### 3. Plaintiffs Disclaimed That AllianzGI Owed Fiduciary Duties as an Investment Advisor.

**Plaintiff Key:**      *CLPF; CMERS; CTWW; Lehigh*

---

[38]      *See also* CPPT FAC ¶ 106 (alleging duty "to act with the requisite level of care of a skilled investment manager"); FFLD/NEHC SAC ¶ 106 (alleging duty "to exercise the care, loyalty, skill and judgment that a reasonably prudent investment manager would exercise in a similar position, and under similar circumstances"); TMRT/BLYR ¶ 130 (alleging duty to use "care, skill, prudence, and diligence under the circumstances . . . that a prudent person acting in a like capacity, and with [similar] experience . . .would use in a similar situation").

In their Complaints, Plaintiffs conclusorily assert that as "an investment adviser registered with the SEC," AllianzGI owed "professional duties of care" under common law "irrespective of any contractual duties" in connection with "performing advisory services." (Lehigh FAC ¶ 269; *see also* CLPF Compl. ¶ 172; CMERS Compl. ¶ 159; CTWW Compl. ¶ 178.)[39]   But Plaintiffs allege no facts showing that AllianzGI was "performing advisory services" *for the Plaintiffs*. To the contrary, Plaintiffs expressly represented in the Subscription Agreements that they were *not* relying on AllianzGI for any investment advice.

The mere fact of AllianzGI's "registration" as an investment adviser is of no moment absent allegations that AllianzGI was providing investment advice *to Plaintiffs*. *DeBlasio* v. *Merrill Lynch & Co., Inc*., 2009 WL 2242605, at *28-30 (S.D.N.Y. July 27, 2009) (Sullivan, J.) (dismissing claims for breach of fiduciary duty, finding no duty established where plaintiffs offered "conclusory assertion" that defendants "held themselves out as financial advisors" but did not allege that plaintiffs "sought [] investment advice") (quotations omitted); *Zhu* v. *HSBC Bank USA*, 2019 WL 6998782, at *4 (C.D. Cal. July 24, 2019) (dismissing claims where "Plaintiffs fail to allege facts to establish that [Defendants] acted as an investment adviser" and thus to "establish a fiduciary duty on [this] theory"). Indeed, AllianzGI's registration as an investment adviser is required in order to act as an *investment manager* under ERISA. *See* 29 U.S.C. § 1002 ("[t]he term 'investment manager' means any fiduciary . . . (A) who has the power to manage, acquire, or dispose of any asset of a plan; (B) who [] is registered as an investment adviser under the

---

[39]   Because this theory of fiduciary duty is unrelated to the internal affairs of the Funds under Delaware law and concerns a supposed "advisory" relationship between AllianzGI and Plaintiffs (which did not exist), New York law applies to these common law breach of fiduciary duty claims, as Plaintiffs allege the conduct underlying the Complaints took place in New York. *See AHW Inv. P'ship* v. *Citigroup Inc.*, 980 F. Supp. 2d 510, 524 (S.D.N.Y. 2013) (Stein, J.) (as "the jurisdiction with the greatest interest in litigation . . . regarding conduct based in New York, . . . New York law governs these claims), *aff'd*, 661 F. App'x. 2 (2d Cir. 2016).

Investment Advisers Act of 1940" or is not registered based on inapplicable exemptions in that Act).  In its capacity as Investment Manager, any duties AllianzGI had to "advise" on investments were owed *to the Funds*, not to Plaintiffs, as the Side Letters entered into with CLPF, CMERS and CTWW make clear.[40]

Moreover, Plaintiffs do not, and cannot, allege that AllianzGI provided investment advice to them because each Plaintiff "acknowledge[d]" in the Subscription Agreements "that it ha[d] *made an independent decision to invest in the Fund*"; that it "relied solely upon the [PPM], the [LLC] Agreement and *[its own] independent investigations*"; and that it was "not relying on . . . the Managing Member" in evaluating the investment.  (Subscription Agreement § II(E) (emphasis added).)  Each Plaintiff further represented that "either independently or . . . with its consultants and advisors," it had the "knowledge and experience" to "evaluat[e] the merits and risks" of investing in the Fund; that it had "sufficient information" to conduct such an evaluation; and that it had "determined" that the Fund was "a suitable investment."  (Subscription Agreement § II(K).)  Indeed, Plaintiffs represented that, having "evaluated the risks of investing" (presumably, for some, with the help of their professional consultants), they "under[stood] there are substantial risks of loss" and that they could "afford a complete loss of the investment."  (*Id*. § II(K), (L).)

