UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:*<br><br>ALLIANZ GLOBAL INVESTORS U.S. LLC<br>ALPHA SERIES LITIGATION | 20 Civ. 5615 (KPF)<br>20 Civ. 5817 (KPF)<br>20 Civ. 7061 (KPF)<br>20 Civ. 7154 (KPF)<br>20 Civ. 7606 (KPF)<br>20 Civ. 7842 (KPF)<br>20 Civ. 7952 (KPF)<br>20 Civ. 8642 (KPF)<br>20 Civ. 9478 (KPF)<br>20 Civ. 9479 (KPF)<br>20 Civ. 9587 (KPF)<br>20 Civ. 10028 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs, large institutional investors, have brought more than a dozen related actions, including two putative class actions, against Defendant Allianz Global Investors U.S. LLC ("AllianzGI") arising out of the collapse of a series of Structured Alpha Funds (the "Funds") in which Plaintiffs had invested. The Funds lost much of their value, and in some instances collapsed completely, in February and March of 2020 during the market turmoil caused by the COVID-19 pandemic. Plaintiffs allege that Defendant's mismanagement and self-dealing caused the Funds' precipitous collapse in value, and they assert claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), and at common law for breach of contract, breach of fiduciary duty, and negligence. One Plaintiff also asserts claims for fraud and misrepresentation. Now before the Court is Defendant's omnibus motion to dismiss in part Plaintiffs' complaints in the first twelve of these related cases (collectively, the "Related

Cases"). For the reasons that follow, Defendant's motion is granted in part and denied in part.

**BACKGROUND**[1]

## A.   Factual Background

The Related Cases encompass twelve actions, each with a unique complaint containing extensive factual allegations. Defendant moves to

---

[1]   This Opinion draws its facts from Plaintiffs' complaints and amended complaints, the well-pleaded allegations of which are taken as true for purposes of the instant motion. *See Ark. Tchr. Ret. Sys.* v. *AllianzGI, et al.* ("*ATRS*"), No. 20 Civ. 05615 (KPF), Dkt. #1 ("ATRS ¶ []"); *Ret. Program for Emps. of the Town of Fairfield, et al.* v. *AllianzGI* ("*FFLD/NEHC*"), No. 20 Civ. 5817 (KPF), Dkt. #46 ("FFLD/NEHC SAC ¶ []"); *Lehigh Univ.* v. *AllianzGI* ("*Lehigh*"), No. 20 Civ. 7061 (KPF), Dkt. #46 ("Lehigh FAC ¶ []"); *Teamster Members Ret. Plan, et al.* v. *AllianzGI* ("*TMRT/BLYR*"), No. 20 Civ. 7154 (KPF), Dkt. #61 ("TMRT/BLYR SAC ¶ []"); *Blue Cross & Blue Shield Ass'n Nat'l Emp. Benefits Comm.* v. *AllianzGI, et al.* ("*BCBS*"), No. 20 Civ. 7606 (KPF), Dkt. #1 ("BCBS ¶ []"); *Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr., et al.* v. *AllianzGI* ("*MTA*"), No. 20 Civ. 7842 (KPF), Dkt. #44 ("MTA FAC ¶ []"); *Chi. Area I.B.T. Pension Plan & Tr., et al.* v. *AllianzGI* ("*CPPT*"), No. 20 Civ. 7952 (KPF), Dkt. #62 ("CPPT FAC ¶ []"); *Emps.' Ret. Sys. of the City of Milwaukee* v. *AllianzGI, et al.* ("*CMERS*"), No. 20 Civ. 8642 (KPF), Dkt. #1 ("CMERS ¶ []"); *Chi. & Vicinity Laborers' Dist. Council Pension Fund, et al.* v. *AllianzGI, et al.* ("*CLPF*"), No. 20 Civ. 9478 (KPF), Dkt. #1 ("CLPF ¶ []"); *Bds. of Trs. for the Carpenters Health & Sec. Tr. of W. Wash., et al.* v. *AllianzGI, et al.* ("*CTWW*"), No. 20 Civ. 9479 (KPF), Dkt. #1 ("CTWW ¶ []"); *United Food & Com. Workers Unions & Emps. Midwest Pension Fund, et al.* v. *AllianzGI, et al.* ("*UFCW*"), No. 20 Civ. 9587 (KPF), Dkt. #4 ("UFCW ¶ []"); *Bd. of Trs. of the Int'l Bhd. of Elec. Workers, Local No. 38 Pension Fund Pension Plan* v. *AllianzGI* ("*IBEW*"), No. 20 Civ. 10028 (KPF), Dkt. #36 ("IBEW FAC ¶ []"). For ease of reference, citations to the docket in this Opinion are to the docket in the lead case, *Arkansas Teacher Retirement System* v. *AllianzGI, et al.*, No. 20 Civ. 5615 (KPF), unless otherwise specified.

In making Rule 12(b)(6) determinations, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference … and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted); *accord Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). Accordingly, the Court also draws facts from exhibits to the Declaration of Robert J. Giuffra, Jr. in Support of Defendant's Motion to Dismiss (Dkt. #87 ("Giuffra Decl., Ex. []")), and exhibits attached to the Declaration of Stephanie G. Wheeler in support of Defendant's supplemental motion to dismiss (*Lehigh*, Dkt. #63 ("Wheeler Decl., Ex. []")).

2

dismiss only certain of Plaintiffs' claims in each complaint.  As such, the Court relays in this Opinion only those facts relevant to resolving the instant motions to dismiss.[2]

### 1.   The Parties

Plaintiffs are institutional investors with millions, if not billions, of dollars of investments under management.  (*See, e.g.*, BCBS ¶¶ 16, 17; CMERS ¶¶ 3, 21).[3]  Most Plaintiffs are fiduciaries that owe duties to the individuals or entities whose assets they have been entrusted to invest.  (*See, e.g.*, BCBS ¶ 16; TMRT/BLYR SAC ¶¶ 8, 10).  Some Plaintiffs utilize the services of independent investment advisors.  (*See, e.g.*, ATRS ¶ 17; CLPF ¶ 20).  Eight of the twelve Related Cases — the *BCBS, CLPF, CPPT, CTWW, FFLD/NEHC, IBEW, TMRT/BLYR*, and *UFCW* actions — involve Plaintiffs that are subject to ERISA.  (*See* Giuffra Decl., App. B (summary of Plaintiffs' investments)).[4]  Across the

---

[2]   In reciting facts that are commonly pleaded across multiple of the Related Cases, the Court will generally cite in this Opinion to only one or two of Plaintiffs' complaints as exemplars to source each fact pleaded.

Throughout this Opinion, the Court refers to Defendant's omnibus memorandum in support of its motion to dismiss as "Def. Br." (Dkt. #83); to Plaintiffs' joint memorandum in opposition to the omnibus motion to dismiss as "Pl. Opp." (Dkt. #97); to Defendant's reply brief in further support of its omnibus motion to dismiss as "Def. Reply" (Dkt. #104).  Defendant's brief in support of its supplemental motion to dismiss Lehigh's fraud claims is referred to as "Def. Supp. Br." (*Lehigh*, Dkt. #57); Lehigh's opposition is referred to as "Lehigh Opp." (*Lehigh*, Dkt. #69); and Defendant's reply is referred to as "Def. Supp. Reply" (*Lehigh*, Dkt. #75).

For the convenience of the reader, the Court adopts the abbreviations that Defendant uses to refer to Plaintiffs in its omnibus memorandum of law in support of its motion to dismiss.  (*See* Def. Br. ix-xii).

[2]   In reciting facts that are commonly pleaded across multiple of the Related Cases, the Court will generally cite in this Opinion to only one or two of Plaintiffs' complaints as exemplars to source each fact pleaded.

[3]   In some of the Related Cases the plan trustee is a named co-plaintiff.  (*See, e.g.*, CPPT FAC; UFCW).  Additionally, two individual investors are Plaintiffs in the *TMRT/BLYR* case.  (*See* TMRT/BLYR SAC ¶ 11).

[4]   The Plaintiffs subject to ERISA are: BCBS, BLYR, CLPF, CPPT, CTWW, IBEW, NEHC, TMRT, and UFCW (collectively, the "ERISA Plaintiffs").  These nine ERISA Plaintiffs are

Related Cases, Plaintiffs invested in more than a dozen of Defendant's Structured Alpha Funds.  (*Id.*).

Defendant is a Delaware limited liability company and registered investment advisor under the Investment Advisers Act of 1940, with its principal office in New York, New York.  (*See, e.g.*, ATRS ¶ 20; BCBS ¶ 17).  Defendant is the investment manager for the Funds.  (*See, e.g.*, ATRS ¶ 20; CMERS ¶ 22).  ATRS, the first of Plaintiffs to invest in the Funds, did so in April 2009 (Giuffra Decl., Ex. 39), and the last investment made by any of the Plaintiffs occurred in November 2019 (*see* Lehigh FAC ¶ 45).

### 2.    Defendant's Investment Strategy[5]

Broadly speaking, Plaintiffs allege that Defendant marketed the Funds as relatively safe investments, pitching a multi-pronged investment strategy designed to both provide "broad market exposure" and achieve "targeted positive return potential," while still maintaining "structural risk protections" to

---

plaintiffs in eight actions (the "ERISA Actions") because TMRT and BLYR are named Plaintiffs in a single putative class action.

[5]    The parties agree that the Funds are governed by a series of documents: a Limited Liability Company Agreement ("LLC Agreement"), a Confidential Private Placement Memorandum ("PPM"), and a Subscription Agreement ("SA," and collectively with the LLC Agreement and PPM, the "Governing Documents").  (*See* Def. Br. xii; Pl. Opp. 11).  Throughout this Opinion, the Court adopts the parties' practice of citing to the Governing Documents of the Structured Alpha 1000 LLC Fund (Giuffra Decl., Ex 1 (LLC Agreement); *id.*, Ex. 2 (PPM); *id.*, Ex. 3 (SA)), unless specifically stated otherwise.  The Court notes that the Governing Documents for the various Funds are substantially similar.  (*See generally id.*, Ex. 7-38 (Governing Documents of additional Funds); *see also id.*, App. D1-D3 (demonstrative summary tables comparing each of the Governing Documents for each Fund at issue)).  Certain Plaintiffs also executed "Side Letter" agreements with Defendant.  (*See* LLC Agreement § 2.13 (permitting Defendant to enter into individualized "side letters or similar agreements" with non-managing members of the Funds that could "alter[] or supplement[]" the terms of the LLC Agreement, including "different … [f]ee[s] … and information rights")).  Plaintiffs allege that the Funds were only "governed in part" by the Governing Documents.  (Pl. Opp. 11).

safeguard against losses in the event of a market crash.  (BCBS ¶ 20).  The key to the Funds' investment strategy was the implementation of "alpha" and "beta" components.  (*See, e.g.*, FFLD/NEHC SAC ¶ 17; MTA FAC ¶ 46).  The "beta" component consisted of investments "that [sought] to deliver a return equivalent to" a specified "benchmark" index (PPM 1), essentially aiming to replicate the return of a selected market index or other passive investment strategy (Lehigh FAC ¶ 62).  Depending on the Fund, the beta component could be comprised of investments that tracked different market indices.  (ATRS ¶ 53).  The "alpha" component, by contrast, sought to generate returns above the benchmark index, "using the underlying investments of the [b]eta [c]omponent as collateral" (PPM 1-2) in order to execute an options-based strategy (TMRT/BLYR SAC ¶¶ 36-37; PPM 1-2).[6]

Plaintiffs allege that Defendant marketed the alpha component as a strategy for trading options aimed at delivering a "steady, resilient return stream with a fundamental emphasis on risk management."  (Lehigh FAC ¶ 65).  Defendant purportedly marketed the alpha component as "non-directional," insofar as it "[wa]s not predicated on correctly taking a view on the direction of equities, interest rates or any other fundamental factor."  (BCBS ¶ 22; UFCW ¶ 30).  In other words, the alpha component was pitched to Plaintiffs as a way of achieving relatively safe, risk-managed returns that were uncorrelated with market performance.  (*See, e.g.*, ATRS ¶ 4; IBEW FAC ¶¶ 4-

---

[6]     For example, Structured Alpha 1000 LLC sought to generate approximately 1000 basis points (or 10%) of "alpha" outperformance, net of Defendant's fees, over the Bank of America Merrill Lynch 3-Month U.S. Treasury Bill Index.  (*See* CMERS ¶ 54; PPM 1).

5).  As such, Defendant told Plaintiffs that Defendant would "never make a forecast on the direction of equities or volatility."  (BCBS ¶ 22; CMERS ¶ 7; *see also* CLPF ¶ 5; CTWW ¶ 5).  The risk protections Defendant purportedly utilized "combine[d] both long- and short-volatility positions at all times," meaning that the Funds simultaneously held positions betting *for* (long-volatility) and *against* (short-volatility) market vicissitudes.  (BCBS ¶ 23; *see also* Giuffra Decl., Ex. 5 ("Lehigh Pitchbook") at 12).  Defendant's risk management strategy aimed to "capitalize on the return-generating features of selling options (short volatility)," while "simultaneously benefit[ing] from the risk-control attributes associated with buying options (long volatility)[.]"  (BCBS ¶ 23).

Defendant told Plaintiffs that three types of trades were the "building blocks" of Defendant's investment strategy for the Funds: (i) range-bound spreads, (ii) directional spreads, and (iii) hedging positions.  (*See, e.g.*, BCBS ¶ 24; CMERS ¶¶ 64-68).  The range-bound spreads were "short volatility positions," "designed to collect option premium[s] and to generate excess returns in normal market conditions."  (Lehigh FAC ¶ 81).  The strategy underpinning the range-bound spreads was to "sell options [with] the greatest probability of expiring worthless" (Lehigh Pitchbook 12-13), meaning that these positions "would make money if the underlying asset stayed in a particular range" of volatility — the so-called "profit zone" — "but would lose money if the price of the underlying asset landed outside" the profit zone.  (Lehigh FAC ¶ 81; *see also* PPM 1, 25; Lehigh Pitchbook 12).  Directional spreads, which were advertised as "combination long-short volatility positions,"  consisted of "option

6

positions that benefit[ed] from a large index move to the upside and/or downside" (Lehigh Pitchbook 12-13; *see also* BCBS ¶ 26).  Directional spreads were "intended to be a diversifier that provided returns when the market behaved unusually" (CMERS ¶ 65; *see also* BCBS ¶ 26).

In deploying the range-bound and directional spreads, Defendant was "effectively selling expensive insurance to other investors seeking to protect themselves from large market swings."  (ATRS ¶ 10; *see also* CMERS ¶ 64).  In essence, the Funds' options-based strategy sought to generate above-market returns by collecting premiums from options sales, which premiums could be passed along as profit to Plaintiffs if the market did not move in such a way as to trigger the exercise of the options.  (*See* TMRT/BLYR SAC ¶¶ 41-42; CMERS ¶ 79; PPM 1).

Defendant informed Plaintiffs of the substantial risks implicated by this strategy.  (*See, e.g.*, PPM 25-26; Lehigh Pitchbook 36).  In recognition of these risks, Defendant employed the third component of the investment strategy, the hedges, as "long-volatility positions" that were "designed to protect the portfolio in the event of a market crash."  (UFCW ¶ 36; *see also* CPPT FAC ¶ 63).  In conjunction with writing options and collecting premiums, hedges involved options that Defendant purchased itself to mitigate the risk that market volatility would trigger the options it wrote as part of the range-bound and directional spreads.  (*See* TMRT/BLYR SAC ¶¶ 50-51, 53-54).  Defendant told Plaintiffs that as part of its hedging strategy, it would purchase put options "out of the money at various levels to the downside, and always in a greater

quantity than the amount of puts sold for the range-bound positions," in order to protect against the exposure to market volatility.  (BCBS ¶ 28; *see also* CLPF ¶ 8; Lehigh Pitchbook 14).  Defendant purportedly emphasized to Plaintiffs that the "long puts are in place at all times," and were utilized "exclusively for risk-management purposes."  (BCBS ¶ 28; *see also* CPPT FAC ¶ 109).[7]  These hedges were supposed to prevent against the risk of an "ill-timed margin call," which could occur when options traders suffer particularly severe losses, and which would require the liquidation of positions at unfavorable prices.  (BCBS ¶ 58; *see also* CLPF ¶ 71; CMERS ¶ 62; CTWW ¶ 72).  Defendant maintained that "under no scenario can an equity-market decline cause our portfolio to experience a margin call, a crucial differentiator from many options strategies." (BCBS ¶ 58; *see also* CTWW ¶ 72).

Defendant further advertised that it utilized the following "[i]nvestment philosophy and objectives" to cabin risk:

- Long and short volatility at the same time at all times;

- Do not presume that the market will behave normally or that history will repeat itself;

- Outperform irrespective of the market environment;

- Protect in adverse market environments;

- Prepare for the unexpected: pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses; and

---

[7]     For example, in April 2018, Defendant told investors that the hedges would protect their investments "in the event of multi-day or multi-week significant declines."  (BCBS ¶57; *see also* CLPF ¶82).

- Never make a forecast on the direction of equities or volatility.