The ERISA Plaintiffs asserting this theory of fiduciary duty—CLPF, CTWW and IBEW—

---

[40]    *See* Exs. 53 at 3, 55 at 3 (CLPF Structured Alpha 1000 LLC and Structured Alpha 500 LLC Side Letters) (AllianzGI "acknowledg[ing]" that "as a registered investment adviser under the Investment Advisers Act of 1940," it "shall be considered . . . an ERISA fiduciary *with respect to the Account Assets*" when subject to ERISA (emphasis added)); Exs. 55 at 4-5, 74 at 2, 78 at 2, 81 at 2 (CLPF and CTWW Structured Alpha 500 LLC, Structured Alpha 1000 Plus, and Structured Alpha U.S. Equity 250 Side Letters) (AllianzGI acknowledging that "as a registered investment adviser under the Investment Advisers Act of 1940," it will be a fiduciary "*with respect to the Plan's assets in the Fund*" when subject to ERISA (emphasis added)); Ex. 59 at 9 (CMERS Structured Alpha U.S. Fixed Income 250 LLC Side Letter) (AllianzGI "acknowledg[ing] that it is a fiduciary *with respect to the Fund* under applicable state laws and the Advisers Act").  Lehigh did not enter into any Side Letter (emphasis added).)

further specifically represented that, notwithstanding registration as an investment adviser, AllianzGI did *not* "render[] investment advice for a fee" that would "serve as a primary basis for investment decisions . . . based on the particular investment needs of the Plan) . . . ." (Subscription Agreement Schedule V, Part III(d).)   The PPM specifically directed that the ERISA Plaintiffs "must make the decision to invest in the Fund (*without reliance on any advice provided by the Managing Member*)."  (PPM at 16 (emphasis added).)

These representations make clear that AllianzGI never agreed to provide any investment advice to Plaintiffs at the time of their initial investment, and thus *a fortiori*, AllianzGI was not providing investment advice when it shared updates and information about the Funds *after Plaintiffs had already invested*.  Courts repeatedly reject similar attempts to impose an investment advisory relationship where none exists.  *See, e.g.*, *de Kwiatkowski* v. *Bear*, *Stearns & Co*., 306 F.3d 1293, 1309 (2d Cir. 2002) (affirming that defendant did not "contract to serve in an advisory capacity [] and thus (undisputedly) was [not] an 'investment adviser' as defined by the Investment Advisers Act of 1940"); *Zorbas* v. *U.S. Tr. Co*., 48 F. Supp. 3d 464, 487-88 n.20 (E.D.N.Y. 2014) (Brodie, J.) (denying plaintiff's motion for summary judgment on breach of fiduciary duty claim "based on the premise that [defendant] was acting as a professional investment advisor with respect to Plaintiff's investments, and not merely in a management capacity," where "no evidence" showed "[defendant] agreed to take on a professional investment advising role").

### 4.    The Limited Power of Attorney Granted to AllianzGI Cannot Support Plaintiffs' Claims for Breach of Fiduciary Duty.

**Plaintiff Key:**    *ATRS; CLPF; CTWW; FFLD/NEHC; Lehigh; TMRT/BLYR*

Plaintiffs may not distort the narrow power of attorney granted to AllianzGI under the LLC Agreements to impose a fiduciary duty over the Funds' management.  In their Complaints, Plaintiffs claim that AllianzGI's appointment as Plaintiffs' "representative and attorney-in-fact

with respect to the Alpha Funds," was "a designation that imposes the fiduciary duty of loyalty" on AllianzGI in connection with its completely separate and much broader mandate as Investment Manager.  (ATRS Compl. ¶ 138; *see* CLPF Compl. ¶ 174 (same); CTWW Compl. ¶ 179 (same); TMRT/BLYR SAC ¶ 129 (same); FFLD/NEHC SAC ¶ 110 (alleging further that "based on AllianzGI's appointment as . . . attorney-in-fact, [it] owed a fiduciary duty of loyalty *and care* to Plaintiffs and the Classes".)  Once again, in selectively quoting from the parties' agreements, Plaintiffs ignore the law.