(BCBS ¶ 76; *see also* ATRS ¶¶ 5-6; CMERS ¶¶ 6-8).  Defendant advertised specific risk management components to Plaintiffs, such as portfolio- and firm-level monitoring and stress testing.  (*See, e.g.*, ATRS ¶ 70; BCBS ¶ 59; CMERS ¶ 77; FFLD/NEHC SAC ¶¶ 26-27).  Plaintiffs' complaints are replete with particularized examples of Defendant touting the risk management benefits of investing in the Funds.  (*See, e.g.*, BCBS ¶ 81; CMERS ¶¶ 77-80; CLPF ¶¶ 80-86; Lehigh FAC ¶ 82).

### 3.    The Funds and the Governing Documents

Each Fund was a separate Limited Liability Company ("LLC") organized under Delaware law, with Defendant as the managing member.  (*See* BCBS ¶ 46; *see also* LLC Agreement ¶ 2.01; SA 7).  To invest in the Funds (*i.e.*, to become a non-managing member of the LLC), each Plaintiff agreed to "the terms and conditions set forth [in the Subscription Agreement], in the [PPM] of the Fund, ... and in the Limited Liability Company Agreement of the Fund[.]" (SA 7).

In the LLC Agreement, Defendant accepted appointment as, *inter alia*, the Investment Manager of the Fund, with "duties" that included "management of the [Fund's] assets."  (LLC Agreement § 2.03).  Section 2.12 of the LLC Agreement provides:

> [i]n the event that any assets of the [Fund] are subject to fiduciary duty rules of ERISA ... [Defendant], in its capacity as investment manager ... acknowledges that it will be a fiduciary with respect to such assets. Additionally, to the extent that the underlying assets of

> the [Fund] constitute "plan assets" within the meaning of ERISA and the regulations thereunder ... ("Plan Assets"), [Defendant], in its capacity as "investment manager" of the [Funds] within the meaning of Section 3(38) of ERISA, shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA[.]

(LLC Agreement § 2.12). In other words, when the Funds' assets were considered "plan assets" under ERISA — meaning 25% or more of the Funds' assets were invested by ERISA benefit plans (the "ERISA 25% Threshold") — Defendant agreed to abide by "the standard of care imposed on fiduciaries under ERISA" (the "Contractual ERISA Standard of Care"). (*Id.*; *see also* 29 C.F.R. § 2510.3-101(a)(2)(ii), (f) (establishing that when the assets of an entity, such as the Funds, meet the ERISA 25% Threshold, any person who has control or management responsibilities over the underlying assets is a fiduciary of the investing plan)).[8] The PPM imposes similar duties, stating that "for so

---

[8]    The fiduciary duties under ERISA include the "prudent man standard of care," which provides in relevant part that:

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are

long as the assets of the Fund are treated as 'plan assets' for purposes of ERISA, the Managing Member is a 'fiduciary,' as such term is defined by ERISA[.]" (PPM 57).

With respect to non-ERISA plan assets, Defendant agreed to "use its reasonable best efforts to discharge its duties consistent with the standard of care … under Section 404(a)(1)(B) of ERISA [29 U.S.C. § 1104(a)(1)(B)]," but not "any other provisions of ERISA" (the "Contractual Non-ERISA Standard of Care," together with the Contractual ERISA Standard of Care, the "Contractual Standard of Care").[9] (LLC Agreement § 2.12; *see also* PPM 58). Regardless of a non-managing member's status under ERISA, if the Fund is "subject to ERISA" (*i.e.*, meets the ERISA 25% Threshold), the LLC Agreement provides that "the rights of Members that are plans subject to ERISA or Section 4975 of the Code shall be extended to non-ERISA plan Members[.]" (LLC Agreement § 2.12). The LLC Agreement also establishes:

> [t]o the extent permitted by applicable law, whenever in this Agreement the Managing Member is permitted or required to make a decision (i) in its "discretion" or under a similar grant of authority or latitude, the Managing Member shall be entitled to consider only such interests and factors as it desires and may, to the extent that the assets of the Company are not treated as Plan Assets (as defined in Section 2.12), consider its own interests and the interests of its Affiliates, or (ii) in "good faith" or under a similar standard, the Managing

---

consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a).

[9]   The Contractual Non-ERISA Standard of Care clearly disclaimed the duties imposed by 29 U.S.C. § 1104(a)(1)(A), (C), and (D), including ERISA's duty of loyalty, duty to diversify, and duty to administer the Fund in accordance with plan documents.

> Member shall act under such standard and shall not be
> subject to any other or different standards, except as
> may be required by applicable law.

(*Id.* § 2.01).  In other words, the LLC Agreement states that when the Fund

assets were not plan assets under ERISA, Defendant could "consider its own

interests" when making decisions in its "discretion."  (*Id.*).

Furthermore, in a section entitled "Indemnification," the LLC Agreement

states:

> [t]o the fullest extent permitted by law, the provisions of
> this Agreement ... to the extent that they modify,
> restrict[,] or eliminate the duties (including fiduciary
> duties) and liabilities or rights and powers of any person
> otherwise existing at law or in equity with respect to
> matters expressly provided for in this Agreement, are
> agreed by the parties hereto to replace such other duties
> and liabilities of such person.

(LLC Agreement § 2.07).[10]  As discussed in greater detail below, Defendant

argues that this provision explicitly replaces any common-law duties it owes to

Plaintiffs with the fiduciary duties as defined in Section 2.12, as permitted

under Delaware law.  *See* 6 Del. C. § 18-1101(c).  (*See also* Def. Br. 11-12).

The Governing Documents also address the issue of liability for*, inter*

*alia*, losses incurred by the Funds.  For example, Section 2.06, entitled

"Exculpation," precludes Defendant's liability for "any acts or omissions arising

out of or in connection with the [Funds], any investment made or held by the

[Funds] or this Agreement *unless such action or inaction was made in bad faith*

---

[10]    The LLC Agreement notes that "the headings of the Sections of this Agreement are for
convenience of reference only, and are not to be considered in construing the terms and
provisions of this Agreement."  (LLC Agreement § 8.15).  Consistent with this provision,
the Court refers to the LLC Agreement's section headings only for ease of reference.

*or constitutes willful misconduct or negligence*[.]"  (LLC Agreement § 2.06 (emphasis added)).[11]  The LLC Agreement specifically notes that Section 2.06 does not "provide for the exculpation" of Defendant "for any liability ... to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law," including under liability imposed by ERISA in certain circumstances "even on persons that acted in good faith."  (*Id.*).  Similarly, Section 2.07 of the LLC Agreement states in relevant part that:

> [t]o the fullest extent permitted by law, the [Fund] shall indemnify and hold harmless [Defendant] from and against any loss, damage, penalty, obligation, liability, cost[,] or expense suffered ... by reason of ... any acts, omissions or alleged acts or omissions arising out of or in connection with the [Fund], any investment made or held by the [Fund] or this Agreement ... provided, that such acts, omissions or alleged acts or omissions ... were not made in bad faith and did not constitute willful misconduct or negligence[.]

(*Id.* § 2.07).

Defendant did not receive a flat asset-based fee to manage the Funds. (*See* BCBS ¶ 83).  Instead, it received a performance-based fee, equal to 30 percent of the Fund's quarterly returns in excess of the relevant benchmark index, but only if those returns exceeded the aggregate amount of any past underperformance from prior periods when compared to the benchmark index. (PPM 6-7).  As such, if Defendant underperformed, it received nothing — and

---

[11]   The PPM further explains that Defendant will not have "any liability to the Fund or the Members as a result of performance of services under the [LLC] Agreement, except for losses arising from its own bad faith, willful misconduct or negligence."  (PPM 31).

would have to recover the amount of any underperformance before it could begin receiving fees again.  (*See, e.g.*, ATRS ¶ 100; CTWW ¶ 125).

The Funds were exempt from registration under the Securities Act of 1933 and the Investment Company Act of 1940 because, *inter alia*, interests in the Funds were sold only to sophisticated investors "who underst[ood] the nature of the investment, d[id] not require more than limited liquidity in the investment and c[ould] bear the economic risks of the investment including loss of principal."  (PPM 17-18, 35; *see also* SA § II.(Q)).  As such, Fund investors, including Plaintiffs, were required to be "accredited investors" under the Securities Act and "qualified clients" under the Investment Advisers Act. (PPM 17-18).  *See also* 17 C.F.R. §§ 230.501(a)(1) (defining an "accredited investor as, *inter alia*, "any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state," or "any employee benefit plan" under ERISA with total assets in excess of $5 million), 275.205-3(d)(1) (defining qualified client).

Similarly, in signing the Subscription Agreement, each Plaintiff represented that it had "made an independent decision to invest in the Fund and that, in making its decision to subscribe for an Interest, the Investor [*i.e.*, Plaintiff] has relied solely upon the [PPM], the [LLC] Agreement and independent investigations made by the Investor."  (SA § II(E)).  Plaintiffs also represented that, in deciding to invest in the Funds, they were "not relying on the Fund or the Managing Member, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment

14

other than the Investor's own advisers." (*Id.*; *see also id.* § II(H), (K)).  Each Plaintiff further represented in the Subscription Agreement that its "investment ... is consistent with [its] investment purposes, objectives[,] and cash flow requirements ... and will not adversely affect [its] overall need for diversification and liquidity." (*Id.* § II(N)).

The PPM included disclosures about the risks Plaintiffs undertook in investing in the Funds, including that "[u]nexpected volatility ... in the markets in which the Fund[s] directly or indirectly hold[] positions could impair the Fund[s'] ability to carry out [their] business or cause [them] to incur losses." (PPM 29; *see also id.* at 20-24; SA § II(L) (representing that by signing, each investor could "afford a complete loss of the investment")).  The PPM also informed investors that, although "the Fund[s] will generally follow the investment strategies outlined [in the PPM,]" Defendant "may, however, formulate new approaches to carry out the [Funds'] investment objective[s]" and may "change any of its investment strategies without prior consent of, or notice to" investors.  (PPM 19-20).

### 4. The Funds' Collapse

Plaintiffs allege that throughout 2019 and 2020, Defendant secretly abandoned its investment and risk management strategies.  (*See, e.g.*, BCBS ¶ 82; Lehigh FAC ¶¶ 10, 15).  They allege that these changes constituted imprudent, disloyal actions that subjected Plaintiffs' investments in the Funds to undisclosed risk and ultimately led to the massive losses the Funds incurred

in February and March of 2020.  (*See* Lehigh FAC ¶ 16).  As illustrative

examples, Plaintiffs claim that:

- Defendant purchased hedging puts further out of the money than Allianz had represented because those hedges were cheaper (*see, e.g.*, BCBS ¶ 85; CMERS ¶¶ 97-98; UFCW ¶ 68);

- Defendant bought hedging puts that expired sooner than the risk-bearing options it sold — contrary to the representations it made to Plaintiffs — such that there was a "duration mismatch" between the options Defendant was short and those it was long, essentially purchasing less "reinsurance" than promised (*see, e.g.,* BCBS ¶¶ 87-88; CTWW ¶ 110; FFLD/NEHC SAC ¶ 42);

- Defendant sold options on volatility indexes, essentially betting against large increases in volatility (*i.e.*, taking short volatility positions, thus compounding the Funds' exposure to volatility) without hedging these positions — in direct contravention of Defendant's representation to never make a forecast on the direction of equities or volatility (*see, e.g.*, ATRS ¶¶ 78, 83, 103; BCBS ¶¶ 90-91; CTWW ¶ 110; FFLD/NEHC SAC ¶¶ 50-51); and

- Defendant failed to conduct adequate stress tests, or if it did conduct such tests, those tests were "mere window dressing" (CLPF ¶ 118), because Defendants failed to respond to the risks that such tests would have surely uncovered, *i.e.*, "the risks of a severe, multi-week decline" (CMERS ¶ 107; *see also, e.g.*, ATRS ¶ 96; Lehigh FAC ¶ 156).

Plaintiffs allege that Defendant made these changes because doing so

was cheaper than implementing the risk management practices that Defendant

had promised to maintain, and, further, that these activities allowed Defendant

to inflate profits from its range-bound and directional spreads, while still

claiming that it was managing risk.  (*See, e.g.*, BCBS ¶¶ 88, 93; UFCW ¶¶ 68,

70; CTWW ¶¶ 128-130).  More importantly, Plaintiffs allege that each of these actions "left the portfolio effectively unhedged and exposed … to losses far beyond those [Defendant] had presented as possible."  (BCBS ¶ 86; *see also, e.g., id.* at ¶ 88; CMERS ¶¶ 97-98; FFLD/NEHC SAC ¶ 56; Lehigh FAC ¶¶ 132, 140).  In consequence, Plaintiffs allege that going into late February and early March 2020, the Funds were highly exposed to market volatility.  (*See, e.g.,* BCBS ¶ 103).

Throughout January and early February 2020, the Chicago Board Options Exchange Volatility Index ("VIX")[12] remained relatively low and the S&P 500 remained relatively stable before the market began to decline and volatility spiked in the second half of February and March 2020.  (BCBS ¶ 100).  Yet despite Defendant's knowledge in early February 2020 that COVID-19 would "cascade throughout the global economy" and cause major disruption (CLPF ¶ 96), rather than holding hedges to expiration to lock in minimal losses, Defendant sold the hedges it had in place, replaced them with long puts much further out of the money, and used the proceeds to close out existing positions and sell new risk-bearing positions (BCBS ¶ 105).  Plaintiffs allege that Defendant should have kept the hedges in place and accepted modest losses to act in the best interest of the Funds' investors, but that the structure of Defendant's performance-based compensation incentivized Defendant to take a

---

[12]     The VIX represents market participants' "expectations for market volatility over the next 30 days and typically moves upward as equity markets experience downturns." (FFLD/NEHC SAC ¶ 40 n.27).

risky gamble that the market would recover quickly.  (*See, e.g.*, BCBS ¶¶ 105-106; CMERS ¶¶ 110-111, 118; TMRT/BLYR SAC ¶¶ 100, 134).

Defendant's bet on a market recovery only compounded the Funds' losses:

> As Allianz acknowledged in its March 13 email, these active management decisions ... created a "duration mismatch" between the short and long puts that contributed to the portfolio's losses.  This mismatch, [Defendant] explained, meant that the long puts "couldn't be harvested because they were shorter-dated" and about to expire. The resulting "theta decay reduced their value," and the puts "did not pay out." Another problem was that the cost to replace the expiring long puts increased dramatically as the market declined and volatility spiked.  "We are continually rolling into new long puts as they expire," [Defendant] wrote, "but there still is a duration mismatch that causes a continued equity decline / vol increase to hurt the mark and vice versa."

(BCBS ¶ 107).  The other hedges purchased by Defendant were, according to Plaintiffs, "further out of the money than [Defendant] had represented" and therefore "expired worthless in early March."  (*Id.* at ¶ 109).  And in addition to the duration mismatch, Defendant's practice of selling unhedged calls on volatility came home to roost, compounding the already significant losses. (*See, e.g.*, ATRS ¶¶ 104-108; BCBS ¶¶ 110-111).

By mid-March 2020, many of the Funds had suffered losses great enough that they faced margin calls, lost most of their value, or were liquidated completely.  (*See, e.g.*, CLPF ¶¶ 18-19; FFLD/NEHC SAC ¶ 75; MTA FAC ¶¶ 90-94).  After two Funds were liquidated, Plaintiffs withdrew from the remaining Funds.  (*See, e.g.*, ATRS ¶ 119; CLPF ¶¶ 137, 148; CTWW ¶ 138).

Plaintiffs collectively lost more than $4 billion during February and March 2020.  (ATRS ¶ 18; BCBS ¶ 9; CLPF ¶ 21; CMERS ¶ 20; CPPT FAC ¶ 21; CTWW ¶ 20; FFLD/NEHC SAC ¶ 77; IBEW FAC ¶ 100; Lehigh FAC ¶ 16; MTA FAC ¶ 107; TMRT/BLYR SAC ¶ 5; UFCW ¶ 1).

## B.    Procedural Background

Plaintiffs in the *ATRS* case initiated the first of the Related Cases on July 20, 2020 (Dkt. #1), and Plaintiffs in the remaining cases filed their initial complaints over the course of the following three months, with the last of the Related Cases commenced on November 30, 2020 (*IBEW*, Dkt. #1).[13]  On September 11, 2020, the Court granted Defendant's request to delay briefing on Defendant's anticipated motion to dismiss in part until after the initial pretrial conference ("IPTC") in mid-November of that year, citing a desire "to coordinate motion practice and discovery in as many of [the Related Cases] as possible, to the greatest extent possible."  (Dkt. #52).

On November 17, 2020, the parties attended an IPTC conducted via videoconference (*see* Minute Entry for Nov. 17, 2020), at which conference the parties discussed, *inter alia,* (i) pursuing consolidated motion practice due to the significant overlap among Plaintiffs' claims, the Governing Documents, and Defendant's anticipated grounds for dismissal; (ii) streamlining the claims at issue by dismissing AllianzGI affiliates from certain of Plaintiffs' complaints; and (iii) preparing a proposed stipulation and order to govern discovery, the

---

[13]    Although not relevant to resolving the instant motion, Plaintiffs in two of the Related Cases bring putative class actions.  (*See FFLD/NEHC*, Dkt. #46; *TMRT/BLYR,* Dkt. #61).

filing of amended complaints, and Defendant's anticipated motions to dismiss. (*See generally* Dkt. #59 (transcript)).  Defendant also indicated that it did not plan to move to dismiss Plaintiffs' claims that alleged breaches of the Contractual Standard of Care.  (*See id.* at 23:8-24:3).