The full text of Section 8.02 of the LLC Agreements ("Power of Attorney")—which Plaintiffs omit entirely from their Complaints—makes clear that AllianzGI's appointment as "attorney-in-fact" is a limited power of attorney to "*make, execute, sign, acknowledge, swear to and file*" specific documents, such as "a Certificate of Formation of the Company"; "any duly adopted amendment to this Agreement"; or other documents "necessary or desirable to accomplish the business" of the Fund.  (LLC Agreement § 8.02 (emphasis added).)  The Side Letter between AllianzGI and ATRS (which filed the first Related Action and is the original source of this strained theory of fiduciary liability) expressly acknowledged that "the powers of attorney granted to the Managing Member . . . *are intended to be ministerial in scope and limited solely to those items permitted under the relevant grant of authority*." (*See* Ex. 40 ¶ 24 (emphasis added), cited in ATRS Compl. ¶ 137.)  Six other Plaintiffs subsequently latched onto this theory, but courts consistently reject attempts to expand the duty of loyalty beyond a limited grant of power of attorney, as this Court should do here.  *See Trusa* v. *Nepo*, 2017 WL 1379594, at *6 & n.48 (Del. Ch. Apr. 13, 2017) (dismissing breach of fiduciary duty claim based on "plain language of the agreement," where power of attorney clause was "expressly limited"); *Steinbeck* v. *Steinbeck Heritage Found.*, 400 F. App'x 572, 575-76 (2d Cir. 2010) (affirming summary judgment dismissing breach of

fiduciary duty claim because grant of power of attorney did not impose fiduciary obligations where the "powers of attorney were executed solely to effectuate the authority conferred" under agreement).

### 5. Side Letters Provide No Support for an Independent Fiduciary Duty Claim.

**Plaintiff Key:**    *ATRS; CLPF; CMERS; CTWW; UFCW*

The Court should also reject Plaintiffs' meritless claim that Side Letters with AllianzGI somehow created *extra-contractual* duties.  Those Side Letters created contractual obligations, not common law duties and, in fact, the CLPF, CMERS, CTWW and UFCW Side Letters include obligations that are similar to Section 2.12 of the LLC Agreements, and impose duties on AllianzGI to manage the Funds' assets according to an "ERISA Fiduciary Standard of Care" or a contractual prudence standard similar to Section 2.12.  (*See* CLPF FAC ¶ 173; CMERS Compl. ¶ 161; CTWW Compl. ¶ 177; UFCW Compl. ¶¶ 119-20; Ex. 53 at 4-5; Ex. 59 at 9; Ex. 74 at 2; Ex. 109 at 4-5.)  The ATRS Side Letter merely "acknowledged" that AllianzGI owed "a fiduciary duty to [ATRS] in connection with [ATRS's] investment in the Fund." (Ex. 43 at 10; Ex. 45 at 10.) As shown above, Section 2.12 of the LLC Agreement specifies the fiduciary obligations that AllianzGI owed to investors, and its "acknowledgement" in the ATRS Side Letter does nothing to change the scope of those obligations.  (*See* Parts I; IV.B.1., *supra*.)

Thus, the Court should hold that Plaintiffs' claims for breach of fiduciary duty based on these Side Letters are impermissibly duplicative because they are grounded "entirely upon a breach of the terms of a contract" and should be dismissed.  *Delaware State Univ.*, 556 F. Supp. 2d at 377. (*See* Part IV.B.2., *supra*.)

### 6. The Safe Harbor Under Section 28(e) of the Securities Exchange Act Is Irrelevant.

**Plaintiff Key:**    *IBEW; MTA; UFCW*

Plaintiffs try to claim that AllianzGI owed "fiduciary duties" to Plaintiffs because the PPMs state—under the headings "Execution of Portfolio Transactions" and "Selection of Brokers-Dealers and Counterparties"—that "Section 28(e) of the Securities Exchange Act . . . provides a 'safe harbor'" whereby "soft dollars," *i.e.*, trading commissions, may be used "to obtain investment research and brokerage services" but that "[c]onduct outside of the safe harbor . . . is subject to the traditional standards of fiduciary duty under state and federal law." (PPM at 42; *see* IBEW Compl. ¶ 130; MTA Compl. ¶ 151; UFCW Compl. ¶ 121.) This disclosure provides no basis for Plaintiffs' fiduciary duty claims because it (i) concerns duties owed to the Funds, not Plaintiffs, and (ii) is irrelevant to the conduct alleged in the Complaints.