The parties submitted their proposed case management plan and scheduling order on December 3, 2020 (Dkt. #63), which plan the Court adopted — with slight modifications — on December 7, 2020 (Dkt. #64, 65).  As relevant here, the scheduling order: (i) stayed motions to dismiss any complaints in any related action filed after December 3, 2020;[14] (ii) required that amended complaints in the Related Cases be filed by December 24, 2020, absent consent of the Defendant or leave of Court; (iii) set a briefing schedule on Defendant's anticipated consolidated partial motion to dismiss; and (iv) set a schedule for discovery, given that Defendant did not plan to move to dismiss Plaintiffs' complaints in their entirety.  (Dkt. #65).  Over the course of the following several months, Plaintiffs voluntarily dismissed claims against the AllianzGI affiliates without prejudice (*see, e.g.*, Dkt #66; *IBEW*, Dkt. #27; *Lehigh*, Dkt. #39), filed amended complaints (*see, e.g.*, *FFLD/NEHC*, Dkt. #46; *TMRT/BLYR*, Dkt. #61), and voluntarily dismissed certain claims without prejudice (*see, e.g.*, *TMRT/BLYR*, Dkt. #84), to streamline litigation in the Related Cases.  The parties also began discovery.  (*See* Dkt. #65).

---

[14]    Since that date, at least six additional cases have been filed against AllianzGI or its affiliates concerning Structured Alpha products.  Those cases are not addressed in this Opinion.

Defendant filed its consolidated motion to dismiss in part and supporting papers on February 25, 2021 (Dkt. #82-85; *see also Lehigh*, Dkt. #57-58); Plaintiffs filed their consolidated opposition and supporting papers on April 26, 2021 (Dkt. #97-100; *see also Lehigh*, Dkt. #69); and Defendant filed its reply on May 26, 2021 (Dkt. #104; *see also Lehigh*, Dkt. #75).  Accordingly, Defendant's motions to dismiss in part are fully briefed and ripe for decision.

## DISCUSSION

### A.    Applicable Law

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  The Court must accept as true all well-pleaded factual allegations in the complaint.  *See Iqbal*, 556 U.S. at 678.

**B.     Discussion**[15]

As noted, Defendant does not move to dismiss Plaintiffs' claims arising

under Section 2.12 of the LLC Agreement for breach of the Contractual

Standard of Care.  (*See generally* Def. Br.; Def. Reply).  Rather, in the instant

motion, Defendant asks the Court to "trim" Plaintiffs' "blunderbuss" complaints

of the following claims: (i) common-law claims where preempted by ERISA;

(ii) breach of contract (and quasi-contract) claims based on contractual duties

purportedly arising from sources other than Section 2.12; and (iii) tort claims

(common-law negligence and breach of fiduciary duty) as duplicative of

Plaintiffs' ERISA or contract claims and for various other reasons.  (Def. Br. 4-

7).  In a supplemental motion, Defendant moves to dismiss Lehigh's securities

fraud, common-law fraud, and misrepresentation claims.  (*See generally* Def.

Supp. Br.).  The Court first addresses choice of law issues, and then addresses

each of Defendant's arguments in turn.

**1.     Choice of Law Issues**

Defendant moves to dismiss several of Plaintiffs' state-law claims, and

"[i]n deciding a question of state law, the federal court must apply the forum

state's choice-of-law rules to determine which state's law governs." *Zerman* v.

*Ball*, 735 F.2d 15, 19-20 (2d Cir. 1984).  New York choice of law rules mandate

application of the substantive law of the state with the most significant

---

[15]     In their opposition to the instant motion, Plaintiffs occasionally cite documents
produced in discovery.  (*See, e.g.*, Pl. Opp. 12 n.4).  To the extent those documents
are "not incorporated by reference or otherwise integral to the Complaint" the Court
declines to consider them given the procedural posture of this case.  *Concord Assocs.,
L.P.* v. *Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016).

relationship to the legal issue.  *See, e.g.*, *Skaff* v. *Progress Int'l, LLC*, No. 12 Civ.

9045 (KPF), 2014 WL 5454825, at *8 (S.D.N.Y. Oct. 28, 2014) (quoting

*Intercontinental Plan., Ltd.* v. *Daystrom, Inc.*, 24 N.Y.2d 372, 382 (1969)).

      The LLC and Subscription Agreements contain choice of law provisions

that specify that the documents are governed by Delaware law (LLC Agreement

§ 8.05; SA § VI), and the PPM is incorporated by reference into the Subscription

Agreement (SA 7).  The parties do not dispute that Plaintiffs' contract claims

are governed by Delaware law, and accordingly the Court applies Delaware law

to resolve Defendant's motion to dismiss Plaintiff's breach of contract claims.

*See Arch Ins. Co.* v. *Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).  By

extension, because "breach of the implied covenant of good faith and fair

dealing is a contractual cause of action," *Comprehensive Habilitation Servs.,*

*Inc.* v. *Com. Funding Corp.*, No. 05 Civ. 9640 (PKL), 2009 WL 935665, at *10

n.14 (S.D.N.Y. Apr. 7, 2009), "[c]hoice-of-law provisions that govern a contract

also govern related claims for breach of the implied covenant of good faith and

fair dealing," *ARS Kabirwala, LP* v. *El Paso Kabirwala Cayman Co.*, No. 16 Civ.

6430 (GHW), 2017 WL 3396422, at *3 (S.D.N.Y. Aug. 8, 2017).  Therefore, the

Court also applies Delaware law to Plaintiffs' claims asserting breach of the

implied covenant of good faith and fair dealing.

      For tort claims, including negligence, breach of fiduciary duty, fraud, and

misrepresentation, "the law of the jurisdiction where the tort occurred will

generally apply because that jurisdiction has the greatest interest in regulating

behavior within its borders."  *Negri* v. *Friedman*, No. 14 Civ. 10233 (GHW),

2017 WL 2389697, at *3 (S.D.N.Y. May 31, 2017) (quoting *Cooney* v. *Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)).[16]  Plaintiffs' negligence claims are governed by New York law because Plaintiffs allege that the tortious conduct (*i.e.*, mismanagement and related negligence) occurred in New York, where Defendant is headquartered.  (*See, e.g.*, ATRS ¶ 38; CLPF ¶ 47; CMERS ¶ 42; CTWW ¶ 47; MTA FAC ¶ 19; TRMT/BLYR SAC ¶ 16; UFCW ¶ 27).  *See AHW Inv. P'ship* v. *Citigroup Inc.*, 980 F. Supp. 2d 510, 524 (S.D.N.Y. 2013), *aff'd sub nom. AHW Inv. P'ship, MFS, Inc.* v. *Citigroup Inc.*, 661 F. App'x 2 (2d Cir. 2016) (summary order).[17]  Using that analysis, the Court finds that to the extent Plaintiffs' common-law breach of fiduciary duty claims are premised on duties Defendant allegedly owed as an investment advisor or pursuant to public policy, New York law applies to those claims as well.  Conversely, to the extent those claims arise out of duties Defendant owed as Managing Member of the

---

[16]    The Court rejects Plaintiffs' argument that a "complex" choice of law analysis precludes resolving Defendant's motion to dismiss Plaintiffs' tort claims as duplicative.  (*See* Pl. Opp. 39-40).  For the reasons set forth in Defendant's reply brief (Def. Reply 11-13), the Court does not believe the choice of law analysis for Plaintiffs' tort claims is particularly complex.  Furthermore, Plaintiffs identify no purported conflict between New York law and any other state's potentially applicable law, and their citations to allegations of conduct in states other than New York are at best inconsequential, if not irrelevant, to the interests analysis implicated by Plaintiffs' allegations — namely that Defendant mismanaged the Funds in New York.

[17]    Lehigh and Defendant agree that New York law governs Lehigh's common-law fraud and negligent misrepresentation claims (*see generally* Def. Supp. Br.; Lehigh Opp.), "and such implied consent is sufficient to establish choice of law." *MIG, Inc.* v. *Paul, Weiss, Rifkind, Wharton & Garrison, LLP*, 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010) (quoting *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 61 (2d Cir. 2004)), *aff'd*, 410 F. App'x 408 (2d Cir. 2011) (summary order).  In any event, after conducting a choice of law analysis the Court concludes that, for substantially the same reasons the Court applies New York law to Plaintiffs' negligence claims, it will apply New York law to Lehigh's fraud claim as well.

Funds, all of which were Delaware LLCs, Delaware law applies.  *See Trahan* v.

*Lazar*, 457 F. Supp. 3d 323, 346 n.4 (S.D.N.Y. 2020).[18]

### 2. Defendant's Motion to Dismiss Plaintiffs' State-Law Claims as Preempted by ERISA Is Denied as Premature

To begin, Defendant moves to dismiss Plaintiffs' state-law claims as

preempted by ERISA in five of the Related Cases.[19]  And it is true that ERISA

preempts "any and all State laws insofar as they may now or hereafter relate to

any employee benefit plan."  29 U.S.C. § 1144(a).  The express preemption

"provisions of ERISA are deliberately expansive, and designed to 'establish

pension plan regulation as exclusively a federal concern.'"  *Pilot Life Ins. Co.* v.

*Dedeaux*, 481 U.S. 41, 45-46 (1987) (quoting *Alessi* v. *Raybestos-Manhattan,

Inc.*, 451 U.S. 504, 523 (1981)).  As such, ERISA "completely preempts any

state-law cause of action that 'duplicates, supplements, or supplants' an ERISA

remedy."  *Montefiore Med. Ctr.* v. *Teamsters Local 272*, 642 F.3d 321, 327 (2d

Cir. 2011) (quoting *Aetna Health Inc.* v. *Davila*, 542 U.S. 200, 209 (2004)).

Indeed, a state-law claim that "merely amounts to an alternative theory of

recovery for conduct actionable under ERISA is preempted."  *Venturino* v. *First

Unum Life Ins. Co.*, 724 F. Supp. 2d 429, 432 (S.D.N.Y. 2010) (quoting *Diduck

v. Kaszycki & Sons Contractors Inc.*, 974 F.2d 270, 288 (2d Cir. 1992)).  Of

potential significance to the instant motion, however, "ERISA bars only state

---

[18]     To the extent Plaintiffs argue that the entirety of their breach of fiduciary duty claims are governed by New York law (*see* Pl. Opp. 42 & n.32), as noted below, *see infra* Section B.4.c, the choice of law issue is not outcome-determinative, as the claims would be resolved in the same manner under either Delaware or New York law.

[19]     These cases are: *BCBS*, *CPPT*, *IBEW*, *FFLD/NEHC*, and *UFCW*.

law claims against fiduciaries; state law claims against non-fiduciaries escape preemption." *United Teamster Fund* v. *MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 472 (S.D.N.Y. 2014) (citing *Burger* v. *Empire Blue Cross & Blue Shield*, No. 99 Civ. 4366 (LMM), 2000 WL 1425101, at *2 (S.D.N.Y. Sept. 27, 2000)).

The issue at the heart of Defendant's ERISA preemption argument is whether Defendant was in fact an ERISA fiduciary throughout the relevant period. Defendants argue that the Court should dismiss Plaintiffs' state-law claims as preempted by ERISA against BCBS, CPPT, IBEW, NEHC, and UFCW. (Def. Br. 30-32; Def. Reply 5-7).[20] Plaintiffs concede that their state-law claims are preempted if Defendant was an ERISA fiduciary. (Pl. Opp. 23). However, they argue that dismissal on preemption grounds is premature at this stage of the litigation because "where the evidence has not yet shown whether defendants are fiduciaries, plaintiffs may plead state law claims in the alternative." *United Teamster Fund*, 39 F. Supp. 3d at 473 (internal quotation marks omitted) (quoting *Pedre Co.* v. *Robins*, 901 F. Supp. 660, 666 (S.D.N.Y. 1995)). The Court agrees.

---

[20]   As noted above, the ERISA Plaintiffs are: BCBS, BLYR, CLPF, CPPT, CTWW, IBEW, NEHC, TMRT, and UFCW. (*See* Giuffra Decl., Ex. App. B).

The five ERISA Plaintiffs against whom Defendant invokes ERISA preemption allege that Defendant acted as an ERISA fiduciary in managing the Funds' assets throughout the relevant period because the ERISA 25% Threshold was met at all relevant times. (*See* BCBS ¶ 144; CPPT FAC ¶ 120; FFLD/NEHC SAC ¶ 138; IBEW FAC ¶¶ 29, 136; UFCW ¶ 132). Defendant does not move to dismiss on preemption grounds in *CLPF*, *CTWW*, and *TMRT/BLYR* because it concedes that "the application of ERISA is disputed or unclear." (Def. Reply 6; *see also* Def. Br. 30 n.19).

26

Defendant argues that there is no factual dispute as to its status as an ERISA fiduciary, but, in some tension with that argument, Defendant has declined to stipulate that it was an ERISA fiduciary for the relevant period, though it has offered to "accept a stipulation as to when the ERISA 25% Threshold was met." (Def. Reply 6). While the Court takes no position as to the parties' attempts to reach an agreement regarding Defendant's status under ERISA at relevant times, the unconsummated stipulation necessarily implies that there remains a dispute over the issue. Accordingly, at this early stage in the litigation, without the benefit of discovery on this issue, and with the parties in the process of resolving Defendant's status under ERISA, the Court declines to find as a matter of law that Defendant was a fiduciary under ERISA when Plaintiffs' causes of action arose. Therefore, dismissal on preemption grounds is premature. *See United Teamster Fund*, 39 F. Supp. 3d at 473; *Pedre Co.*, 901 F. Supp. at 666.

The Court is unpersuaded by Defendant's remaining arguments to the contrary. Defendant cites *Fastener Dimensions, Inc.* v. *Massachusetts Mutual Life Insurance Co.*, Nos. 12 Civ. 8918 (DLC), 13 Civ. 4782 (DLC), 2013 WL 6506304 (S.D.N.Y. Dec. 12, 2013), and *Toussaint* v. *JJ Weiser & Co.*, No. 04 Civ. 2592 (MBM), 2005 WL 356834 (S.D.N.Y. Feb. 13, 2005), to argue that the Court can find at the motion to dismiss stage that Defendant is an ERISA fiduciary purely on the basis of Plaintiffs' allegations. (Def. Reply 6). The Court is not convinced that either case compels dismissal of Plaintiffs' claims on preemption grounds here.

27

*First*, *Fastener Dimensions* is plainly distinguishable.  In that case, the issue was not whether a plan was subject to ERISA; rather, the plaintiff there tried to plead state-law claims in the alternative on the theory that the ERISA plan itself might not actually have existed.  *See Fastener Dimensions*, 2013 WL 6506304, at *6.  In that scenario, the court concluded that pleading state-law claims in the alternative was not proper, as the argument that the plaintiff's employers "lied to [her] in saying" that the ERISA plan existed was "far outside the scope of the allegations in the ... [c]omplaint."  That is not the case here, where it is not "far outside the scope of the allegations" in Plaintiffs' complaints that the ERISA 25% Threshold may not in fact have been met for the duration of the relevant period, especially given the parties' inability to reach a stipulation as to Defendant's status as an ERISA fiduciary.

*Second*, the Court disagrees with *Toussaint*'s conclusion and notes that the weight of authority in this District is to decline to dismiss state-law claims pleaded in the alternative where there remains a disputed issue of fact as to ERISA's applicability.  In *Toussaint*, the court accepted the plaintiff's allegations as true that defendants were ERISA fiduciaries and therefore dismissed state-law claims as preempted.  *Toussaint*, 2005 WL 356834, at *8, 15.  However, in support of its conclusion at the motion to dismiss stage that the defendants were ERISA fiduciaries, the court reasoned only that "construing the allegations in the Complaint and inferences therefrom in the light most favorable to plaintiffs, the Broker Defendants are deemed at this stage to be fiduciaries under ERISA."  *Id.* at *8.  Other courts in this District

regularly allow state-law claims pleaded in the alternative to ERISA claims to advance at the motion to dismiss stage where a defendant's status under ERISA is unclear, and the Court joins them today in denying Defendant's motion to dismiss on preemption grounds as premature. *See, e.g., United Teamster Fund*, 39 F. Supp. 3d at 473 (denying motion to dismiss on preemption grounds where "the evidence has not yet shown whether defendants are fiduciaries"); *Burger*, 2000 WL 1425101, at *2 ("In light of the fact that [the defendant] has not admitted it acted in the capacity of a fiduciary as defined by ERISA, its motion to dismiss is denied[.]"); *Pedre Co.*, 901 F. Supp. at 666 ("[A]t the motion-to-dismiss stage … the evidence has not yet shown whether defendants are fiduciaries.  If they are fiduciaries, plaintiffs must plead their injuries under ERISA.  If they are not fiduciaries, plaintiffs have no ERISA claim but may proceed at common law."); *see also Walker* v. *Merrill Lynch & Co. Inc.*, 181 F. Supp. 3d 223, 236 (S.D.N.Y. 2016) (denying motion to dismiss on preemption grounds where defendant's fiduciary status under ERISA was unclear, but declining to exercise supplemental jurisdiction over state-law claim).  Accordingly, Defendant's motion to dismiss on preemption grounds is denied as premature.