Section 28(e) of the Securities Exchange Act provides a "safe harbor" whereby an asset manager "shall [not] be deemed" to have "breached a fiduciary duty under State or Federal law" for agreeing to pay a broker higher trading commissions where the manager "determined in good faith" that the commission "was reasonable" based on the overall the value of brokerage and research services received. 15 U.S.C. § 78bb(e). But as Judge Koeltl held in *In re Eaton Vance Mutual Funds Fee Litigation*, breach of fiduciary duty claims based on alleged "misuse of . . . assets to provide . . . soft dollar compensation to brokers. . . is an injury *to the . . . Funds* that adversely affects the plaintiffs only indirectly through their status as investors." 380 F. Supp. 2d 222, 233-34 (S.D.N.Y. 2005) (Koeltl, J.) (emphasis added), *aff'd sub nom. Bellikoff Vance Corp.*, 481 F.3d 110 (2d Cir. 2007).[41] Thus, whatever fiduciary duties might apply to AllianzGI's use of the Funds' assets to compensate brokers beyond the Section 28(e) safe harbor may be enforced

---

[41]     *Eaton Vance* was decided under Massachusetts law, which, as under Delaware law, requires that plaintiffs identify a "harm they claim to have suffered . . . from a breach of duty owed directly to them," that is not "derivative of a breach of duty owed to the corporation." *Int'l Brotherhood of Elec. Workers Local No. 129 Benefit Fund* v. *Tucci*, 70 N.E.3d 918, 923 (2017).

only through a derivative action, but, more pointedly, this narrow disclosure in the PPMs concerning brokerage commissions manifestly has *nothing to do* with any duties owed to Plaintiffs in connection with managing the Funds' assets.  The Court should dismissed claims based on this flawed theory.[42]

### C.   The Economic Loss Doctrine Independently Bars Plaintiffs' Tort Claims.

**Plaintiff Key:**     *All Plaintiffs except BCBS*

Under New York's economic loss doctrine, "[a] plaintiff cannot seek damages by bringing a tort claim when the injury alleged is primarily the result of economic injury for which a breach of contract claim is available."  *Nat'l Credit Union Admin. Bd.* v. *Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 687 (S.D.N.Y. 2019) (Stein, J.) (dismissing negligence and breach of fiduciary duty claims as barred by the economic loss doctrine) (internal quotations and citations omitted).  As this Court has recognized, "[t]he economic-loss rule provides that a contracting party seeking only a benefit of the bargain recovery may not sue in tort."  *BlackRock Allocation Target Shares: Series S. Portfolio* v. *Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 399 (S.D.N.Y. 2017) (Failla, J.) (internal quotations and citations omitted).  The same doctrine applies under Delaware law.  *See, e.g.*, *Brasby* v. *Morris*, 2007 WL 949485, at *6-7 (Del. Super. Ct. Mar. 29, 2007) (holding economic loss rule prohibits tort claims "where overlapping claims based in contract adequately address the injury alleged").

Here, "the application of the economic loss doctrine is clear:  Plaintiff[s] do[] not seek

---

[42]     When read in context (PPM at 42), the "traditional" standards referenced in the PPM clearly relate only to the topic addressed by Section 28(e)—general "principles" requiring that money managers seek "best execution" from brokers, not management of the Funds' assets generally.  *See* Comm'n Guidance Regarding Client Comm'n Practices Under Section 28(e) of the Sec. Exch. Act of 1934, Exchange Act Release No. 34-54165 (July 18, 2006) ("[f]iduciary principles require money managers to seek the best execution for client trades . . .").

damages for injuries to [their] person or property, but for an alleged injury that is quintessentially economic." *Aretakis* v. *Caesars Ent.*, 2018 WL 1069450, at *13 (S.D.N.Y. Feb. 23, 2018) (Failla, J.).  As shown above (*see* Part IV.A., *supra*), Plaintiffs seek to recover investment losses, and assert claims for negligence based on AllianzGI's alleged breach of duties "arising out of the" the parties' agreements.  (ATRS Compl. ¶¶ 121, 123-25.)  Plaintiffs' negligence claims—based on the language of contract and seeking to recover the same monetary damages as their contract claims—cannot survive under New York or Delaware law.