### 3.    Defendant's Motion to Dismiss Plaintiffs' Contract Claims Is Granted in Part and Denied in Part

In moving to dismiss Plaintiffs' breach of contract claims in part, Defendant argues that the only contractual obligations it owes Plaintiffs are the relevant portions of the Contractual Standard of Care imposed under Section 2.12 of the LLC Agreement "or similar provisions" contained in Side

Letter agreements with Plaintiffs in the *BCBS*, *TMRT/BLYR*, *FFLD/NEHC*, and *MTA* actions.  (Def. Br. 33 & n.25; Def. Reply 7).  Plaintiffs counter that Defendant not only breached the Contractual Standard of Care, but also breached contractual obligations to, *inter alia*, abide by the investment strategy in the PPM.  (Pl. Opp. 25-31).[21]  As such, the key questions in resolving this segment of Defendant's motion are: (i) whether statements in the PPM regarding Defendant's investment strategy gave rise to contractual obligations; and (ii) if so, whether Plaintiffs adequately allege a breach of such obligations.

Defendant also moves to dismiss two other types of claims addressing its investment strategy, namely (i) claims predicated on provisions in certain of Plaintiffs' Side Letters ostensibly requiring Defendant to provide notice of a change in investment strategies (Def. Br. 37), and (ii) claims alleging a breach of the covenant of good faith and fair dealing for failing to implement the investment strategy as described in the PPM and as represented to Plaintiffs in other documents and presentations (*id.* at 39).  As noted above, by the terms of the Governing Documents, Delaware law governs disputes over contractual interpretation.  The Court thus begins with an analysis of that state's law.

---

[21]   The parties dispute the degree to which language in the PPMs or in Defendant's communications with Plaintiffs (*i.e.*, marketing presentations, reports, and in meetings) informs the scope of Defendant's Contractual Standard of Care under the LLC Agreement.  (*See* Pl. Opp. 25-26; Def. Reply 8-9).  Because Defendant does not move to dismiss Plaintiff's breach of contract claims to the extent premised on the Contractual Standard of Care, the Court need not determine at this time whether and to what extent the Contractual Standard of Care is informed by the representations in the PPMs or in any of Defendant's marketing materials or other communications with Plaintiffs.

### a.     Interpretation of Contracts Under Delaware Law

For a breach of contract claim to survive a motion to dismiss under Delaware law, "the plaintiff must demonstrate: [i] the existence of the contract, whether express or implied; [ii] the breach of an obligation imposed by that contract; and [iii] the resultant damage to the plaintiff." *VLIW Tech., LLC* v. *Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). "Under Delaware law, the interpretation of a contract is a question of law suitable for determination on a motion to dismiss." *MicroStrategy Inc.* v. *Acacia Rsch. Corp.*, No. 5735 (VCP), 2010 WL 5550455, at *5 (Del. Ch. Dec. 30, 2010) (collecting cases). "When interpreting a cont[r]act, the court strives to determine the parties' shared intent, looking first at the relevant document, read as a whole, in order to divine that intent." *Schuss* v. *Penfield Partners, LP*, No. 3132 (VCP), 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008) (citation and internal quotation marks omitted).

A court must "interpret clear and unambiguous terms according to their ordinary meaning." *GMG Cap. Invs., LLC* v. *Athenian Venture Partners I, LP*, 36 A.3d 776, 780 (Del. 2012); *see also Paul* v. *Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) ("In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning."). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language," and a contract "is not rendered ambiguous simply because the

31

parties do not agree upon its proper construction." *GMG*, 36 A.3d at 780 (citation omitted).

"Dismissal of a claim based on contract interpretation is proper if the defendants' interpretation is the *only* reasonable construction as a matter of law," and if a plaintiff opposing a motion to dismiss offers an interpretation that "is not a reasonable one." *Caspian Alpha Long Credit Fund, LP* v. *GS Mezzanine Partners 2006 LP*, 93 A.3d 1203, 1205 (Del. 2014) (citations and internal quotation marks omitted); *accord VLIW Tech., LLC*, 840 A.2d at 615 ("In deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions. Dismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law." (internal footnote omitted)).

### b. Plaintiffs Adequately Plead Contract Claims Arising out of Defendant's Obligations Under the PPM

The primary dispute between the parties regarding Plaintiffs' breach of contract claims is the extent to which the representations in the PPM regarding Defendant's investment strategy gave rise to enforceable contractual obligations.[22] The LLC Agreement's merger clause makes explicit that "this Agreement is to be read in conjunction with the subscription agreement ... and

---

[22] The Court notes that under the Contractual ERISA Standard of Care, Defendant agreed to discharge its duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). (*See also* LLC Agreement § 2.12). Because Defendant does not move to dismiss breach of contract claims that arise under Section 2.12 at this time, the Court does not discuss whether Defendant agreed to discharge its duties in accordance with the PPMs under this provision of the LLC Agreement, when applicable, nor does it address whether such an obligation is different than Defendant's obligations under the PPM discussed in the remainder of this Section of the Opinion.

the PPM, which documents shall constitute the entire agreement of the parties hereto." (LLC Agreement § 8.20).  Further, the Subscription Agreement clearly provides that each investor purchases interests in the Funds "upon the terms and conditions set forth herein [*i.e.*, in the Subscription Agreement], in the [PPM], and in the [LLC] Agreement[.]" (SA 7).  The plain language of this provision states that Defendant will be bound by the "terms and conditions" of the PPM.  It follows that a breach of those terms and conditions can give rise to contractual liability.

As an example of such a term or condition, the PPM explicitly states that the "assets of the Fund[s] will be invested in accordance with the investment policies and objectives described in this Memorandum" (PPM 54), referencing specific provisions detailed elsewhere in the PPM (*see id.* at 1-2, 19-20 (containing sections entitled "Investment Objective" and "Investment Strategies")), and clearly signaling an intent to follow the general contours of the investment strategy described in those provision.[23]  Similarly, the PPM provides that Defendant, as Managing Member, will "implement[] the Fund's investment strategy" (PPM 38), again referencing the Investment Strategies

---

[23]    In a section entitled "Investment Considerations," the PPM counsels that "an authorized fiduciary of an employee benefit plan proposing to invest in the Fund should, in consultation with its advisers, consider whether the investment would be consistent with the terms of the plan's governing documents and applicable law." (PPM 54).  That this statement is made in the context of a warning to plan fiduciaries only strengthens the plain reading that the parties intended to be bound by its terms.  An ERISA fiduciary otherwise would not be cautioned to consider whether the Fund's "investment policies and objectives" were consistent with those of the ERISA plan.  *See Schuss* v. *Penfield Partners, LP*, No. 3132 (VCP), 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008) ("When interpreting a contract, the court strives to determine the parties' shared intent, looking first at the relevant document, read as a whole, in order to divine that intent.").

section, and specifically tying Defendant's role as Managing Member to carrying out that strategy.  In their complaints, Plaintiffs plausibly allege that Defendant abandoned these investment strategies and objectives (*see, e.g.*, ATRS ¶¶ 9, 73-87; BCBS ¶¶ 81-96; CMERS ¶¶ 84-99, 107; Lehigh FAC ¶¶ 10, 215; MTA FAC ¶¶ 70-94; UFCW ¶¶ 66-76), and therefore, at this stage in the litigation, the Court cannot conclude that "the defendants' interpretation is the only reasonable construction as a matter of law," *VLIW Tech., LLC*, 840 A.2d at 615.

Undeterred, Defendant tries to cabin its liability by arguing that portions of the PPM, including descriptions of the Funds' intended investment strategy, can be ignored because they are not "terms and conditions" of the PPM.  (Def. Br. 33; Def. Reply 8).  But Defendant provides no explanation of what it believes constitutes a "term and condition" of the PPM, and therefore provides the Court with no principled basis to allow it to distinguish those portions of the PPM that do not constitute terms or conditions.  Instead, the Court understands Defendant's argument to simply ask the Court to accept the PPM as a glorified advertising brochure, the substance of which Defendant could ignore at will.  Given the LLC Agreement's merger clause and the Subscription Agreement's incorporation of the PPM, the Court declines this invitation, as it would render the references to the PPM in the other Governing Documents surplusage.  *See Kuhn Constr., Inc.* v. *Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) ("We will read a contract as a whole and we will give each

provision and term effect, so as not to render any part of the contract mere
surplusage.").

Similarly, Defendant contends that the PPM's description of an
investment strategy (or specific representations regarding actions Defendant
was to take in carrying out that strategy) does not give rise to any contractual
cause of action because the PPM also "grant[s] [Defendant] broad discretion to
'formulate new approaches' or 'change any of its investments strategies'
without Plaintiffs' consent." (Def. Reply 8 (quoting PPM 2, 19, 22)). Again,
Defendant seeks to have the Court ignore large swaths of the PPM, even as
Defendant represented that it would invest the Funds' assets in accordance
with those provisions. Furthermore, a "change in investment strategy" is
different than complete repudiation of an investment strategy. Plaintiffs do not
merely allege that Defendant changed the strategy, but that Defendant
abandoned the strategy completely, while simultaneously representing the
exact opposite to Plaintiffs. (*See, e.g.*, ATRS ¶¶ 9, 73-87, 103; BCBS ¶¶ 81-96;
CMERS ¶¶ 84-99; CTWW ¶¶ 110, 121-122; UFCW ¶¶ 66-76). Discovery may
not bear out Plaintiffs' claims, but the Court will not foreclose them at this
stage in the litigation.

Finally, Defendant posits that any representations about investment
strategy were "forward-looking statements" that "merely described
[Defendant's] present intentions with respect to investment strategy, and
made ... clear that the strategy could diverge[.]" (Def. Reply 9). While this may
be true in principle, as noted above, what Plaintiffs claim to be actionable

representations in the PPM are not specific forward-looking investment goals, but rather the commitment to abide by the "investment policies and objectives" and "investment strategy" in the PPM.  (PPM 38, 54; *see also id.* at 19-20).  At this stage, the parties have not asked the Court to interpret those terms, and the parties have not had the opportunity to brief their arguments as to the meaning of — or their understanding of the meaning of — those terms in the context of their agreement (including the potential relevance of marketing materials or similar communications).  Accordingly, the Court declines to delineate the scope of Defendant's contractual obligations under those provisions on this motion, and denies Defendant's motion to dismiss Plaintiff's breach of contract claims to the extent they are premised on Defendant's purported breach of its commitments (i) that "the assets of the Fund[s] ... be invested in accordance with the investment policies and objectives" in the PPM (PPM 54), or (ii) to "implement[] the Fund[s'] investment strategy" (*id.* at 38).[24]

---

[24]     CPPT alleges that Section 2.02 of the LLC Agreement imposes a contractual duty to "do all acts for the preservation, protection, improvement, and enhancement in value of all assets."  (CPPT FAC ¶ 113; *see also* Pl. Opp. 31 & n.17).  The Court agrees with Defendant that, read in its entirety, Section 2.02 imposes a duty on Defendant only to "conduct the day-to-day administration of the [Funds]."  (LLC Agreement § 2.02).  CPPT has not alleged that Defendant failed to carry out the daily administration of the Funds.  Section 2.02 also gives Defendant the discretionary power to "carry out any and all objects and purposes of the [Funds]," along with an enumerated list of actions Defendant was empowered to take if it "deem[ed] [those actions] necessary or advisable."  (*Id.*).  But the grant of authority to take a certain discretionary action, without more, does not impose liability for an exercise of that discretion.  *See Cooper* v. *Gottlieb*, No. 95 Civ. 10543 (JGK), 2000 WL 1277593, at *4-5 (S.D.N.Y. Sept. 8, 2000), *aff'd*, 12 F. App'x 28 (2d Cir. 2001) (summary order).  As such, CPPT's attempt to impose contractual liability pursuant to Section 2.02 fails, regardless of whether CPPT alleges omissions or affirmative actions.

### c.   Plaintiffs Adequately Plead Certain Failure to Notify Claims[25]

Certain Plaintiffs — specifically, ATRS, BCBS, CMERS, MTA, and UFCW — allege that Defendant breached contractual obligations "to provide [Plaintiffs] with prompt notice of any fundamental change in the investment strategy ... from that as described in the [Funds'] governing documents[.]" (ATRS ¶¶ 153, 155; *see also* CMERS ¶¶ 181,183 (same); MTA FAC ¶ 124 (alleging Defendant failed to "inform [Plaintiffs] promptly in writing of ... any material change in the investment strategies disclosed in the [Fund] Documents"); UCFW ¶ 112 (same); BCBS ¶¶ 193-194 (citing Multi Beta I LLC Agreement § 11.2)).[26]  Defendant argues that no such "change in strategy occurred," and as such the notice provision was never triggered.  (Def. Br. 37). However, Plaintiffs have plausibly alleged changes in investment strategy, for example, that Defendant abandoned its strategy of maintaining the risk profile

---

[25]   ATRS's Side Letters are governed by Arkansas law. (*See* Giuffra Decl., Ex. 43 at 12; *id.*, Ex. 45 at 13).  The CMERS and UFCW Side Letters are governed by Delaware law.  (*See id.*, Ex. 57 at 8 (CMERS); *id.*, Ex. 109 at 8 (UFCW)).  The MTA Side Letters do not include a choice of law provision.  The LLC Agreement at issue in the *BCBS* action has a Delaware choice of law provision. (Giuffra Decl., Ex. 31 (the "Multi Beta I LLC Agreement") at § 14.1(b)).

[26]   Section 11.2 of the Multi Beta I LLC Agreement provides that Defendant may not amend the LLC Agreement without "giving Notification to the Members, at least thirty (30) days prior to the implementation of such amendment, setting forth all material facts relating to such amendment and ... obtaining the Consent of the Fund to such amendment prior to the implementation thereof." (Multi Beta I LLC Agreement § 11.2).  However, nothing in the LLC Agreement or in any other document indicates that a change in investment strategy is akin to an amendment to the LLC Agreement, and accordingly, BCBS fails to establish a contractual right to be notified under Section 11.2 of the Multi Beta I LLC Agreement of a change in investment strategy.  Nor does BCBS's Side Agreement impose a reporting requirement on Defendant in the event of a change of investment strategy.  (*See generally* Giuffra Decl., Ex. 47).

of the Funds, left positions unhedged, and placed outsized directional bets against volatility.  (*See, e.g.*, CMERS ¶ 89; UFCW ¶ 66; MTA FAC ¶¶ 73-77).

Defendant next argues that Plaintiffs' claims are speculative because they fail to "specify when their alleged rights to notice purportedly arose, as well as some concrete action that Plaintiffs could have taken at that point to avoid their claimed losses" (Def. Reply 10), or "how a supposed failure to give notice caused their claimed damages" (Def. Br. 37).  But UFCW, as one example, alleges changes in investment strategy "by 2019" (UFCW ¶ 66). ATRS, CMERS, and MTA similarly allege a change in strategy in February 2020 (*see, e.g.*, ATRS ¶ 78; CMERS ¶ 89; MTA FAC ¶¶ 73-74, 76-77).  And while no Plaintiff specifically enumerates potential actions it would have taken upon receiving notice, such counter-factual pleading is unnecessary to survive a motion to dismiss.  *See McBeth* v. *Porges*, 171 F. Supp. 3d 216, 230 (S.D.N.Y. 2016) ("But it is not implausible to infer that, had Defendants complied with their reporting obligations, Plaintiff could have, and would have, taken steps to mitigate, if not prevent, the loss of his investment.").  While Defendant argues that by February 2020, Plaintiffs would have been unable to take any action to respond to the change in strategy and would have incurred losses even with notice (*see* Def. Br. 38), the Court cannot draw that inference in Defendant's favor on a motion to dismiss.  Accordingly, Defendant's motion to dismiss Plaintiffs' breach of contract claims for failure to notify is denied, except as to BCBS.

### d. Plaintiffs Adequately Plead Certain Breach of Implied Covenant of Good Faith and Fair Dealing Claims

Plaintiffs in the *FFLD/NEHC*, *IBEW*, *Lehigh*, *MTA*, and *TMRT/BLYR* actions allege claims for breach of the implied covenant of good faith and fair dealing in the alternative to their contract claims.  Defendant argues that such claims must be dismissed for a failure to "[i]dentify [a]ny [g]aps" in the Governing Documents.  (Def. Br. 39).  But Plaintiffs in three of the five actions — IBEW, Lehigh, and MTA — advance this claim under a different theory.  Because the allegations of those three Plaintiffs are plausible and their theory is viable under Delaware law, the Court denies Defendant's motion as to those actions.  However, the Court grants Defendant's motion as to the *FFLD/NEHC* and *TMRT/BLYR* actions.

"In all contracts, there is an implied covenant of good faith and fair dealing." *Enrique* v. *State Farm Mut. Auto. Ins. Co.*, 142 A.3d 506, 511 (Del. 2016).  Under Delaware law, the implied covenant often arises in two situations.  *Oxbow Carbon & Mins. Holdings, Inc.* v. *Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 504 n.93 (Del. 2019).  One is when an agreement's express terms do not address what should happen in an unforeseen situation, which situation is "best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap* v. *State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (internal quotation marks and footnotes omitted).  Defendant focuses its motion to dismiss on the first situation, which addresses Plaintiffs' allegations in the *FFLD/NEHC* and

*TMRT/BLYR* actions.  On this point, Defendant is correct:  Plaintiffs in these two actions do not adequately allege a breach of the implied covenant because they fail to identify any specific gaps in the Governing Documents or allege that the parties could not have anticipated the issues they now allege are not covered by the Governing Documents.  (*See* FFLD/NEHC SAC ¶¶ 126-130; TMRT/BLYR SAC ¶¶ 146-150).  *See Oxbow Carbon*, 202 A.3d at 507.  As such, these Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing must be dismissed.