The economic loss doctrine similarly bars Plaintiffs' breach of fiduciary duty claims.  *See, e.g.*, *Pac. Life Ins. Co.* v. *Bank of N.Y. Mellon*, 2018 WL 1382105, at *14 (S.D.N.Y. Mar. 16, 2018) (Failla, J.) ("the economic[] loss doctrine *does* bar Plaintiffs' claims" for breach of fiduciary duty where the conduct at issue "was contractually required" (emphasis original)) (internal quotations and citations omitted); *Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 2016 WL 796850, at *11 (S.D.N.Y. Feb. 25, 2016) (Forrest, J.) (dismissing breach of fiduciary duty claim as "barred by the economic loss doctrine" where "[p]laintiff's allegations for damages . . . sound in defendants' failure to take contractual actions," such that "plaintiff's remedy lies in the enforcement of contract obligations," *aff'd*, 898 F.3d 243 (2d Cir. 2018) (internal quotations omitted); *Blackrock Core Bond Portfolio* v. *U.S. Bank Nat'l Ass'n*, 165 F. Supp. 3d 80, 106 (S.D.N.Y. 2016) (Forrest, J.) (claims for "breaches of fiduciary duty and extra-contractual duty" are "barred by the economic loss doctrine" where "[t]he damages that plaintiffs allege . . . arise entirely from defendants' obligations under the [contract]").

Thus, even if Plaintiffs could allege that AllianzGI breached an independent tort duty unrelated to the parties' contracts (and they cannot (*see* Parts IV.A. and B., *supra*)), the Court should "not 'allow evasion of the economic loss rule, which presents a second, distinct barrier' to

extra-contractual claims stemming from contractual relationships." *Pac. Life Ins. Co.*, 2018 WL 1382105, at \*13-14 (quoting *Royal Park Invs. SA/NV* v. *HSBC Bank USA, Nat'l Ass'n*, 109 F. Supp. 3d 587, 599 (S.D.N.Y. 2015) (Scheindlin, J.)) (dismissing "tort claims that allege damages that flow from the violation of the governing agreements").

## V.    PLAINTIFFS' FLAWED THEORY OF SELF-DEALING DOES NOT STATE A CLAIM.

**Plaintiff Key:**  *All Plaintiffs*

Plaintiffs assert claims for (i) common law breach of fiduciary duty; (ii) breach of fiduciary duty under ERISA § 404; and (iii) prohibited transactions under ERISA § 406(b) based on the same theory—*i.e.*, AllianzGI was compensated only if it generated positive returns for investors (a fee structure that was fully disclosed to Plaintiffs, all sophisticated investors).  Thus, Plaintiffs speculate that once the Funds incurred losses in February 2020, AllianzGI must have managed the Funds' assets in a riskier and self-interested manner in March 2020 in its "desperation to generate gains and avoid losses" so that it could earn its performance fee.  (ATRS Compl. ¶ 104.)  As shown below, this strained theory—based on conclusory allegations that AllianzGI "apparent[ly]" tried "to increase its fees" or "doubled-down" on risk "to recoup losses"—is implausible and finds no support in law.[43]

---

[43]    *See* ATRS Compl. ¶ 1 (alleging conclusorily that AllianzGI "'doubled down' on its imprudent strategy after incurring losses"); BCBS Compl. ¶¶ 151(f), 179 (speculating that AllianzGI acted in "an apparent effort" to "maximize its own fees"); CLPF Compl. ¶¶ 165, 181 (alleging AllianzGI "doubl[ed] down" because it "would have been unable to obtain fees" otherwise); CTWW Compl. ¶¶ 169, 186 (same); CMERS Compl. ¶ 169 (same); CPPT FAC ¶124 (alleging AllianzGI added "undisclosed risks" to "maximize its own fees"); FFLD/NEHC SAC ¶¶ 116, 142(e), 147 (AllianzGI acted out of "self-interest"); TMRT/BLYR SAC ¶¶ 134, 164(c), 169 (same); IBEW FAC ¶¶ 132, 145(e), 149 (same); Lehigh FAC ¶ 263 (alleging AllianzGI sought to "boost its management fee" in "self-interested" manner); MTA FAC ¶¶ 137(e), 153 (alleging AllianzGI "sought to maximize its own profits" by putting investments at unreasonable risk); UFCW Compl. ¶¶ 124, 136(e) (same).