But a second context in which an implied covenant arises is when an agreement confers discretion on a party, as the Plaintiffs in *IBEW*, *Lehigh*, and *MTA* allege here.  *See Oxbow Carbon*, 202 A.3d at 504 n.93; *see also Glaxo Grp. Ltd.* v. *DRIT LP*, 248 A.3d 911, 920 (Del. 2021) ("The implied covenant imposes a good faith and fair dealing obligation when a contract confers discretion on a party."); *accord Miller* v. *HCP Trumpet Invs., LLC*, 194 A.3d 908, 2018 WL 4600818, at *1 (Del. Sept. 20, 2018) (unpublished table decision) ("[T]he mere vesting of 'sole discretion' did not relieve the Board of its obligation to use that discretion consistently with the implied covenant of good faith and fair dealing.").  (*See also* LLC Agreement § 2.01; PPM 2, 19, 22 (discussing Defendant's discretion)).

Under Delaware law, the implied covenant imposes a duty "to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Gerber* v. *Enter. Prods. Holdings*, 67 A.3d 400, 419 (Del. 2013) (internal quotation marks omitted), *overruled on other grounds by Winshall* v.

*Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).  And "'good faith' [means] faithfulness to the scope, purpose, and terms of the parties' contract." *Id.* (emphasis omitted).  "Both necessarily turn on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally." *Id.* (internal quotation marks and emphasis omitted).

Here, for example, the Subscription Agreement provides that the investor must "rel[y] solely upon the [PPM], the [LLC] Agreement, and [the investor's] independent investigation" regarding "the organization and investment objectives and policies of, and the risks and expenses of an investment in, the Fund" (SA § II(E)), thereby explicitly requiring investors to rely on the "investment objectives and policies" laid out in the PPM when deciding to invest in the Funds.  IBEW, Lehigh, and MTA allege that Defendant abused its discretion and acted contrary to the purpose of the parties' agreements in abandoning the investment strategy set forth in the PPMs and in Defendant's communications with Plaintiffs.  (IBEW FAC ¶¶ 122-123; Lehigh FAC ¶¶ 293-295; MTA ¶¶ 142-144).  Therefore, to the extent that Plaintiffs fail to plead a viable breach of contract claim arising out of Defendant's alleged departure from the investment strategy articulated in the PPMs and Defendant's communications, Plaintiffs sufficiently plead a violation of the duty of good faith to act consistently with the purpose of that element of the parties' agreement.  *See Manbro Energy Corp.* v. *Chatterjee Advisors, LLC*, No. 20 Civ. 3773 (LGS), 2021 WL 2037552, at *6 (S.D.N.Y. May 21, 2021) (denying motion to dismiss implied covenant claim under Delaware law where plaintiff pleaded

breach arising out of defendants' abuse of discretion in carrying out the purpose of the contract).[27]

In sum, the Court dismisses claims for a breach of the implied covenant of good faith and fair dealing in the *FFLD/NEHC* and *TMRT/BLYR* actions, but denies the motion to dismiss as to the *IBEW*, *Lehigh*, and *MTA* actions.

### 4. Defendant's Motion to Dismiss Plaintiffs' Tort Claims Is Granted in Part and Denied in Part

Plaintiffs assert state-law claims for negligence and breach of fiduciary duty that exist separately from their claims of breach of the Contractual Standard of Care. Defendants move to dismiss these claims on myriad grounds, arguing that: (i) the claims are not "direct" and belong to the Funds, not Plaintiffs; (ii) the claims are duplicative of Plaintiffs' breach of contract claims; and (iii) the economic loss doctrine bars Plaintiffs' tort claims. For the reasons that follow, the Court agrees in part, and:

- grants Defendant's motion to dismiss as to Plaintiffs' tort claims to the extent premised on mismanagement as impermissibly duplicative;

- denies Defendant's motion to dismiss as to Plaintiffs' negligence claims to the extent premised on a duty imposed by Defendant's extracontractual representations; and

---

[27] The parties dispute that Defendant was obligated to implement the investment strategy described in the PPM. While the Court determines that Defendant had some contractual obligations to abide by the strategy described in the PPM, as discussed *supra*, the extent to which those obligations overlap with or track Plaintiffs' allegations of the breach of implied covenant of good faith and fair dealing remains to be seen. Therefore, the Court declines to dismiss this claim as duplicative. *See SerVaas* v. *Ford Smart Mobility LLC*, No. 909 (LWW), 2021 WL 3779559, at *9-10 (Del. Ch. Aug. 25, 2021) (denying motion to dismiss implied covenant claim where record did not yet establish it was duplicative of breach of contract claim).

- grants Defendant's motion to dismiss as to Plaintiffs' breach of fiduciary duty claims in part as duplicative and in part as derivative.

### a.   Certain of Plaintiffs' Tort Claims Are Derivative

Defendant argues that Plaintiffs' tort claims are, at base, allegations of mismanagement of the Funds that only the Funds would have standing to pursue.  (Def. Br. 26-30; Def. Reply 23-26).  Because the Funds are Delaware LLCs, the Court applies Delaware law to determine whether Plaintiffs' claims are direct or derivative.  *See AHW Inv. P'ship* v. *Citigroup, Inc.*, 806 F.3d 695, 699 (2d Cir. 2015), *certified question answered*, 140 A.3d 1125 (Del. 2016).

Under Delaware law, to determine whether a breach of fiduciary claim is derivative or direct, courts engage in a two-step inquiry that considers: (i) "[w]ho suffered the alleged harm (the corporation or the suing stockholders individually)"; and (ii) "who would receive the benefit of the recovery or other remedy."  *Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004); *see also Citigroup Inc.* v. *AHW Inv. P'ship*, 140 A.3d 1125, 1138 (Del. 2016) (explaining that "*Tooley* … and its progeny deal with the distinct question of when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively." (quotation omitted)); *McBeth*, 171 F. Supp. 3d at 232 (applying *Tooley* in the LLC context).  The *Tooley* court further explained that:

> a court should look to the nature of the wrong and to whom the relief should go.  The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and

> *that he or she can prevail without showing an injury to*
> *the corporation.*

845 A.2d at 1039 (emphasis added).

But when a plaintiff asserts a claim based on the plaintiff's own right, such as a claim for breach of contract or for fraud, *Tooley* does not apply.  *See, e.g.*, *NAF Holdings, LLC* v. *Li & Fung (Trading) Ltd.*, 118 A.3d 175, 179 (Del. 2015) ("*Tooley* and its progeny do not, and were never intended to, subject commercial contract actions to a derivative suit requirement."); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015) ("Quintessential examples of personal claims would include … a tort claim for fraud in connection with the purchase or sale of shares.").  *But see El Paso Pipeline GP Co., L.L.C.* v. *Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016) (explaining that when a claim "sounds in breach of a contractual duty" owed to the company, the *Tooley* analysis still applies).

To the extent Plaintiffs' breach of fiduciary duty and negligence claims sound in mismanagement, those claims must be dismissed because "Delaware law is clear that fiduciary duty claims alleging fund mismanagement are derivative." *In re Harbinger Cap. Partners Funds Inv. Litig.*, No. 12 Civ. 1244 (AJN), 2013 WL 5441754, at *9 (S.D.N.Y. Sept. 30, 2013) (collecting cases), *vacated on other grounds in part on reconsideration*, 2013 WL 7121186 (S.D.N.Y. Dec. 16, 2013).  Here, Plaintiffs' breach of fiduciary claims arise from Defendant's purported mismanagement of the Funds.  (*See, e.g.*, ATRS ¶ 121; CLPF ¶ 190; CMERS ¶ 143; CPPT FAC ¶ 15; CTWW ¶ 153; FFLD/NEHC SAC ¶ 77; IBEW FAC ¶ 100; Lehigh FAC ¶ 272; MTA FAC ¶ 107; TMRT/BLYR SAC

44

¶¶ 156-157; UFCW ¶ 108).  Mismanagement of the Funds necessarily harms the Funds directly, and the members only indirectly.  It follows that Plaintiffs cannot "prevail without showing an injury to the corporation," *Tooley*, 845 A.2d at 1039, and thus Plaintiffs' mismanagement-based claims fail at *Tooley*'s first prong, *see El Paso Pipeline*, 152 A.3d at 1261 ("In *Tooley* terms, the harm is to the corporation, because such claims naturally assert that the corporation's funds have been wrongfully depleted, which, though harming the corporation directly, harms the stockholders only derivatively so far as their stock loses value." (internal quotation omitted)).[28]

To avoid the well-established principle that mismanagement claims are derivative, Plaintiffs seek to identify bases for an independent duty that Defendant purportedly owed to them individually.  They find success with their argument that Defendant undertook independent duties pursuant to representations made directly to Plaintiffs regarding: (i) the manner in which the Funds would be invested and (ii) the risk management practices Defendant represented it would employ.  (*See, e.g.*, ATRS ¶¶ 62-70; BCBS ¶¶ 102-107; CMERS ¶¶ 10, 44, 46, 60, 69, 72, 81-82; CPLF ¶ 69; Lehigh FAC ¶¶ 117-129).  *See Bayerische Landesbank, N.Y. Branch* v. *Aladdin Cap. Mgmt. LLC*, 692 F.3d

---

[28]    In their opposition, Plaintiffs argue that their breach of fiduciary duty and negligence claims arise from Defendant's nondisclosure of material information.  (Pl. Opp. 36-38 & n.25-26).  Plaintiffs are correct that mismanagement claims premised on fraud or non-disclosure are sufficiently personal so as to constitute direct claims.  *See, e.g.*, *McBeth* v. *Porges*, 171 F. Supp. 3d 216, 232-33 (S.D.N.Y. 2016); *Anwar* v. *Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 401 n.9 (S.D.N.Y. 2010).  However, while Plaintiffs raise this argument in their briefing (and several Plaintiffs plead nondisclosure as a breach of contract claim), with the exception of Lehigh (Lehigh FAC ¶ 259), they did not plead negligence or breach of fiduciary claims arising out of fraud or nondisclosure.  Lehigh's claim is discussed *infra*.

42, 58-59 (2d Cir. 2012) (holding plaintiff adequately pleaded negligence claims premised on representations made by fund manager to fund investors arising out of, but separate from, contract between the parties).  The duty created by Defendant's representations to Plaintiffs individually is unique to each Plaintiff and therefore is not derivative under *Tooley*.  The adequacy of Plaintiffs' allegations regarding negligence and breach of fiduciary claims arising out of those representations is discussed in greater detail *infra*.  At this stage of this analysis, it is sufficient to note that they are direct claims, not derivative, and accordingly dismissal on this ground is inappropriate.[29]

### b.     Plaintiffs' Negligence Claims

Defendant moves to dismiss Plaintiffs' negligence claims as duplicative of their claims for breach of contract.  "To establish a negligence claim under New York law, a plaintiff must demonstrate that: [i] the defendant owed the plaintiff a cognizable duty of care as a matter of law; [ii] the defendant breached that duty; and [iii] plaintiff suffered damage as a proximate result of that breach."  *Millennium Partners, L.P.* v. *U.S. Bank Nat'l Ass'n*, No. 12 Civ. 7581 (HB), 2013 WL 1655990, at *4 (S.D.N.Y. Apr. 17, 2013) (citing *McCarthy* v. *Olin Corp.*, 119

---

[29]     Plaintiff ATRS plausibly alleges an independent fiduciary duty owed to it by Defendant arising out of a Side Letter, wherein Defendant "confirms and acknowledges that it owes a fiduciary duty *to the Investor* [*i.e.*, to ATRS] in connection with the Investor's investment in the Fund[.]"  (Giuffra Decl., Ex. 43 at 10 (emphasis added)).  As such, ATRS's breach of fiduciary claim is direct, not derivative, and Defendant's motion to dismiss it on these grounds is denied.  To the extent the fiduciary duty articulated in this side letter was intended to be coextensive with the Contractual Standard of Care, as Defendant argues (Def. Br. 52), that issue is more properly resolved at summary judgment.

F.3d 148, 156 (2d Cir. 1997)), *aff'd sub nom. Millennium Partners, L.P.* v. *Wells Fargo Bank, N.A.*, 654 F. App'x 507 (2d Cir. 2016) (summary order).

However, "[a] tort claim cannot be sustained if it 'do[es] no more than assert violations of a duty which is identical to and indivisible from the contract obligations which have allegedly been breached.'" *Millennium Partners*, 2013 WL 1655990, at *4 (second alteration in original) (quoting *Metro. W. Asset Mgmt., LLC* v. *Magnus Funding, Ltd.*, No. 03 Civ. 5539 (NRB), 2004 WL 1444868, at *9 (S.D.N.Y. June 25, 2004)). In other words, "'a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated.'" *Royal Park Invs. SA/NV* v. *Bank of N.Y. Mellon*, No. 14 Civ. 6502 (GHW), 2016 WL 899320, at *7 (S.D.N.Y. Mar. 2, 2016) (quoting *Bayerische*, 692 F.3d at 58). However, the duty "may be connected with and dependent on the contract," *Clark-Fitzpatrick* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987), and "[w]here an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct," *Bayerische*, 692 F.3d at 58.

Thus, to prevail on a negligence claim, Plaintiffs must demonstrate that Defendants breached a duty independent of their obligations under the Governing Documents. *See Carvel Corp.* v. *Noonan*, 350 F.3d 6, 16 (2d Cir. 2003). Taking all of Plaintiffs' allegations together and drawing all reasonable inferences in their favor, as the Court must, *see, e.g., Cont'l Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 (1962), Plaintiffs plausibly establish a legal duty independent of contractual obligation "assessed largely on the

standard of care and the other obligations set forth in the contract," but arising out of extracontractual representations Defendant made to Plaintiffs in the context of their contractual relationship.  *Bayerische*, 692 F.3d at 59.

Plaintiffs cite the Second Circuit's opinion in *Bayerische* as factually analogous to their negligence claims here.  In *Bayerische*, the plaintiff invested in a collateralized debt obligation ("CDO") and defendant was the CDO's portfolio manager.  *Bayerische*, 692 F.3d at 45.  In concluding that the plaintiff's negligence claim was not duplicative of its contract claim, the Second Circuit found that the plaintiff had plausibly alleged that it had "detrimentally relied on [the defendant's] representations," which representations were "made in marketing materials and at a face-to-face meeting," that the defendant would "manage the [CDOs] in a conservative and defensive manner to avoid Credit Events and tranche losses."  *Id.* at 59.  The Second Circuit concluded that plaintiff's allegations of detrimental reliance were sufficient to establish "'[a] legal duty independent of contractual obligations ... imposed by law as an incident to the parties' relationship'" in this case.  *Id.* (quoting *Sommer* v. *Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992)).

Here, Plaintiffs allege a duty based on a series of extracontractual representations made directly to Plaintiffs in presentations, meetings, and other communications, largely regarding the investment and risk management practices that Defendant would deploy to ensure Plaintiffs' investments were adequately protected, including that:

- Defendant would "never make a forecast on the direction of equities or volatility" (BCBS ¶ 22; CMERS ¶ 7; *see also* CLPF ¶ 5; CTWW ¶ 5);

- the risk protections Defendant purportedly utilized "combine[d] both long- and short-volatility positions at all times" (BCBS ¶ 23);

- the funds were "non-directional," in that they were "not predicated on correctly taking a view on the direction of equities, interest rates or any other fundamental factor" (BCBS ¶ 22; UFCW ¶ 30);

- "long puts [we]re in place at all times" and were deployed "exclusively for risk-management purposes" (BCBS ¶ 28);

- Defendant would deploy hedges to prevent against the risk of an "ill-timed margin call" (BCBS ¶ 58; CLPF ¶ 71; CMERS ¶ 62; CTWW ¶ 72); and

- Defendant would utilize portfolio- and firm-level monitoring and stress testing (*see, e.g.*, ATRS ¶ 70; BCBS ¶ 59; CMERS ¶ 77; FFLD/NEHC SAC ¶¶ 27-28).

As in *Bayerische*, Plaintiffs argue that as a result of these representations, which arose out of their contractual relationship with Defendant, they "placed trust in [Defendant] based on the numerous representations committing [Defendant] to manage the Structured Alpha portfolios conservatively and prudently." (Pl. Opp. 41; *see also, e.g.*, CMERS ¶¶ 145, 148-149; CPPT FAC ¶¶ 98, 100-102). Plaintiffs further allege that they "detrimentally relied on [Defendant's] representations of how it would manage the fund." (IBEW FAC ¶¶ 108-109; MTA FAC ¶¶ 116-117; *see also* Lehigh ¶ 270; UFCW ¶¶ 104-105). Thus on this motion, to the extent Defendant's extracontractual representations regarding its risk management and investment strategies are

49

not incorporated directly into the terms of Defendant's obligations under the PPM, *see supra* Section B.3.b, these Plaintiffs have adequately pleaded an independent duty arising out of Defendant's individual representations to them.[30]

To the extent Defendant argues that the terms of the Governing Documents explicitly replace all tort liability with the Contractual Standard of Care, that argument is unsupported by the plain text of the LLC Agreement. Specifically, as noted above, the LLC Agreement expressly provides that Defendant may be liable for acts made "in bad faith or [that] constitute[] willful misconduct or negligence," explicitly allowing for Defendant's liability in tort for "negligence" in provisions otherwise purporting to limit Defendant's liability and scope of indemnification as Manager. (LLC Agreement §§ 2.06-2.07). On

---

[30]     Defendant argues that *Bayerische* is distinguishable because here Defendant included disclaimers in its marketing materials. (Def. Reply 21). Specifically, Defendant contends that the Subscription Agreement and later marketing material required Plaintiffs to "evaluat[e] investment risks independently." (*Id.* (quoting Giuffra Decl., Ex. 6 ("BCBS Presentation") (emphasis omitted))). However, a boilerplate disclaimer requiring investors to independently evaluate risk is inapposite where the investors were explicitly led to rely on Defendant's representations regarding its risk management practices as part of that very independent evaluation. *Cf. Caiola* v. *Citibank, N.A., N.Y.*, 295 F.3d 312, 330-31 (2d Cir. 2002) (holding that, in the securities fraud context, general disclaimers are insufficient to defeat reasonable reliance on material misrepresentations).