**A.     Plaintiffs Cannot State Claims for Common Law Breach of Duty of Loyalty Because Their Claims Arise Under ERISA or Section 2.12.**

        **Plaintiff Key:**    *ATRS, CLPF, CMERS, CTWW, FFLD/NEHC, IBEW, Lehigh, MTA, TMRT, UFCW*

As shown above, in the LLC Agreements, the fiduciary obligations and standards in Section 2.12 "replaced" common law fiduciary duties.  (*See* LLC Agreement §§ 2.07, 2.12; Part IV.B., *supra*.)  Thus, when a Fund was subject to ERISA or the Contractual ERISA Standard of Care—*i.e.*, when the ERISA 25% Threshold was met—AllianzGI was subject to statutory or contractual duties that included a duty of loyalty.  *See* 29 U.S. Code § 1104(a) (requiring ERISA fiduciaries to "to act solely in the interests of the plan").  Otherwise, AllianzGI was obligated to meet the Contractual Prudence Standard of Care and "no other" duties under ERISA.  (*Id.*; *see* Part IV.B.2-6.)  Accordingly, the Court should dismiss Plaintiffs' stand-alone claims for common law breach of fiduciary duty of loyalty.

**B.     Plaintiffs' Conclusory Allegations of Motive Based on AllianzGI's Performance Fee Are Implausible and Fail to State a Claim.**

        **Plaintiff Key:**    *ATRS, BCBS, CLPF, CMERS CTWW, FFLD/NEHC, IBEW, Lehigh, MTA;TMRT/BLYR, UFCW*

To try to plead a claim for breach of duty of loyalty under ERISA,[44] rather than allege facts showing that AllianzGI acted to benefit itself, Plaintiffs impermissibly "recast purported breaches of the duty of prudence as disloyal acts."  *Sacerdote* v. *N.Y. Univ.*, 2017 WL 3701482, at *5

---

[44]     BCBS, CLPF, CTWW; NEHC, IBEW; TMRT/BLYR, and UFCW assert claims for ERISA breach of fiduciary duty of loyalty; all Plaintiffs noted above except BCBS also assert claims for common law breach of fiduciary duty of loyalty, and MTA also asserts a breach of contract claim based on alleged self-dealing. (MTA FAC ¶ 137(e).)  To the extent not dismissed for the reasons set forth in Part V.A., *supra*, those claims should be dismissed as set forth in this Part V.B., as the same principles apply to those claims.  *See Gottsch* v. *Eaton & Van Winkle LLP*, 343 F. Supp. 3d 372, 377–78 (S.D.N.Y. 2018) (Swain, J.) (dismissing common law breach of fiduciary duty of loyalty claim where "the [c]omplaint [did] not allege facts sufficient to support an inference that [d]efendants acted in their own self-interest or otherwise had improper motives").

(S.D.N.Y. Aug. 25, 2017) (Forrest, J.).  As courts have repeatedly held, "to state a loyalty-based" breach of fiduciary duty, "a plaintiff must do more," and "*must allege plausible facts* supporting an inference that the defendant acted for the purpose of providing benefits to itself" or someone else.  *Id*. (emphasis added).  Courts thus dismiss breach of duty of loyalty claims that "merely ride the coattails of Plaintiffs' duty-of-prudence" claims where the complaint is "devoid of factual allegations supporting *purposeful* action" by defendant to benefit itself.  *Ferguson* v. *Ruane Cunniff & Goldfarb Inc*., 2019 WL 4466714, at *4 (S.D.N.Y. Sept. 18, 2019) (Carter, Jr., J.) (emphasis original).  Thus, in *Cunningham* v. *Cornell University*, Judge Castel dismissed claims for breach of the ERISA duty of loyalty where, as here, the allegations "d[id] not support an inference that defendants' actions were *for the purpose* of providing benefits to themselves . . . and did not simply have that incidental effect."  2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017) (emphasis original).