Defendant also argues that Plaintiffs did not sufficiently allege detrimental reliance (*see* Def. Reply 21), but the Court disagrees. *First*, several Plaintiffs explicitly allege detrimental reliance. (*See* IBEW FAC ¶ 108; MTA FAC ¶ 116; Lehigh ¶ 270; UFCW ¶ 104). *Second*, the remaining Plaintiffs include extensive allegations reciting Defendant's many representations to them regarding the Funds' investment strategy and risk management practices. Plaintiffs' allegations regarding those representations make clear that Plaintiffs considered those representations material to their decisions to invest. "[A]ccepting all factual allegations in the complaint as true, and drawing all reasonable inferences in [Plaintiffs'] favor," *Holmes* v. *Grubman*, 568 F.3d 329, 335 (2d Cir. 2009), this is sufficient to state a claim for negligence arising out of Defendant's representations to individual Plaintiffs, though "[a]fter discovery, the facts that come to light may show a different story," *Bayerische Landesbank, N.Y. Branch* v. *Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 65 (2d Cir. 2012).

this plain reading, the LLC Agreement expressly anticipates that Plaintiffs may

seek to hold Defendant liable for negligence.[31]

### c. Plaintiffs' Breach of Fiduciary Duty Claims[32]

Plaintiffs advance several arguments seeking to establish Defendant's

liability for breach of a fiduciary duty owed directly to Plaintiffs rather than to

the Funds, including that: (i) Defendant served as an independent investment

advisor to Plaintiffs; (ii) Defendant retained discretionary control over Plaintiffs'

investment assets; (iii) Defendant's representations to Plaintiffs in meetings,

marketing materials, and presentations created an independent fiduciary duty;

and (iv) the duty was created by contractual obligations under the Governing

Documents.  (*See* Pl. Opp. 42-54).  However, Plaintiffs' search for an

independent fiduciary duty at common law fails for three reasons.

---

[31]     Defendant argues that the economic loss doctrine bars Plaintiffs' tort claims.  "The economic-loss rule provides that 'a contracting party seeking only a benefit of the bargain recovery may not sue in tort notwithstanding the use of familiar tort language in its pleadings.'"  *BlackRock Allocation Target Shares: Series S. Portfolio* v. *Wells Fargo Bank, Nat'l Ass'n* ("*BlackRock ATS*"), 247 F. Supp. 3d 377, 399 (S.D.N.Y. 2017) (quoting *Phoenix Light SF Ltd.* v. *U.S. Bank Nat'l Ass'n*, No. 14 Civ. 10116 (KBF), 2016 WL 1169515, at *9 (S.D.N.Y. Mar. 22, 2016)).  The Court draws the same line as in *BlackRock ATS*: to the extent Plaintiffs have pleaded that Defendant breached extracontractual duties, for which Plaintiffs are owed damages that do not lie simply in the enforcement of Defendant's contractual obligations, those claims will not be dismissed.  *See id.*  Here, the potential overlap is unclear as the parties have not briefed the scope of obligations imposed by the PPM.  *See supra* Section B.3.b.  Accordingly, it is premature to dismiss Plaintiffs' negligence claims on these grounds.  *Fed. Ins. Co.* v. *Gander & White Shipping, Inc.*, No. 19 Civ. 7209 (ALC), 2020 WL 3833408, at *3 (S.D.N.Y. July 8, 2020).  However, should discovery reveal that the duties imposed by Defendant's representations to Plaintiffs are contractual duties, dismissal pursuant to the economic loss doctrine would be appropriate.

[32]     The Court reiterates its conclusion that New York law applies to Plaintiffs' breach of fiduciary duty claims that are premised on duties Defendant allegedly owed as an investment advisor or pursuant to public policy; and that Delaware law applies to the breach of fiduciary duty claims arising out of duties Defendant owed as Managing Member of the Funds.  *See* Section B.1.

*First*, the Court rejects Plaintiffs argument that Defendant owed each of them a personal fiduciary duty directly under the LLC Agreement. (Pl. Opp. 33-35).[33]  Plaintiffs cite Section 2.12, which imposes on Defendant the Contractual Standard of Care, and does not contemplate any additional or independent duty on Defendant. Under Delaware law, "where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim[,] [and] any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Nemec* v. *Shrader*, 991 A.2d 1120, 1129 (Del. 2010). The same is true under New York law. *See GPIF-I Equity Co.* v. *HDG Mansur Inv. Servs., Inc.*, No. 13 Civ. 547 (CM), 2014 WL 1612004, at *4 (S.D.N.Y. Apr. 21, 2014) ("Under New York law, claims of fraud and breach of fiduciary duty that merely duplicate contract claims must be dismissed." (citations omitted)). As discussed briefly above, Plaintiffs' claims for Defendant's breach of the Contractual Standard of Care (whether ERISA or Non-ERISA) are properly brought as breaches of contract, not breaches of fiduciary duty. This does not mean Plaintiffs are without recourse for Defendant's purported mismanagement, but rather, as noted *supra*, those claims arise out of their contracts with Defendant.

---

[33]     To the extent Plaintiffs argue that Defendant owed Plaintiffs a direct fiduciary duty under ERISA when the ERISA 25% Threshold was satisfied (*see* Pl. Opp. 52-53), those claims would be duplicative of breach of contract claims under the Contractual ERISA Standard of Care, brought pursuant to Section 2.12 of the LLC Agreement, which "acknowledges that [Defendant] will be a[n] [ERISA] fiduciary with respect to such assets." (LLC Agreement § 2.12).

*Second*, the Court agrees with Defendant that Section 2.07 of the LLC Agreement explicitly replaced any common-law fiduciary duties owed to Plaintiffs with the Contractual Standard of Care in Section 2.12, as permitted under Delaware law.  (Def. Br. 44-46; Def. Reply 18-19).  Pursuant to 6 Del. Code § 18-1101(c), the parties to an LLC agreement may modify or eliminate an LLC managing member's common-law fiduciary duties.  Section 2.07 of the LLC Agreement does exactly that, by providing that "to the extent that" the provisions of the LLC Agreement "modify, restrict[,] or eliminate" fiduciary duties — as does Section 2.12 — the terms of the LLC Agreement "replace such other duties or liabilities[.]"  (LLC Agreement § 2.07).  Thus, the plain language of Section 2.07 expressly replaces "any other duties or liabilities" with those specified in the LLC Agreement, namely the Contractual Standard of Care at Section 2.12.[34]  And courts have consistently held that agreements with substantially the same or similar language as that in Section 2.07 serve to replace common-law fiduciary duties with those expressly provided for in the agreement.  *See, e.g.*, *Gerber*, 67 A.3d at 411 (upholding determination that substantially similar provision replaced common-law fiduciary duties with contractual duties); *MHS Cap. LLC* v. *Goggin*, No. 2017-449 (SG), 2018 WL 2149718, at *1, 3, 8 (Del. Ch. May 10, 2018) (interpreting operation agreement to replace common-law fiduciary duties with contractual duties); *Kagan* v.

---

[34]     In addition to implementing the Contractual Standard of Care, the LLC Agreement provides that Defendant may be liable "for any acts or omissions arising out of or in connection with the [Funds], any investment made or held by the [Funds] or this Agreement [if] such action or inaction was made in bad faith or constitutes willful misconduct or negligence."  (LLC Agreement § 2.06).

*HMC-N.Y., Inc.*, 939 N.Y.S.2d 384, 384 (1st Dep't 2012) (interpreting nearly identical provision of LLC agreement to replace common-law fiduciary duties).[35]

 *Third*, several Plaintiffs argue that an independent duty arose because Defendant served as their personal "investment advisor registered with the SEC." (Lehigh FAC ¶ 269; *see also* CLPF ¶ 172; CMERS ¶ 159; CTWW ¶ 178). But, as Defendant notes, it served as investment advisor *to the Funds*, not to any individual investor. (*See* LLC Agreement ¶ 2.03).[36] Plaintiffs argue that Defendant "commit[ted] to actually serving as an investment adviser to Plaintiffs" through "present[ations] at numerous investment committee meetings for Plaintiffs, as well as in other interactions with Plaintiffs throughout the course of its monitoring and reporting on the Funds." (Pl. Opp. 51 (emphasis omitted)). It is unclear how Plaintiffs believe meeting with Defendant established a formal investment advisory relationship, and the two cases Plaintiffs cite to establish that relationship are inapposite. In *SEC* v.

---

[35] Plaintiffs' citation to *Ross Holding & Management Co.* v. *Advance Realty Group, LLC*, No. 4113 (VCN), 2014 WL 4374261, at *13 (Del. Ch. Sept. 4, 2014), *judgment entered sub nom. Holdings* v. *Advance Realty Grp., LLC*, 2014 WL 5477523 (Del. Ch. Oct. 29, 2014), does not convince the Court otherwise. (Pl. Opp. 46-48). Unlike here, the provision at issue in *Ross* did not purport to replace or eliminate any of the parties' duties, much less their fiduciary duties. *See Ross*, 2014 WL 4374261, at *13 (interpreting provision stating "[i]t is understood that the Managing Board shall act reasonably and in good faith in its management of the Company."). In fact, *Ross* supports Defendant's position here, because the *Ross* court noted that elimination of default fiduciary duties must be "plain and unambiguous." *Id.* Section 2.07 accomplishes that task where the agreement in *Ross* failed. (*See* LLC Agreement § 2.07).

[36] For this same reason, the Court rejects Plaintiffs' arguments that Defendant's provision of its Form ADV brochure to Plaintiffs (Pl. Opp. 52), or its representations in certain Side Letters (*id.* at 53), signaled a personal investment advisory relationship. The ADV suggests only that Defendant provided advisory services to the Funds. With the exception of the ATRS Side Letter, discussed *supra*, the Side Letters similarly acknowledge Defendant's duty with respect to the Fund. (*See, e.g.*, Giuffra Decl., Ex. 59 (CMERS Side Letter); *id.*, Ex. 102 (MTA Side Letter); *id.*, Ex. 53, 55 (CLPF Side Letters)).

*Haligiannis*, one defendant conceded his status, while the other two defendants were found to be advisors to a limited partnership investment fund, not to the investors in that fund.  470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007).  And the Court agrees with the D.C. Circuit's explanation of the continued relevance of *Abrahamson* v. *Fleschner*, 568 F.2d 862 (2d Cir. 1977), namely that given the sweep of Section 206 of the Investment Advisers Act (which *Abrahamson* interpreted), the case "can only be read for the proposition that investors in a hedge fund may sustain an action for fraud against the fund's adviser." *Goldstein* v. *SEC*, 451 F.3d 873, 881 n.6 (D.C. Cir. 2006) (citing *Abrahamson*, 568 F.2d at 869-71).  Additionally, as Defendants note, their presentations and marketing material explicitly disclaimed the creation of a formal investment advisory relationship.  (*See, e.g.*, Lehigh Pitchbook 5, 37; Giuffra Decl., Ex 6 at 57; *see also* SA § II(E) (disclaiming reliance on investment advice from Defendant when deciding to invest in the Funds)).[37]  Thus, Plaintiffs have not adequately pleaded the existence of any independent, direct investment advisory relationship with Defendant.

In sum, Plaintiffs' breach of fiduciary duty claims fail for several reasons. To the extent premised on allegations of mismanagement, they are dismissed as impermissibly derivative.  To the extent Plaintiffs allege breach arising out of the Contractual Standard of Care, they must be dismissed as duplicative under

---

[37]    The Court notes that Defendant's repeated disclaimers renouncing an investment advisory relationship are much more explicit, and more directly address Plaintiffs' specific allegations here, than the disclaimers Defendant offers to defeat Plaintiffs' negligence claims. *Cf. Caiola*, 295 F.3d at 330 (explaining that "[a] disclaimer is generally enforceable only if it tracks the substance of the alleged misrepresentation").

both New York and Delaware law.  Finally, Plaintiffs' attempt to establish a

direct fiduciary duty outside of their contractual claims is unsuccessful

because (i) Section 2.07 of the LLC Agreement replaces common-law fiduciary

duties with the Contractual Standard of Care and (ii) they fail to establish that

Defendant served as an investment advisor to individual Plaintiffs rather than

to the Funds.

### 5. Defendant's Motion to Dismiss Plaintiffs' Self-Dealing Claims Is Granted in Part and Denied in Part

Plaintiffs allege that Defendant engaged in self-dealing, asserting claims

for (i) common-law breach of the fiduciary duty of loyalty, (ii) breach of the

fiduciary duty of loyalty under ERISA, and (iii) liability for prohibited

transactions under ERISA.  As noted above, the LLC Agreement sources the

fiduciary duties Defendant owed to Plaintiffs to the Contractual ERISA

Standard of Care or the Contractual Non-ERISA Standard of Care, depending

on whether the ERISA 25% Threshold was met.  ERISA's fiduciary duty of

loyalty is codified at 29 U.S.C. § 1104(a)(1)(A), but under Section 2.12,

Defendant only owed a fiduciary duty of loyalty when the ERISA 25% Threshold

was met.  (*See* LLC Agreement § 2.12 (agreeing to abide by "Section 404(a)(1)(B)

of ERISA [29 U.S.C. § 1104(a)(1)(B)]," but "not any other provisions of ERISA"

when the ERISA 25% Threshold is not met)).  As such, any claims for breach of

the fiduciary duty of loyalty must be dismissed to the extent the ERISA 25%

Threshold was not met.[38]

---

[38]     However, the Court will not dismiss ATRS's claims sounding in breach of loyalty (ATRS ¶ 138), because, as noted *supra*, it entered into a Side Letter with Defendant that

Defendants argue that even if the threshold was met and the duty of loyalty applied (either under ERISA, or by extension to non-ERISA Plaintiffs because the ERISA 25% Threshold was met), Plaintiffs still fail to allege a breach because "Plaintiffs impermissibly 'recast purported breaches of the duty of prudence as disloyal acts.'" (Def. Br. 57 (quoting *Sacerdote* v. *N.Y. Univ.*, No. 16 Civ. 6284 (KBF), 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017)). As explained below, the Court disagrees with Defendant's characterization of Plaintiffs' allegations.

"Loyalty has been called 'the most fundamental duty of a trustee' and the onus it places on fiduciaries has been described as 'stricter than the morals of the marketplace.'" *Falberg* v. *Goldman Sachs Grp., Inc.*, No. 19 Civ. 9910 (ER), 2020 WL 3893285, at *11 (S.D.N.Y. July 9, 2020) (quoting *Pegram* v. *Herdich*, 530 U.S. 211, 224-25 (2000)). To state a claim of disloyalty, "a plaintiff must allege plausible facts supporting an inference that the defendant acted for the purpose of providing benefits to itself or someone else." *Ferguson* v. *Ruane Cunniff & Goldfarb Inc.*, No. 17 Civ. 6685 (ALC), 2019 WL 4466714, at *4 (S.D.N.Y. Sept. 18, 2019) (emphasis omitted) (collecting cases).

Here, Plaintiffs allege that Defendant violated this duty by, for example: (i) abandoning its risk management strategy "in the hopes of chasing additional return" (BCBS ¶ 82); (ii) failing to disclose material facts (*id.* at ¶ 147); and (iii) further repudiating its risk management strategy in late February and early

---

plausibly imposes a fiduciary duty on Defendant additional to or separate from that imposed under Section 2.12 of the LLC Agreement.  (*See* Giuffra Decl., Ex. 43 at 10).

March 2020 precisely because the Funds' compensation structure would prevent Defendant from earning compensation unless it gambled with Plaintiffs' investments (*see, e.g.*, ATRS ¶ 145; BCBS ¶¶ 105-106; Lehigh FAC ¶ 263).  These allegations suffice to plead that Defendant acted against the Funds' interest with the purpose of benefiting itself.  *See Moreno* v. *Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 9936 (LGS), 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) (denying motion to dismiss where implementation of fiduciary's compensation scheme demonstrated self-interested purpose); *see also Devlin* v. *Empire Blue Cross & Blue Shield*, 274 F.3d 76, 88 (2d Cir. 2001) ("When a plan administrator ... fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty[.]" (alteration omitted)).