Here, Plaintiffs do not plausibly allege any breach of any duty of loyalty from the fully-disclosed and unexceptional fact that AllianzGI received performance-based fees for managing the Funds  In trying to do so, Plaintiffs improperly "ride the coattails" of their allegations that AllianzGI continued to manage the Funds' assets imprudently during the market turmoil in March 2020.  But such conclusory allegations cannot plausibly support an inference that AllianzGI acted for an improper, self-interested purpose.  It is equally plausible that when AllianzGI made (allegedly imprudent) management decisions in March 2020 in an effort "to generate gains and avoid losses" (ATRS Compl. ¶ 104), AllianzGI did so for the benefit of *Plaintiffs and other investors* in the Funds, not just for itself, just as AllianzGI had successfully done for many years under the same fee structure, including during prior market downturns.  *See Bell Atl. Corp*. v. *Twombly*, 550 U.S. 554, 565-67, 570 (2007) (plaintiffs did "not nudge[] their claims across the

line from conceivable to plausible" where "obvious alternative explanation" existed for alleged misconduct); *Trump* v. *Vance*, 977 F.3d 198, 207 (2d Cir. 2020) (affirming dismissal and holding that "bare allegation of improper motive . . . will not suffice if there is an obvious alternative explanation for the conduct alleged" (internal quotations and citations omitted)).

Moreover, Plaintiffs ignore that performance fees are directly designed to *align* an investment manager's and investors' interests.  For this reason, courts in this Circuit have long rejected the existence of performance fees as a motive for wrongdoing.  *See*, *e.g.*, *Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1130 (2d Cir. 1994) (quoting *Ferber* v. *Travelers Corp*., 785 F. Supp. 1101, 1107 (D. Conn. 1991)) ("[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated").  If accepted, Plaintiffs' theory would allow investors, following a market reversal, to impugn every management judgment taken in pursuit of positive returns for the benefit of investors as disloyal and self-interested—simply because an investment manager stood to share in those returns.  This Court should reject Plaintiffs' conclusory and implausible allegations of wrongdoing based on performance fees.

### C.    Plaintiffs May Not Convert a Routine Performance-Based Fee Structure Into a "Prohibited Transaction" Under ERISA § 406(b)

**Plaintiff Key:**  *BCBS, CPPT, FFLD/NEHC, IBEW, TMRT/BLYR*

Based on the same allegations, Plaintiffs assert that AllianzGI's continued trading of the Funds' assets during the market crash in March 2020 amounted to a "prohibited transaction" under ERISA § 406(b), which, as relevant here, prohibits fiduciaries from "deal[ing] with the assets of the plan in his own interest or for his own account."  29 U.S.C. § 1106(b)(1).  As shown above, any claimed inference of self-interest is implausible.  Moreover, in the context of ERISA § 406(b), Plaintiffs' theory posits that managing assets for a performance-based fee is a *per se* "prohibited transaction" under ERISA § 406(b), because such a fee structure will by definition create a

financial incentive for the manager to "deal with the assets of the plan in his own interest" insofar as the manager is seeking outperformance in which it will share.  The imposition of such a *per se* prohibition would put the onus on the investment manager to prove the negative—*i.e.*, that any time the manager took risk and incurred a loss, its pursuit of returns was *not* motivated by self-interest.

Recognizing this, the Department of Labor ("DOL") issued clear guidance years ago (ignored by Plaintiffs) that performance-based incentive compensation is not a *per se* prohibited transaction under ERISA § 406(b).  *See* DOL Advisory Opinion, No. 89-31A, 1989 WL 224560, at *6 (Oct. 11, 1989).  This guidance concluded that an investment manager's performance fee would not "in itself, constitute a violation of Section 406(b)(1) of ERISA" where, as here, the amount of compensation is determined solely by "reference to a predetermined index" such that the investment manager "would not be exercising any of its fiduciary authority or control to cause a plan to pay an additional fee."  *Id*.  Thus, even though the manager would have an incentive to manage the account to generate outperformance in which the manager would share, the DOL concluded this did not constitute a self-interested transaction prohibited by ERISA § 406(b).  This Court should reject Plaintiffs' attempt to read into ERISA a *per se* prohibition that is not supported by its language or regulatory guidance and dismiss their prohibited transactions claims.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' claims as set out in Appendix A to the Giuffra Declaration.

Respectfully,

/s/ Robert J. Giuffra, Jr.

Robert A. Skinner (*admitted pro hac vice*)          Robert J. Giuffra, Jr.
Amy D. Roy (*admitted pro hac vice*)                 Stephanie G. Wheeler
ROPES & GRAY LLP                                     Ann-Elizabeth Ostrager
800 Boylston Street                                  Hilary M. Williams
Boston, MA 02199                                     SULLIVAN & CROMWELL LLP
(617) 951-7000                                       125 Broad Street
                                                     New York, New York  10004
                                                     (212) 558-4000

*Counsel for Defendant Allianz Global Investors U.S. LLC*

February 25, 2021