Similarly, Plaintiffs adequately allege that Defendant violated Section 406 of ERISA, 29 U.S.C. § 1106(b), which prohibits a plan fiduciary from engaging in certain prohibited transactions, including by "deal[ing] with the assets of the plan in his own interest or for his own account," *id.* § 1106(b)(1).  Section 406 "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries ... by categorically barring certain transactions deemed 'likely to injure the pension plan.'"  *Harris Tr. & Sav. Bank* v. *Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) (quoting *Comm'r* v. *Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)).  For example, Plaintiffs allege that because the Funds had experienced major losses, Defendant was unlikely to earn compensation for the foreseeable future and therefore "gambled (with investors'

money) that markets would soon enter a V-shaped recovery" so it could earn its performance fee.  (Pl. Opp. 19 (citing BCBS ¶¶ 105-106); *see also, e.g.*, CPPT FAC ¶¶ 81, 87; Lehigh FAC ¶ 263; TMRT/BLYR SAC ¶¶ 100, 134).  Plaintiffs' contention that Defendant managed the Funds against Plaintiffs' interests in order to preserve its own ability to profit from managing the Funds adequately pleads a prohibited transaction, and Defendant's motion to dismiss Plaintiffs' Section 406 claims is denied.  *See Bd. of Trs. of Operating Eng'rs Pension Tr.* v. *JPMorgan Chase Bank, Nat. Ass'n*, No. 09 Civ. 9333 (KBF), 2013 WL 1234818, at *12 (S.D.N.Y. Mar. 27, 2013).[39]

### 6.    Defendant's Motion to Dismiss Lehigh's Fraud Claims Is Denied

Defendant separately moves to dismiss claims brought by Lehigh for securities fraud pursuant to Section 10(b) of the Securities Exchange Act, common-law fraud, and negligent misrepresentation.  In brief, Lehigh alleges that Defendant wrongfully concealed material changes to its investment strategy at least as early as March 2019, inducing Lehigh to make additional investments in the Funds and denying Lehigh the opportunity to exit the Funds.  Defendant argues that dismissal is warranted because: (i) Lehigh's

---

[39]    Defendant argues that Plaintiffs' Section 406 claims must be dismissed because they are based on a "permissible fee structure" for compensating Defendant for managing the Funds, and "performance-based incentive compensation is not a per se prohibited transaction under ERISA § 406(b)."  (Def. Br. 60).  But Plaintiffs do not argue that a performance-based compensation model is a *per se* violation of Section 406, and instead allege that Defendant managed the Funds in its own interest in this particular instance by "abandon[ing] its stated investment strategy and assum[ing] unreasonably risky positions in an effort to recoup losses that the [Funds] had already sustained and in the process generate revenue for itself."  (IBEW FAC ¶ 149; *see also, e.g.*, BCBS ¶ 149; CPPT FAC ¶¶ 81, 88, 124; FFLD/NEHC SAC ¶ 147).

additional investment in the Funds took place before Defendant's purported misconduct occurred; (ii) Lehigh's holder claims are barred by New York law; and Lehigh fails to adequately plead: (iii) material misrepresentation, (iv) scienter, and (v) reliance.  For the reasons that follow, the Court denies Defendant's supplemental motion.

### a.    Overview of Lehigh's Complaint

The Court included certain of Lehigh's allegations in its earlier summary of Plaintiffs' complaints, but here focuses on Lehigh's FAC.  According to its First Amended Complaint (or "FAC"), Lehigh began investing in one of the Funds in 2011.  (Lehigh FAC ¶ 42).  It transferred its investment to a different Fund in 2013; increased its investments in that Fund in 2015 and 2016; and then transferred $35 million into a third Fund over the course of four transactions in March, April, May, and November 2019.  (*Id.* at ¶¶ 42-45).

Defendant's offering documents and marketing materials informed Lehigh that the Structured Alpha trading strategy embodied a "'three-pronged objective': (1) 'to profit during normal (up/down/flat) market conditions'; (2) to '[p]rotect against a market crash'; and (3) to '[n]avigate as wide a range of equity-market outcomes as possible.'"  (Lehigh FAC ¶¶ 74-75 (emphasis omitted)).  To that end, Defendant employed a combination of long, short, and long-short volatility positions, in which long puts — which are designed to provide protection against a tail event or market crash — "'[we]re a cornerstone of Structured Alpha's investment process.'"  (*Id.* at ¶¶ 82-83 (internal citation omitted); *see also id.* at ¶¶ 85-88 (discussing similar representations in

Defendant's pitchbooks); *id.* at ¶¶ 89-95 (discussing Quarterly Updates that, *inter alia,* "echoed [Defendant's] representations in the pitchbooks and the Strategy Overview that it would construct an options portfolio designed to benefit from a range of market scenarios and that the Funds would always be simultaneously long and short volatility, protecting them from directional movements in the market"); *id.* at ¶¶ 117-129 (outlining oral representations by Defendant, including statements that Funds were "uncorrelated" and "non-directional")).

In point of fact, no later than April 2019, Defendant "deliberately changed its investment strategy to increase the options portfolio's directionality and sensitivity to market swings, and hence, downside risk." (Lehigh FAC ¶ 130). Among other things, Defendant became a net seller of short options (including short puts), but then failed to hedge these options properly; in so doing, according to Lehigh, Defendant "gambled that the financial markets would remain relatively static and not decline[.]" (*Id.* at ¶¶ 130-136). And while Defendant did disclose to Lehigh in late 2018 that "it was reallocating a large number of its long puts into its sealed range-bound spread positions" (*id.* at ¶ 145), it did *not* disclose the directional bet it had taken concerning market volatility and, indeed, "continued to falsely represent to Lehigh that the Funds' options strategy was market-agnostic and designed to profit in the face of market declines" (*id.* at ¶ 148; *see also id.* at ¶¶ 150-161 (discussing purportedly false or misleading statements in 2019 Quarterly Updates)).

61

The market downturn in February 2020 prompted concern on Lehigh's part about its investments in the Funds. Though the market decline overall was 9%, the funds in which Lehigh invested were down nearly 19%. (Lehigh FAC ¶¶ 177-178). When Lehigh initially reached out to Defendant to "troubleshoot the portfolio's decline" (*id.* at ¶ 207), it was told that "the damage to the Funds was 'well-contained,'" and that losses would not be expected to exceed 10% (*id.* at ¶¶ 208-209). Unbeknownst to Lehigh, however, Defendant had reacted to the market event by "structur[ing] the Funds' options portfolio to recoup those losses by simultaneously selling the Funds' long put protections and buying short puts" — thereby "gambl[ing] that the market would rebound by positioning the portfolio to generate returns if the market stabilized and volatility levels declined." (*Id.* at ¶¶ 200-201). The market did not stabilize, and Lehigh's investments in the Funds lost approximately 75% of their value. (*Id.* at ¶ 220).

In March 2020, Defendant "disclosed for the first time the significant negative gamma increase in 2019 and that the Funds were much more exposed to directionality than previously represented."[40] (Lehigh FAC ¶ 182; *see also id.* at ¶ 184 (admission by Trevor Taylor, the Funds' Co-Lead Portfolio Manager, during conference call that the Funds were overall "clearly a short volatility strategy"); *id.* at ¶¶ 185-186 (admission by Defendant that "it had purchased an inadequate number of put options, and that the strike prices of the put

---

[40]   Gamma is a calculation for options trading, widely employed by options traders to help assess risk in a portfolio. (Lehigh FAC ¶ 163).

options it did purchase were far below the price range that it had previously

represented to Lehigh"); *id.* at ¶¶ 191-194 (purported deficiencies in

Defendant's stress-testing and risk management programs)).  Lehigh states

that "[h]ad Lehigh known that the information they received from [Defendant]

contained material misrepresentations and omissions ... Lehigh would not have

made investments in the Global Fund on April 1, 2019, May 1, 2019 and

November 1, 2019, in the aggregate amount of $25,000,000."  (*Id.* at ¶ 238).

Lehigh also alleges that Defendant's misrepresentations and omissions induced

it to retain its existing investments in the Funds, and had it known the truth,

Lehigh "would have redeemed" its entire existing investment.  (*Id.* at ¶¶ 243,

245).

###  b.    Applicable Law

Plaintiffs' fraud and misrepresentation claims are subject to the

heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil

Procedure, and its securities fraud claims are also subject to the Private

Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).

*See Ong* v. *Chipotle Mexican Grill, Inc.*, No. 16 Civ. 141 (KPF), 2017 WL 933108,

at *7 (S.D.N.Y. Mar. 8, 2017) (citing *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,

493 F.3d 87, 108 (2d Cir. 2007)).  Under Rule 9(b), a plaintiff must "state with

particularity the circumstances constituting [a] fraud."  Fed. R. Civ. P. 9(b).[41]

The Second Circuit has held that Rule 9(b) and the PSLRA require a securities

---

[41]    "[N]egligent misrepresentation claims must be pled with particularity under Rule 9(b)
where ... they are based on the same set of facts as the fraud claims."  *Trahan* v. *Lazar*,
457 F. Supp. 3d 323, 354 n.11 (S.D.N.Y. 2020) (citation omitted).

fraud complaint to: "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *Gamm* v. *Sanderson Farms, Inc.*, 944 F.3d 455, 462-63 (2d Cir. 2019)) (quoting *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  In contrast, "intent, knowledge, and other conditions of mind … may be averred generally." *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).

### c.    Lehigh's 2019 Investment Does Not Post-Date Defendant's Purported Fraud or Misrepresentations

*First*, Defendant contends that Lehigh cannot assert claims with respect to investments totaling $25-$35 million made in 2019 in the AllianzGI Structured Alpha Global Equity 500 LLC (the "Global Fund"), because "Lehigh invested, or committed to invest, in the Funds well before any of the challenged statements were made to Lehigh beginning on April 29, 2019."  (Def. Supp. Br. 2).  Defendant contends that Lehigh "committed to execute" the investments in February 2019, even though the actual investments closed on three dates in March, April, and May of 2019.  (*Id.* at 3, 11).

Defendant's argument fails because Lehigh does not simply allege that misrepresentations were made beginning on April 29, 2019.  Rather, Lehigh alleges that Defendant began providing false and misleading information beginning whenever Defendant materially altered the Funds' investment and risk management strategy, "from at least March 2019" (Lehigh FAC ¶ 238), and argues that the exact date when Defendant altered its strategies is an issue of fact to be determined in discovery (Lehigh Opp. 10).  Even accepting

Defendant's factual proffer that the investments became irrevocable on February 19, 2019 (*see* Def. Supp. Reply 11 (citing Wheeler Decl., Ex. 4)) — which proffer would require the Court to consider materials that it may not on this motion, *see Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016), and to impermissibly draw inferences in Defendant's favor on a motion to dismiss — Lehigh alleges that Defendant consistently represented it maintained a market-neutral investment strategy, and as such made material misrepresentations or omissions in monthly risk reports and other communications starting whenever Defendant changed its strategy (*see* Lehigh FAC ¶¶ 9, 100, 102-103, 173). Thus, the Court declines to limit Lehigh's claims arising out of its 2019 investments in the Global Fund.

### d.    Lehigh's "Holder" Claim Is Not Barred by New York Law

*Second*, Lehigh alleges that it would have redeemed its earlier investments had Defendant disclosed its change in investment and risk management strategy at some point prior to March 2019. (Lehigh FAC ¶¶ 243, 245). Defendant argues these claims must be dismissed because they are "holder" claims that violate New York's "out-of-pocket" rule. (Def. Supp. Br. 11). "A 'holder' claim is one 'in which the plaintiffs allege that material misrepresentations or omissions caused them to retain ownership of securities that they acquired prior to the alleged wrongdoing.'" *Matana* v. *Merkin* ("*Matana I*"), 957 F. Supp. 2d 473, 490 (S.D.N.Y. 2013) (emphasis omitted) (quoting *In re WorldCom, Inc. Sec. Litig.*, 336 F. Supp. 2d. 310, 318-23 (S.D.N.Y. 2004)).

Under New York law, the out-of-pocket rule limits recovery for fraud and misrepresentation to "the actual pecuniary loss sustained as the direct result of the wrong." *Starr Found.* v. *Am. Int'l Grp., Inc.*, 901 N.Y.S.2d 246, 249 (2010) (alternations omitted). After *Starr*, however, the status of holder claims under New York law is unclear. This Court finds persuasive Judge Engelmayer's thorough analysis of *Starr* and its progeny in his decision in *Matana* v. *Merkin* ("*Matana II*"), wherein he concluded that:

> On the present state of the case law, therefore, this Court cannot predict that the New York Court of Appeals would preclude holder claims altogether. No New York state court has so held, or even so stated in dicta. The Court instead is compelled to predict, consistent with *Starr*, that the New York Court of Appeals today would still recognize a limited set of holder claims, specifically, those in which plaintiffs seek to recover out-of-pocket losses, and perhaps, but not necessarily, further limited to those in which there is a non-conjectural evidentiary basis for asserting causation and tabulating damages.

989 F. Supp. 2d 313, 323-24 (S.D.N.Y. 2013).

Here, Lehigh does not plead speculative lost profits, but pleads out-of-pocket losses by alleging that it would have redeemed its entire investment upon learning the truth about Defendant's new investment and risk management practices. (Lehigh FAC ¶ 245). At the very least, Lehigh's damages are capable of being calculated and proven, as its investment will have a certain, verifiable value as of the date where discovery establishes that Defendant's misrepresentations or fraud began (assuming discovery reveals such misconduct at all). *See Beach* v. *Citigroup Alt. Invs. LLC*, No. 12 Civ. 7717 (PKC), 2014 WL 904650 (S.D.N.Y. Mar. 7, 2014) (noting that a valid holder

claim, post-*Starr*, may be established by "alleging [i] the loss of substantially the entire investment, [ii] whether the plaintiff would have sought to rescind the investment, had there been an accurate disclosure of the relevant information, [iii] the time frame within which the rescission would have occurred, [iv] the portion of the investment that would have been sold, and [v] the effect truthful disclosure would have had on the value of the investment"); *see also AHW Inv. P'ship, MFS, Inc.*, 661 F. App'x at 6 ("[W]e take no position on whether other types of holder claims, such as those seeking damages other than lost profits, may be cognizable under New York law").[42] Thus, because Lehigh alleges specific, verifiable out-of-pocket losses associated with Defendant's purported fraud and misrepresentation, dismissal for violation of New York's out-of-pocket rule is inappropriate.

### e.     Lehigh Adequately Pleads Actionable Misrepresentations

*Third*, Defendant argues that Lehigh failed to allege any material misrepresentation because Defendant did disclose changes in its investment strategy to Lehigh, and because any failure to disclose changes to its investment or risk management strategies were not sufficiently material as to be actionable.  (Def. Supp. Br. 15-19; Def. Reply 2-7).  The Court disagrees.

---

[42]     The cases Defendant cites for the proposition that holder claims are barred under New York law are distinguishable, as those cases involve claims seeking speculative lost profits or alleging vague and unverifiable losses.  *See Feinberg* v. *Marathon Patent Grp. Inc.*, 148 N.Y.S.3d 51, 54 (1st Dep't 2021) (affirming dismissal where plaintiffs failed to provide any specificity as to the amount of shares to be sold or the timing of those sales, alleging only general inducement to hold shares); *Varga* v. *McGraw Hill Fin., Inc.*, 48 N.Y.S.3d 24, 26 (1st Dep't 2017) (affirming dismissal where plaintiffs sought to recover lost revenue from holding securities).

Defendant first argues that Lehigh concedes that it was informed of a change in investment strategy and that therefore Defendant cannot be liable for Lehigh's failure to investigate the downside risks of that strategy.  (Def. Supp. Br. 16; Def. Supp. Reply 4-6).  However, that argument misconstrues Lehigh's allegations.  Lehigh pleads that although Defendant disclosed that it modified its investment strategy by buying a much larger percentage of the Funds' long puts closer to the money (Lehigh FAC ¶ 145), it failed to disclose that at some point prior to March 2019, it changed the entire investment strategy to become a net seller of short options (*id.* at ¶¶ 131, 238), staking the entire investment strategy on a "directional bet," while simultaneously telling Lehigh that the Funds remained "market-agnostic" (*id.* at ¶ 148).  Lehigh contends that this was an entirely separate change than the one Defendant disclosed to it.  (Pl. Opp. 7; *see also* Lehigh FAC ¶¶ 147-148).

On the current record the Court declines to hold that Defendant's disclosure that it would implement a reduced ratio of long to short puts (*see* Def. Supp. Reply 5-6; *see also* Lehigh FAC ¶¶ 145-146), sufficiently disclosed its purported wholesale abandonment of a market-neutral strategy or the extent of its "directional bet" (Lehigh FAC ¶ 148).  The crux of Lehigh's allegations is that Defendant continued to represent to Lehigh that, as a result of Defendant's modified investment strategy — which involved more than simply a change to one element of the alpha component — "the Funds possessed *de minimis* directional exposure," despite implementing changes directly to the contrary.  (*Id.* at ¶ 160).  Thus, at least at the motion to dismiss

68

stage, Defendant's claim that Lehigh should have understood from this limited disclosure regarding the reduced ratio of long puts that Defendant had actually undertaken a massive directional bet, while simultaneously telling Lehigh the exact opposite, is unavailing.

Lehigh's allegations regarding the gamma metric and the inversion of the put ratio are similarly best understood in the context of the entirety of the FAC, rather than as stand-alone misrepresentations. Defendant argues it had no duty to disclose the former, and that its representations as to the latter were merely unactionable "illustrative example[s.]" (Def. Supp. Reply 6-7). The Court understands these allegations as offered by Lehigh to support its underlying claim that Defendant undertook major changes to its investment strategy; knew such changes materially altered the Funds' exposure to market volatility; and knowingly, willfully, or recklessly failed to disclose that information to Plaintiffs. (*See* Lehigh FAC ¶¶ 160, 164-165, 221, 231-232). Lehigh claims that these particular developments were material because disclosure of either fact would have provided Lehigh with notice of the change that it alleges Defendant fraudulently concealed, and would have altered its investment decisions. (*See, e.g., id.* at ¶¶ 144, 238).[43]

---

[43]    Defendant also argues that it had no duty to disclose any changes to its investment strategy due to disclaimers in the PPM that Defendant could change the investment strategy as will. (Def. Supp. B. 15). That argument fails here for the same reason as discussed *supra* in Section B.3.b, namely that a change in investment strategy is different than complete repudiation of an investment strategy, as Lehigh and other Plaintiffs allege here.

Defendant next argues that Lehigh's claims must be dismissed because Lehigh advances a theory of "fraud by hindsight."  (Def. Supp. Br. 13, 18-19).  However, Defendant again mischaracterizes Lehigh's allegations.  Lehigh alleges not that Defendant mismanaged the Funds by, for example, buying insufficient put options or failing to adequately assess risk (Def. Supp. Br. 12-15, 17-19), but rather that Defendant affirmatively represented that it was implementing certain risk assessment and investment strategies while simultaneously failing to do so.  (*See* Lehigh FAC ¶¶ 76, 94-95, 114-115, 118, 131, 151, 155, 192-193).  *See Novak* v. *Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (vacating dismissal of fraud claim where complaint alleged that defendants "did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true").

### f.    Lehigh Adequately Pleads Scienter

*Fourth*, Defendant argues that Plaintiff fails to adequately plead scienter. (Def. Supp. Br. 20-25; Def. Supp. Reply 7-9).  The standard to plead scienter under Section 10(b) is higher than the familiar plausibility standard.  "To adequately plead scienter under [Section] 10(b) and Rule 10b-5, a plaintiff must 'plead the factual basis which gives rise to a strong inference of fraudulent intent.'"  *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 732 (S.D.N.Y. 2015) (quoting *IKB Int'l S.A.* v. *Bank of Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014) (summary order)).  This strong inference of fraudulent intent can be established by alleging with sufficient particularity (i) "that defendants had

70

the motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). This requires a "comparative evaluation," in which a court "must consider not only inferences urged by the plaintiff … but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Accordingly, "an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* This inquiry is to be conducted holistically, looking to "*all* of the facts alleged, taken collectively." *Id.* at 323.

Here, "accepting the facts alleged in the [FAC] as true, and drawing all reasonable inferences in [Lehigh's] favor," *Set Cap. LLC* v. *Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021), the Court need only analyze the second prong to determine that Lehigh has adequately plead scienter via "strong circumstantial evidence of … recklessness," *ECA, Local 134*, 553 F.3d at 198. Under this prong, a plaintiff must plead conscious misbehavior or recklessness, "'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *Id.* at 199 (quoting *Kalnit*, 264 F.3d at 142).[44]  "To plead conscious recklessness adequately, a plaintiff must

---

[44]     Throughout the FAC, Lehigh suggests that Defendant's investment decisions vis-à-vis the Funds were motivated by the Funds' unusual compensation structure, in which fees were based exclusively on performance and not the amount of assets under management. (*See, e.g.,* Lehigh FAC ¶¶ 51-56, 136, 169, 204-206, 234). Because the Court finds that Lehigh adequately pleads at least conscious recklessness, it does not

allege facts showing 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it.'" *Ong*, 2017 WL 933108, at *14 (citing *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). A plaintiff may allege that a defendant "engaged in deliberately illegal behavior, *knew facts or had access to information suggesting his public statements were not accurate*, or failed to check information that he had a duty to monitor." *Nathel* v. *Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) (emphasis added) (citing *Novak*, 216 F.3d at 311); *accord ECA, Local 134*, 553 F.3d at 199. Opinions or predictions can be the basis for scienter "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted).

Here, Lehigh has plausibly alleged circumstantial evidence of conscious recklessness, particularly that Defendant knew facts or had access to information suggesting that its public statements were inaccurate, which when viewed in the holistic context of Lehigh's allegations, supports a strong inference of scienter. On the facts alleged in the FAC, the Court is able to draw the inference that Defendant's public statements to Lehigh throughout 2019 (if not before) regarding its investment strategy and risk management approach

---

determine whether Lehigh satisfies the first prong by pleading motive. Accordingly, this Opinion should not be read to foreclose that possibility at a later stage in this litigation.

were false when made, and that Defendant knew or should have known as such.  (*See, e.g.,* Lehigh FAC ¶¶ 162-168).  Specifically, Lehigh alleges that certain of the Funds' principal managers and key employees knew the reality of the Funds' composition throughout 2019:

> Trevor Taylor, the Chief Investment Officer for AllianzGI's US Structured Products, Greg Tournant, the Funds' Co-Lead Portfolio Manager, and Jeff Sheran, Product Specialist — knew that its representations in the 2019 Quarterly Updates that the Funds were well-hedged for a potential market decline were materially false, because AllianzGI had intentionally restructured its investment strategy in or around April 2019 so that the Funds would generate higher profits in lower volatility environments and incur losses if the market declined and volatility increased.

(*Id.* at ¶ 162).[45]  This claim that specific employees with management responsibility over the Funds (*see id.* at ¶ 167) knew of the falsity of Defendant's public representations regarding the composition of the Funds' portfolio lends support to a strong inference of scienter.  *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2001) ("[O]ther courts facing similar issues have held that on a motion to dismiss, making all reasonable assumptions in favor of the plaintiff includes assuming that principal managers of a corporation are aware of matters central to that business's operation.").

---

[45]    Defendant notes that Plaintiff reversed Taylor's and Tournant's proper roles in this paragraph of the FAC.  (*See* Def. Supp. Br. 23 n.10).  Elsewhere in the Amended Complaint, Plaintiff correctly states Taylor's role as Co-Lead Portfolio Manager.  (*See* Lehigh FAC ¶ 184).

Lehigh also alleges that Defendant repeatedly represented that it would monitor the Funds' directional risk (Lehigh FAC ¶ 163), and that as such, Defendant knew or should have known that as a result of its furtive strategy change, the Funds developed significant downside exposure (*id.* at ¶¶ 164-165, 168).  Lehigh contends that Defendant made these changes while simultaneously telling Lehigh the precise opposite, that the Funds remained directionally neutral.  (See *id.* at ¶¶ 127-128 (alleging material misstatements at November 2019 meeting), 150-161 (alleging material misrepresentations in Quarterly Reports throughout 2019)).  Lehigh also points to Defendant's false or misleading representations regarding its risk management approach, particularly that despite Defendant's repeated claims that "it had in place robust risk management procedures by which it would, among other things, model the Funds' performance in different market scenarios" (*id.* at ¶ 192), Defendant's agents, including Tournant, Taylor, and Sheran, knew that no such modelling or testing occurred under "the new undisclosed options strategy for a market decline with high volatility" (*id.* at ¶ 167).  In short, despite allegedly implementing an investment strategy diametrically opposed to that which it publicly disclosed, Defendant nevertheless claimed to have maintained its protocols for safeguarding the Funds against the risks of a market downturn, without ever following through on these protocols.  On these facts, the Court finds that Lehigh adequately alleges that Defendant's statements as to the Funds' market directionality and risk management were made with the requisite conscious recklessness, as they were "materially

misleading in that the disclosed polic[ies] no longer reflected actual practice."
*Novak*, 216 F.3d at 311; *accord In re Nielsen Holdings PLC Sec. Litig.*, 510 F.
Supp. 3d 217, 229 (S.D.N.Y. 2021) (finding plaintiffs adequately alleged
scienter where defendants publicly misrepresented the strength and growth of
business despite their awareness of trend to the contrary).

Moreover, Taylor's admission in March 2020 that the Funds were overall
"clearly a short volatility strategy" (Lehigh FAC ¶ 166), as well as Defendant's
*ex post* disclosures to Lehigh relaying the modifications to the Funds' options
strategy (*see id.* at ¶¶ 181-194), adds to the inference of scienter by
demonstrating that key employees involved in the Funds' management had
access to information about the Fund's true strategy, all the while making
misleading representations to the public.  *See Set Cap. LLC*, 996 F.3d at 79
(finding CEO's potentially false or misleading statement "to support a culpable
inference [of scienter] because the complaint plausibly alleges that [defendants]
'knew facts or had access to information suggesting that their public
statements were not accurate'" (quoting *Emps.' Ret. Sys. of Gov't of the Virgin
Islands* v. *Blanford*, 794 F.3d 297, 306 (2d Cir. 2015))).  The materials
Defendants distributed to Lehigh in March 2020 buttress this inference that
contemporaneous materials existed showing the Funds' true investment
strategy, which materials include: (i) a document titled "Historical Greeks
Exposure," which reflected "the [Funds'] significant negative gamma increase in
2019" (Lehigh FAC ¶ 182); (ii) a March 9, 2020 email from Defendant's senior
relationship manager confirming that the "Funds' options gamma profile

increased as of April 2019 due to a 'new directional call program' and an 'increase in VIX option positions' (*id.* at ¶ 183); and (iii) a document titled "AllianzGI US Equity 500 Holdings and Deltas 1/31/2020," which reflected "that many of the strike prices for the long puts options it purchased were well below the -10% to -30% range that [Defendant] had previously represented … and purchased in insufficient quantities to provide the meaningful downside protections promised to Lehigh" (*id.* at ¶ 186).  Although Taylor's retrospective admission of the Funds' true strategy and the revelation of documentation supporting the same post-date Lehigh's 2019 investments in the Funds, the Court finds that, when viewed holistically, they support the inference that in 2019, Defendant either knew about or was reckless in not knowing the false nature of its repeated reassurances that the Funds were pursuing a strategy geared toward "uncorrelated investment returns with robust protections from a market crash[.]"  (*Id.* at ¶¶ 169-170).

Finally, Defendant's argument that the Funds' collapse was caused by the unanticipated effects of COVID-19 and that "market events overwhelmed the strategy" (Def. Supp. Reply 9), is largely irrelevant to the issue of fraudulent intent, and is thus not more compelling than Lehigh's claim that Defendants implemented a clandestine reversal of its investment strategy.  Defendant's failure to predict the COVID-19 pandemic is unrelated to Lehigh's actual allegations, which are that Defendant improperly concealed a change in investment strategy that left the Funds severely exposed to an increase in volatility — an allegation that is sustained regardless of the materialization of

any tail risk.  That Defendant failed to predict how that volatility actually materialized is immaterial to the scienter issue.  *See Plumbers & Pipefitters Nat'l Pension Fund* v. *Davis*, No. 16 Civ. 3591 (GHW), 2020 WL 1877821, at *13 (S.D.N.Y. Apr. 14, 2020) ("Although Defendants may have hoped that PSG would uncover new sources of future revenue and thus that the risk of lower future sales associated with the rising inventory would not materialize, the Fund has plausibly alleged facts that give rise to a strong inference that the decision not to disclose this information was nonetheless reckless."); *see also In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("It is simply not a plausible opposing inference that the Company's officers — sophisticated executives actively engaged in the planning of these transactions — were ignorant of the transactions' consequences[.]").

This is not a case where the context of the purportedly misleading statements cuts against an inference of scienter.  *See, e.g., In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 389 (2d Cir. 2021) (summary order) (finding that misleading statements regarding the feasibility of an ultimately doomed turbine project made in the context of the company's ongoing disclosures about known problems with the project, plausibly suggested an inference that the company believed it was implementing what it believed to be a workable solution).  To the contrary, fora such as the Quarterly Updates or investor presentations were precisely the contexts in which Defendant would have been expected, if not obligated, to reveal a dramatic change in the Funds' investment strategy.  Defendant's failure to so, and instead persistent pronouncements of an obverse

investment approach, supports an inference of conscious wrongdoing.

Assuming the allegations in the FAC to be true and viewing them holistically,

the Court concludes that under these circumstances, the inference of

fraudulent intent is at least as strong as any opposing inference, and thus that

Lehigh has adequately alleged scienter.

### g.    Lehigh Adequately Pleads Reasonable Reliance

Defendant argues that any reliance on Defendant's purported

misstatements is unreasonable given Lehigh's representations in the

Subscription Agreement and its own sophistication (*see* Def. Supp. Br. 27), and

Defendant's "extensive and express disclaimers" (Def. Supp. Reply 10; *see also*

Def. Supp. Br. 26-27).  The Court agrees with Lehigh that Defendant's

boilerplate disclosures fail to render Lehigh's reliance on the specific

representations at issue here unreasonable.

Defendant points to statements in the PPM that "[t]he Fund may change

any of its investment strategies without prior consent of, or notice," to Lehigh

(Wheeler Decl., Ex. 1 (U.S. Fund PPM) at 20; *id.*, Ex. 2 (Global PPM) at 21), to

argue that it was unreasonable for Lehigh to believe Defendant would only

change the investment strategy after first informing Lehigh (Def. Supp.

Reply 10).  However, as discussed *supra*, that argument fails because

Defendant's warning that it may change the investment strategy is different

than Lehigh's allegations that Defendant completely repudiated its investment

strategy, as Lehigh and other Plaintiffs allege here.  *See Caiola* v. *Citibank, N.A.,*

*N.Y.*, 295 F.3d 312, 330 (2d Cir. 2002) (explaining that "[a] disclaimer is

generally enforceable only if it tracks the substance of the alleged misrepresentation," and finding reliance reasonable where "[t]he disclaimer provisions contained in the [agreements] fall well short of tracking the particular misrepresentations alleged" (internal quotation marks and citation omitted)). Furthermore, Defendant disclosed some information about a change in strategy, but in so doing made material misrepresentations about the Funds' directional exposure. *See id.* Finally, Lehigh's representations that it conducted its own "independent investigations" and had the "knowledge and experience" needed to "evaluat[e] the merits and risks" of the Funds (*see* Wheeler Decl., Ex. 3 (Feb. 2019 Subscription Agreement) at § II(E), (H), (K)), does not give Defendant *carte blanche* to make fraudulent or material misrepresentations. *Caiola*, 295 F.3d at 330-31 (holding that general disclaimers are insufficient to defeat reasonable reliance on material misrepresentations as a matter of law, even by a sophisticated party).

In sum, Lehigh has adequately pleaded the requisite elements of its securities fraud, common-law fraud, and negligent misrepresentation claims. Therefore, Defendant's supplemental motion to dismiss those claims must be denied.

## C. The Court Grants Leave to Amend in Part

Plaintiffs request leave to amend their pleadings to the extent the Court has concluded that Plaintiffs' claims are deficient. (Pl. Opp. 60 n.52). Federal Rule of Civil Procedure 15(a)(2) instructs courts to freely give leave to amend "when justice so requires." *McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184,

200 (2d Cir. 2007); *see also* Fed. R. Civ. P. 15(a).  "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'"  *Williams* v. *Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam) (quoting *New York* v. *Green*, 420 F.3d 99, 104 (2d Cir. 2005)).  And where, as here, a case "combines a complex commercial reality with a long, multi-prong complaint," the Circuit has encouraged courts to grant leave to amend, because "pleading defects may not only be latent, and easily missed or misperceived without full briefing and judicial resolution; they may also be borderline, and hence subject to reasonable dispute."  *Loreley Fin. (Jersey) No.3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

Given the opportunities to amend Plaintiffs have already been afforded, as well as the granularity with which Defendant's dismissal arguments were discussed at the pre-motion conference (*see generally* Dkt. #59), the Court is reluctant to grant Plaintiffs open-ended leave to amend their pleadings. However, the Court is cognizant that Plaintiffs may have come into possession of meaningful information either during the briefing schedule or subsequent to the completion of their briefing.  Indeed, at least one Plaintiff has indicated as much.  (*See, e.g.*, Pl. Opp. 27 n.10).  To account for this possibility, the Court will permit Plaintiffs leave to amend insofar as they have acquired additional documents that may serve as a basis for amendment, or for other similar good cause shown.  The Court adopts this approach to balance the liberal amendment standard with the risk of undue prejudice that may flow to Defendant from permitting Plaintiffs, some of whom have already amended, a

chance to do so yet again, irrespective of whether they have come into possession of additional information.  *See Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000) (affirming district court's denial of leave to amend where Plaintiff "had all the information necessary" and "nothing he learned in discovery or otherwise altered that fact").

## CONCLUSION

For the reasons set forth above, Defendant's motions to dismiss are GRANTED IN PART and DENIED IN PART as set forth in this Opinion.

Plaintiffs are hereby ORDERED to notify the Court, on or before **October 30, 2020**, regarding whether they will file amended pleadings.

The Clerk of Court is directed to docket this Opinion in case numbers No. 20 Civ. 5615, No. 20 Civ. 5817, No. 20 Civ. 7061, No. 20 Civ. 7154, No. 20 Civ. 7606, No. 20 Civ. 7842, No. 20 Civ. 7952, No. 20 Civ. 8642, No. 20 Civ. 9478, No. 20 Civ. 9479, No. 20 Civ. 9587, and No. 20 Civ. 10028.

The Clerk of Court is further directed to terminate the motions pending at No. 20 Civ. 5615, Dkt. #82; No. 20 Civ. 5817, Dkt. #54; No. 20 Civ. 7061, Dkt. #54; No. 20 Civ. 7154, Dkt. #70; No. 20 Civ. 7606, Dkt. #71; No. 20 Civ. 7842, Dkt. #52; No. 20 Civ. 7952, Dkt. #70; No. 20 Civ. 9478, Dkt. #62; No. 20 Civ. 9479, Dkt. #62; No. 20 Civ. 9587, Dkt. #51; and No. 20 Civ. 10028, Dkt. #44.

SO ORDERED.

Dated:      September 30, 2021
            New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge